1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TIMOTHY S. VERNOR,

               Plaintiff,

    v.

AUTODESK, INC.,

               Defendant.

CASE NO. C07-1189RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion (Dkt. # 20) from Defendant Autodesk, Inc. ("Autodesk") to either dismiss Plaintiff Timothy Vernor's complaint for failure to state a claim, or to grant summary judgment.  For the reasons stated below, the court DENIES the motion.

## II.  BACKGROUND

Mr. Vernor makes his living selling goods on eBay, the well-known internet auction site.  He has two packages of Autodesk's copyrighted AutoCAD software, and hopes to sell them on eBay.  He brought this action for declaratory relief because Autodesk's past actions give him reason to believe that Autodesk will try to stop his sales.

ORDER – 1

In 2005, Mr. Vernor purchased an authentic, used AutoCAD package[1] at a garage sale and put it up for auction on eBay.  Autodesk responded by sending a Digital Millennium Copyright Act ("DMCA") notice to eBay claiming that the sale would infringe its copyright.  EBay suspended the auction.  Mr. Vernor responded with a DMCA counter-notice claiming that his sale was lawful, to which Autodesk never responded.  *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1179 (C.D. Cal. 2001) (describing notice and counter-notice procedure under section 512 of the DMCA, 35 U.S.C. § 512).  EBay reinstated the auction, and Mr. Vernor sold the AutoCAD package without further interference from Autodesk.

In 2007, Mr. Vernor bought four authentic, used AutoCAD packages from an office sale at Cardwell/Thomas Associates ("CTA"), a Seattle architecture firm.  Mr. Vernor sold three packages on eBay, but each time he put a package up for auction, an exchange of DMCA notices from Autodesk, suspension of the auction by eBay, counter-notices from Mr. Vernor, and reinstatement of the auction followed.  When Mr. Vernor attempted to sell the fourth AutoCAD package, Autodesk filed another DMCA notice, and eBay responded by suspending Mr. Vernor's eBay account for one month for repeat infringement.

In both 2005 and 2007, Mr. Vernor notified Autodesk either in writing or over the telephone that he had acquired the AutoCAD packages lawfully, and that he was not infringing any Autodesk copyright.  In 2005, an Autodesk attorney told him that Autodesk does not allow any resale of its software products, and that any resale would infringe Autodesk's copyright.  In 2007, an Autodesk attorney wrote Mr. Vernor and

---

[1]It appears that each AutoCAD package contains one or more compact or floppy disks encoded with at least one copy of the AutoCAD software, a copy of a license agreement, and perhaps other documentation.

ORDER – 2

explained that he would advise Autodesk "to take further action" if Mr. Vernor did not cease his efforts to sell Autodesk software.

Mr. Vernor now has two AutoCAD packages that he wishes to sell.  By tracing the serial numbers on the packages, Autodesk has determined that both were originally transferred from Autodesk to CTA in a settlement of an unrelated dispute.  According to the Settlement Agreement, CTA paid just over $44,000.  LaHaie Decl., Ex. A, ¶ 1.  That sum "include[d] the acquisition by [CTA] of ten (10) packages of AutoCAD®, Release 14 software . . . ."  *Id.* ¶ 1.  Autodesk shipped the packages to CTA; CTA eventually resold some of the packages to Mr. Vernor, including the two AutoCAD packages that Mr. Vernor now possesses.

In the Settlement Agreement, CTA agreed to "adhere to all terms of the [attached] Autodesk Software License Agreement."  LaHaie Decl., Ex. A, ¶ 4.  The License Agreement ("License") is substantially identical to one included inside each AutoCAD package.  The License Agreement grants a "nonexclusive, nontransferable license to use the enclosed program . . . according to the terms and conditions herein."  License: Grant of License.[2]  The License imposes various restrictions on users of the software.  *Id.* (regulating number of computers on which user can install software, number of users, software copying, and copying of documentation).  It also imposes several "Restrictions," including a prohibition on "rent, lease, or transfer [of] all or part of the Software, Documentation, or any rights granted hereunder to any other person without Autodesk's prior written consent."  License: Restrictions (also prohibiting use outside of western hemisphere, modification or reverse-engineering of software, and removing labels).

---

[2]The License contains no numbered paragraphs.  When citing the License, the court will refer to the name of the heading to the left of the cited paragraph.

ORDER – 3

### III.  ANALYSIS

Mr. Vernor seeks a declaration that his resale of AutoCAD is lawful, and also presses a claim for unfair competition under either California or Washington law. Autodesk moves the court to either dismiss his claims for failure to state a claim, or alternatively, to enter summary judgment.  *See* Fed. R. Civ. P. 12(b); Fed. R. Civ. P. 56.

The court's resolution of this motion relies only on facts that do not appear to be in dispute.  At least for purposes of this motion, Autodesk has not disputed Mr. Vernor's account of how he acquired his AutoCAD packages or of his attempts to auction his copies on eBay.  Mr. Vernor, in turn, has not disputed Autodesk's account of how CTA acquired its AutoCAD packages, or that two of those packages are now in his possession. He has also not disputed the authenticity of the Settlement Agreement and License that Autodesk submitted in support of its motion.  Because these facts go beyond the scope of Mr. Vernor's complaint, however, the court must treat this motion as one for summary judgment.  Fed. R. Civ. P. 12(d).

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party must initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  When confronted with purely legal questions, the court does not defer to the non-moving party.

ORDER – 4

## A.        Mr. Vernor has Standing to Pursue Declaratory Relief.

At the outset, the court must address Autodesk's contention that Mr. Vernor lacks standing to sue for declaratory relief regarding his future sales of AutoCAD packages. Mr. Vernor invokes the Declaratory Judgment Act, which provides as follows:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).  The term "case of actual controversy" in the Act is coextensive with the grant of jurisdiction to consider "Cases" and "Controversies" in Article III, Section Two of the Constitution.  *MedImmune, Inc. v. Genentech, Inc.*, 127 S.Ct. 764, 771 (2007).  In determining if it has subject matter jurisdiction over a claim for declaratory judgment, a court must decide as follows:

> [W]hether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Id.* (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Autodesk contends that Mr. Vernor's fear of adverse action arising from future attempts to auction AutoCAD packages is not a controversy of sufficient immediacy. Autodesk is wrong.  Mr. Vernor's allegations establish that he has a practice of selling AutoCAD packages, that he has packages he is prepared to sell, and that his past attempts to sell have resulted in harm.  The harm is twofold.  First, Autodesk delays his eBay auctions by posting DMCA notices, forcing him to issue counter-notices to reinstate the auctions.  Second, Autodesk's repeated notices resulted in a one-month suspension of Mr. Vernor's eBay account, and a resulting temporary inability to engage in his business.  Mr. Vernor fears that Autodesk will repeat this conduct.  On the record before the court, that fear is well-founded.  Moreover, an Autodesk attorney threatened to "take further action"

ORDER – 5

against Mr. Vernor if continued to sell AutoCAD packages.  Under these circumstances,

Mr. Vernor's declaratory judgment claim presents a controversy of sufficient immediacy.

Autodesk's additional contention that Mr. Vernor's harm flows from eBay's

policies rather than Autodesk is specious.  *See* Autodesk Mot. at 17.  EBay would have

taken no action against Mr. Vernor but for Autodesk's allegations.  There is no basis to

blame eBay for the consequences of Autodesk's copyright enforcement efforts.

**B.     Mr. Vernor Is Entitled to the Protection of the First Sale Doctrine.**

**1.        If It Applies, the First Sale Doctrine Immunizes Mr. Vernor.**

If there were no License, there is no dispute that Mr. Vernor's resale of the

AutoCAD packages would be legal.  The first sale doctrine permits a person who owns a

lawfully-made copy of a copyrighted work to sell or otherwise dispose of the copy:

> Notwithstanding the provisions of section 106(3) [17 USCS § 106(3)], the
> owner of a particular copy or phonorecord lawfully made under this title, or
> any person authorized by such owner, is entitled, without the authority of
> the copyright owner, to sell or otherwise dispose of the possession of that
> copy or phonorecord.

17 U.S.C. § 109(a).  There is no dispute that the copy of Autodesk software contained in

each AutoCAD package was lawfully made.[3]  If there were no License, there would be no

dispute that CTA owned the AutoCAD packages at issue, that Mr. Vernor now owns the

packages, and that he can dispose of them as he wishes.

The first sale doctrine is a narrow limitation on a copyright holder's rights.  The

Copyright Act gives a copyright holder the exclusive right to reproduce his copyrighted

work (17 U.S.C. § 106(1)), the exclusive right to prepare derivative works based on his

copyrighted work (17 U.S.C. § 106(2)), and the exclusive right to distribute copies of his

work (17 U.S.C. § 106(3)).  When a copyright holder chooses to sell a copy of his work,

---

[3]The court's discussion focuses on the software, but its discussion applies with equal
force to other copyrighted items included in each AutoCAD package.  *See* n.1, *supra*.

ORDER – 6

however, he "exhaust[s] his exclusive statutory right to control its distribution." *Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998). Because a first sale exhausts the copyright holder's distribution right, future distributions of the copy do not implicate the Copyright Act. *United States v. Wise*, 550 F.2d 1180, 1187 (9th Cir. 1977) (noting that after "first sale," a vendee "is not restricted by statute from further transfers of that copy"). A first sale does not, however, exhaust other rights, such as the copyright holder's right to prohibit copying of the copy he sells. *Wise*, 550 F.2d at 1187 (noting that "other copyright rights (reprinting, copying, etc.) remain unimpaired"). For example, the first sale doctrine permits a consumer who buys a lawfully made DVD copy of "Gone With the Wind" to resell the copy, but not to duplicate the copy.

Autodesk's motion turns on its assertion that, because of the License, the transfer of AutoCAD packages to CTA was not a sale. Without a sale, there can be no "first sale." Or, phrased in the language of § 109(a), without a sale, CTA was not an "owner of a . . . copy" of Autodesk software. If CTA was not an owner within the meaning of the statute, Mr. Vernor is also not an owner within the meaning of § 109(a).

Autodesk correctly asserts that mere possession of a copyrighted copy pursuant to a license is not a sale, and thus not a basis to invoke the first sale doctrine. The Supreme Court has acknowledged as much, if only in passing. *See Quality King*, 523 U.S. at 146-147 ("[T]he first sale doctrine would not provide a defense to . . . any non-owner such as a bailee, a licensee, a consignee, or one whose possession of the copy was unlawful."). The Ninth Circuit recognizes that a mere licensee in possession of a copy cannot rely on the first sale doctrine. *See Wise*, 550 F.2d at 1188-89. Indeed, the Copyright Act itself declares that the first sale doctrine does not "extend to any person who has acquired possession of the copy or phonorecord from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it." 17 U.S.C. § 109(d); *Los Angeles News*

ORDER – 7

*Serv. v. Tullo*, 973 F.2d 791, 799 n.8 (9th Cir. 1992) (citing § 109(d) and noting that licensees cannot authorize sales).

The critical dispute here, however, is whether Autodesk's transfer of AutoCAD packages to CTA was a sale or a mere transfer of possession pursuant to a license. If the transaction was a sale, then the restrictions of the License give rise, at most, to a breach of contract claim:

> [A] "first sale" buyer's disregard of restriction on resale does not make buyer – or subsequent buyer an infringer; [a] copyright holder's remedy is suit for breach of contract containing the restrictions.

*Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143, 1152 (9th Cir. 1996) (citing *Am. Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661, 664 (5th Cir. 1978)). If Autodesk sold the AutoCAD packages, then the License's ban on transferring the software is of no consequence under the Copyright Act. *Id.*, *see also Wise*, 550 F.2d at 1187 ("[T]he exclusive right to vend the transferred copy rests with the vendee, who is not restricted by statute from further transfers of that copy, even though in breach of an agreement restricting its sale.").

### 2.    What is a Sale?  The Ninth Circuit Answers in *Wise*.

No bright-line rule distinguishes mere licenses from sales. Several principles govern. The court must analyze the "arrangement at issue and decide whether it should be considered a first sale." *Wise*, 550 F.2d 1189 (quoting *United States v. Bily*, 406 F. Supp. 726, 731 (E.D. Pa. 1975)). The label placed on a transaction is not determinative. *Cf. Wise*, 550 F.2d at 1192 (finding that some contracts, "consistent with their designation as loans or licenses," are not sales).

*Wise* charts a path to distinguishing sales from non-sales in determining if the first sale doctrine applies. The *Wise* court considered numerous transfer contracts between movie studios and recipients of movie prints, and found that almost all of them were

ORDER – 8

licenses, loans, or other non-sale transactions. Many of the contracts "reserved title to the film prints" in the studio, and required that the recipients return the prints following the expiration of a fixed term. *Wise*, 550 F.2d at 1190. Those contracts were labeled "licenses," and all transferred "only limited rights for the exhibition or distribution of the films for a limited purpose and for a limited period of time." *Id.* In some contracts, the studios did not expressly reserve title to the film print. Nonetheless, the court found that this omission was not determinative because "the general tenor of the entire agreement [was] inconsistent" with a sale. *Id.* at 1191. As to all of these contracts, the court found that they were not "first sales, since both on their face and by their terms they were restricted licenses and not sales." *Id.* at 1190. The court reached the same conclusion as to several "V.I.P. agreements" in which studios loaned film prints to movie stars for their private use, expressly retaining title to the prints. *Id.* at 1192.

When the *Wise* court considered three types of contracts that allowed the recipient to keep the film print, however, it found sales. One contract allowed a television network receiving the film prints to retain one print, without restrictions on its resale. *Wise*, 550 F.2d at 1191-92 & n.20. Another contract, for the sale of a film print to actress Vanessa Redgrave ("the Redgrave Contract"), required Ms. Redgrave to pay a fee to receive a film print that was subject to draconian transfer restrictions. *Id.* at 1192. Ms. Redgrave could use the print only for her "personal use and enjoyment," was required to retain possession of the print "at all times," and could not sell, lease, license, or loan the print to any other person. *Id.* Despite the absolute bar on transferring the film, the court found that the "transaction strongly resembl[ed] a sale with restrictions on the use of the print." *Id.* The court held that the defendant could rely on the first sale doctrine with respect to his later sales of the print. *Id.* at 1192, 1194. Finally, the court found that film prints transferred solely for salvage or destruction were sold. *Id.* at 1192-93.

ORDER – 9

1
2
3
4
5
6
7
8

In comparing the transactions found to be sales in *Wise* with those that were not, the critical factor is whether the transferee kept the copy acquired from the copyright holder. When the film studios required that prints be returned, the court found no sale. When the studios did not require the transferee to return the prints, the court found a sale.[4] Even a complete prohibition on further transfer of the print (as in the Redgrave Contract), or a requirement that the print be salvaged or destroyed, was insufficient to negate a sale where the transferee was not required to return the print.

9
10
11
12
13
14
15
16

Taking direction solely from *Wise*, the court concludes that the transfer of AutoCAD packages from Autodesk to CTA was a sale. Like the Redgrave Contract, the Settlement Agreement and License allowed CTA to retain possession of the software copies in exchange for a single up-front payment. Like the Redgrave Contract, the Settlement Agreement and License imposed onerous restrictions on transfer of the AutoCAD copies. Similar to the salvage transactions in *Wise*, the License required CTA to destroy the software in the event that it purchased a software upgrade.[5] License:

17
18
19
20
21
22
23

[4]In *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 103 (9th Cir. 1960), the court examined a license agreement that allowed the licensee to retain possession of film prints indefinitely. The *Wise* court cited the case favorably. 550 F.2d at 1189, 1190 n.17. Although *Hampton* considered and rejected the defendant's contention that a movie print was assigned to him rather than merely licensed, *Hampton*, 279 F.2d at 103, there was no first sale issue, but rather a dispute about whether the defendant could *display* the movie. The *Hampton* court held that no assignment of the plaintiff's display right had occurred, because the plaintiff had merely licensed display under certain conditions. *Id.* at 103. The defendant did not invoke the first sale doctrine because there is no indication that he wanted to sell the film print at issue.

24
25
26
27
28

[5]Autodesk presents evidence that, before CTA sold the AutoCAD packages to Mr. Vernor, it bought upgraded AutoCAD software. LaHaie Decl. ¶ 4. Autodesk asserts that the License required CTA to destroy the AutoCAD packages, and barred their resale. Autodesk Mot. at 6 n.1; Reply at 9. This contention is fodder for a breach of contract claim against CTA, but it does not affect Mr. Vernor. Even if Autodesk could revive its "exhausted" distribution rights by reclaiming title to software copies it sold, Autodesk did not reclaim title. It merely required CTA to destroy its copies. License: Upgrades & Updates. There is no basis to distinguish this transaction from the salvage transactions that were found to be sales in *Wise*.

ORDER – 10

Upgrades and Updates.  Under *Wise*, however, this is a "sale with restrictions on use," and is a sufficient basis to invoke the first sale doctrine.

### 3.   A Trio of Ninth Circuit Decisions Reaches Results Contrary to *Wise*.

As far as the court is aware, *Wise* is the only Ninth Circuit precedent analyzing what constitutes a "sale" for purposes of invoking the first sale doctrine.[6]  In the more than 30 years since *Wise*, no Ninth Circuit opinion has questioned it, much less overruled it.  It retains vitality in recent Ninth Circuit jurisprudence.  *See Denbicare*, 84 F.3d at 1150.  Three opinions issued after *Wise*, however, consider the same "sale" question in a different context, and arrive at contrary results.

In a trio of decisions, the Ninth Circuit considered § 117 of the Copyright Act, which grants owners of computer software copies a limited right to copy their copies.  As with § 109(a), only an "owner of a copy" of software can invoke § 117(a):

> Notwithstanding the provisions of section 106 [17 USCS § 106], it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided [that the owner meets two conditions.]

17 U.S.C. § 117(a).  Section 117 is critical for software users, because in using software, a user's computer inevitably makes one or more copies of it.  *Madison River Mgmt. Co. v. Business Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 537-38 (M.D.N.C. 2005) (explaining statutory history of § 117).  Section 117 ensures that those who buy software cannot be held liable for copying that is essential to their use of the software.  *Madison River*, 387 F. Supp. 2d at 538; 17 U.S.C. § 117(a)(1) (requiring that copying be "essential step in the utilization of the computer program").

---

[6]The court in *Los Angeles News Serv. v. Tullo* touched the question in a footnote.  973 F.2d 791, 799 n.8 (9th Cir. 1992).  In *Tullo*, there was no serious contention that a first sale had occurred, because the defendant had copied plaintiff's copyrighted material without authorization.  *Id.* at 792, 799 n.8.

ORDER – 11

As with the first sale doctrine, courts have determined that a person becomes an "owner of a copy" of software under § 117 only in certain transactions.  *See*, *e.g.*, *Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769, 785 (9th Cir. 2006) ("[I]f a software developer retains ownership of every copy of software, and merely licenses the use of those copies, § 117 does not apply.").

In *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993), the court considered a software license that controlled the use of the software, and declared that "any possession" of the software "not expressly authorized under this License" is prohibited.  *Id.* at 517 n.3.  The court devoted its attention to whether the use of the software by an unlicensed repair service violated the plaintiff's copyright.  In a single footnote, without analysis or explanation, the court declared that "[S]ince MAI licensed its software, [its] customers do not qualify as 'owners' of the software and are not eligible for protection under § 117."  *Id.* at 519 n.5.  The court did not cite *Wise*.

In *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1333 (9th Cir. 1995), the court tacitly assumed that licensees could not invoke § 117.  The panel conceded that customers to whom the plaintiff had "sold its software outright" could rely on § 117, but implicitly concluded that licensees could not.  *Id.* (finding licenses, not sales, in contract banning duplication of software or use by third parties and in contract requiring users to pay a fee on selling their software copies).  Again, the court engaged in no analysis of the license terms, and did not cite *Wise*.  The *Triad* court cited *MAI* repeatedly (*e.g.*, 64 F.3d at 1333, 1335), but did not cite the sole footnote in *MAI* addressing the applicability of § 117.

Finally, in *Wall Data*, the court briefly analyzed a purported license agreement to determine if it was a sale that would permit the invocation of § 117.  The license agreement imposed restrictions on copying the software, restrictions on the number of

ORDER – 12

users, and restrictions on transferring the software on computers within the licensed entity. *Wall Data*, 447 F.3d at 775 n.5. The license imposed no limits on resale of the software. *Id.* The court concluded that the restrictions were "sufficient to classify the transaction as a grant of license to Wall Data's software, and not a sale of Wall Data's software." *Id.* at 785 (citing *MAI*). The court reasoned that "such restrictions would not be imposed on a party who owned the software." *Id.*[7] The court did not cite *Wise*.

If the court were to apply this trio of precedent (the "*MAI* trio") to the license before it, it would conclude that Autodesk did not sell AutoCAD copies to CTA. The terms of the Autodesk License are either indistinguishably similar to or more restrictive than the licenses found not to be sales in the *MAI* trio. Like the defendants in the *MAI* trio, CTA agreed to restrictions on its use of the software. *Compare* License: Grant of License (setting forth concurrent use and copying restrictions) *with MAI*, 991 F.2d at 517 n.3 (same); *Wall Data*, 447 F.3d at 775 n.5 (same). The restrictions in the License are more severe, because they prohibit resale of the software without Autodesk's permission. *Cf. MAI*, 991 F.2d at 517 n.3 (no restrictions on resale); *Triad*, 64 F.3d at 1333 (requiring owners to pay fee on resale); *Wall Data*, 447 F.3d at 775 n.5 (no restrictions on resale). If restrictions like those in the *MAI* trio are sufficient to warrant a "no sale" finding, then the transfer of AutoCAD copies from Autodesk to CTA was not a sale.

### 4. The Court Must Follow *Wise*, Not the *MAI* Trio.

The court holds that it must follow *Wise*, and not the *MAI* trio. Where opinions of three-judge Ninth Circuit panels conflict, the court must rely on the earliest opinion.

---

[7]As an alternate holding, the *Wall Data* court concluded that even if the defendant "owned" the software within the meaning of § 117, it had not met other conditions of § 117. 447 F.3d at 785. Because the court phrased its holdings as alternatives, neither are dicta. *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*.") (italics in original).

*United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005). The court has carefully considered the tension between *Wise* and the *MAI* trio, and finds the decisions in irreconcilable conflict as applied to the critical issue in this case. Autodesk prevails in its motion if the court follows the *MAI* trio, but loses if the court follows *Wise*. Comparing *Wall Data* to *Wise* gives the clearest snapshot of the conflict. The *Wall Data* court held that the license restrictions before it "were sufficient to classify the transaction as . . . not a sale of Wall Data's software." 447 F.3d at 785. In *Wise*, harsher license restrictions than those in *Wall Data* were insufficient to prove the absence of a first sale. *Wise*, 550 F.2d at 1192 (discussing the Redgrave Contract). The court cannot ignore the conflict.

Because the conflict between *Wise* and the *MAI* trio places the court in the uncomfortable position of choosing which Ninth Circuit precedent to follow, the court has considered possibilities for avoiding the conflict. As the court explains below, it finds the conflict unavoidable.

First, the court has considered whether the cases are distinguishable because *Wise* considered the statutory predecessor to § 109, and the predecessor did not employ the phrase "owner of a . . . copy." 550 F.2d at 1187 (citing prior § 27 of Copyright Act, which stated that "nothing in this title shall be deemed to forbid . . . the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained"). The difference in language has no substantive impact, however, because the *Wise* court applied the "judicial gloss" on the prior statute, and that gloss "require[d] a transfer of title before a 'first sale' can occur." *Id.* The court concludes that deciding whether title to a copy has been transferred (as in *Wise*) is no different than deciding whether the transferee is the "owner of a . . . copy" (as in the *MAI* trio).

Second, the court considers, but rejects, the possibility that the analysis of whether a "first sale" has occurred might be different for purposes of § 109 (at issue in *Wise*) and

ORDER – 14

§ 117 (at issue in the *MAI* trio).  The court rejects the possibility because both statutes use the same "owner of a . . . copy" language.[8]  The court presumes that identical phrases used within the Copyright Act have identical meaning.  *See Moldo v. Matsco, Inc. (In re Cybernetic Servs., Inc.)*, 252 F.3d 1039, 1051 (9th Cir. 2001) (interpreting Patent Act).  Nothing before the court overcomes the presumption in this case.

The court also concludes that it cannot distinguish *Wise* because it was a criminal case, and the government carried the burden of proving the absence of a first sale.  550 F.2d at 1192.  No Ninth Circuit decision addresses who bears the burden to prove a first sale or the absence thereof in a civil case.  Some authority suggests that a defendant should bear the burden.  *Am. Int'l Pictures*, 576 F.2d at 663-65 (acknowledging question regarding burden, but declining to resolve it); H.R. Rep. No. 94-1476, at 81, *as reprinted in* 1976 U.S.C.C.A.N. 5659, at 5695 ("House Report") ("It is the intent of the Committee . . . that . . . the burden of proving whether a particular copy was lawfully made or acquired should rest on the defendant."); *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785 MMC, 2004 U.S. Dist. LEXIS 16861, at *25 (N.D. Cal. Aug. 17, 2004) (placing burden on defendant, citing House Report).  The court need not determine who bears the burden in this case.  It appears that all evidence relevant to whether the Autodesk-CTA transaction was a sale is before the court, regardless of who produced it.  In any event, the court finds no way to reconcile the contradictory holdings of *Wise* and the *MAI* trio as a result of different burdens of proof.

Finally, although the court recognizes the tsunami of technological change between the decisions in *Wise* and the *MAI* trio, it finds that the change provides no basis

---

[8]Section 117(a) uses the phrase "owner of a copy," whereas § 109(a) uses the phrase "owner of a particular copy."  There is no suggestion that the word "particular" makes a material difference.

ORDER – 15

to avoid the conflict between the decisions. *Wise* considered motion picture film prints, whereas the *MAI* trio considered computer software. As the court noted in *Wall Data*:

> Software fundamentally differs from more traditional forms of medium, such as print or phonographic materials, in that software can be both more readily and easily copied on a mass scale in an extraordinarily short amount of time and relatively inexpensively. One of the primary advantages of software, its ability to record, concentrate and convey information with unprecedented ease and speed, makes it extraordinarily vulnerable to illegal copying and piracy.

*Wall Data*, 447 F.3d at 781 (quoting *Adobe Sys. Inc. v. Stargate Software Inc.*, 216 F. Supp. 2d 1051, 1059 (N.D. Cal. 2002)). As an initial matter, the court notes that *Wall Data* adopted this observation in deciding if the defendant could invoke the defense of fair use, an issue that is not before this court. Weighing policy arguments is one thing when considering fair use, which is an evolving judicially-created limitation on a copyright holder's rights. *Wall Data*, 447 F.3d at 777. It is another matter entirely to weigh policy considerations when determining which Ninth Circuit precedent to follow. Statutes like § 117 show that Congress can adapt the Copyright Act to target evolving technologies. The court declines to choose between *Wise* and the *MAI* trio based on a policy judgment. Moreover, although technology has changed, the question at the core of this case is not technological. Mr. Vernor does not seek to take advantage of new technology to ease copying, he seeks to sell a package of physical objects which contain copies of copyrighted material. The essential features of such sales vary little whether selling movie prints via mail (as in *Wise*) or software packages via eBay.

For the reasons stated above, the court follows the *Wise* course and concludes that the transfer of AutoCAD packages from Autodesk to CTA was a sale with contractual restrictions on use and transfer of the software. Mr. Vernor may thus invoke the first sale doctrine, and his resale of the AutoCAD packages is not a copyright violation.

ORDER – 16

5.  **Because** *Wise* **Disposes of the First Sale Question Before the Court, the Court Acknowledges, But Does Not Rely Upon, Authority from Other Circuits and District Courts.**

In much of their argument, the parties encourage the court to adopt the reasoning of various district courts and courts of appeal other than the Ninth Circuit.  The court has reviewed each of those cases, and acknowledges great divergence of opinion among courts attempting to distinguish between mere licenses and sales.  None of them address the conflict between *Wise* and the *MAI* trio.  Many reach results that favor Autodesk.  *E.g.*, *Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086 (N.D. Cal. 2000); *Novell*, *supra*; *Stargate Software*, 216 F. Supp. 2d 1051; *Microsoft Corp. v. Harmony Computers & Elecs. Inc.*, 846 F. Supp. 208 (E.D.N.Y. 1994).  Many reach results that favor Mr. Vernor.  *E.g.*, *Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005); *Softman Prods. Co. v. Adobe Sys. Inc.*, 171 F. Supp. 2d 1075 (N.D. Cal. 2001); *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F. Supp. 2d 1218 (D. Utah 1997).  These cases are persuasive authority.  *Wise*, however, is binding precedent.  The court therefore declines to discuss authority from other circuits and district courts in greater detail.

**B.  Mr. Vernor's Resale of AutoCAD Packages is Not Contributory Copyright Infringement**.

Autodesk devoted its motion to its contention that it had not sold the AutoCAD packages to CTA, and thus Mr. Vernor could not invoke the first sale doctrine in his resales of the packages.  The court rejected that contention in the prior section.

In its reply brief, however, Autodesk switched gears.  It argued for the first time that Mr. Vernor's resales are contributory copyright infringement[9] because he is inducing the people to whom he resells to copy AutoCAD software in violation of the Copyright

---

[9]To prove contributory infringement, a plaintiff must prove that the defendant knowingly contributed to another's infringement, and that his contribution was material to the infringement. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996).

ORDER – 17

Act.  Ordinarily, the court would not consider an argument raised for the first time in a reply brief.  In this case, however, the authority the court has already discussed permits it to reject Autodesk's contention without further input from Mr. Vernor.

As the court has previously discussed, § 117 of the Copyright Act permits owners of copies of computer software to copy the software if doing so is essential to the use of the software.  *See* 17 U.S.C. § 117(a); Part III.A.3, *supra*.  Like § 109 and the first sale doctrine it codifies, the right to copy that § 117 confers is contingent upon the user being an "owner of a copy."  17 U.S.C. § 117(a).  The court has already concluded that Mr. Vernor (and by extension, those to whom he resells) is the owner of the copies of AutoCAD software contained in the packages he bought.  The persons to whom he resells, therefore, may copy AutoCAD software in accordance with § 117.

Autodesk does not contend that Mr. Vernor is inducing his customers to copy AutoCAD software in a manner beyond the scope of § 117.  There is no indication that Mr. Vernor's customers will make copies other than those necessary for their use of the software.  Moreover, there is no indication that Mr. Vernor *knows* that his customers will make copies other than those necessary for their use of the software.  For those reasons, there is no merit to the contention that Mr. Vernor induces copyright infringement.[10]

## C.   Autodesk Has Not Established that Its License Binds Mr. Vernor or His Customers.

Although Mr. Vernor's resale of AutoCAD packages is not a copyright violation, he is concerned that Autodesk asserts he is contractually bound by the License.  In

---

[10] The court's discussion of Autodesk's belated contributory infringement argument highlights another reason that the phrase "owner of a copy" in § 117 has the same meaning as "owner of a . . . copy" in § 109.  *See supra* Part III.B.4.  If "owner of a copy" in § 117 were more restrictive, then an "owner" with a right to resell his copy under § 109 would nonetheless violate the Copyright Act by inducing his customer to unlawfully copy the software.  There is no indication that Congress enacted § 117 as a *sub silentio* partial nullification of § 109 as it applies to computer software purchasers.

ORDER – 18

reviewing Autodesk's motion and its reply, the court finds a few suggestions that Autodesk believes that the License binds Mr. Vernor. *See* Autodesk Mot. at 2 (intimating that Mr. Vernor is a "subsequent licensee"). In support of its belated contributory infringement contentions, it also suggests that Mr. Vernor's customers are bound by the Autodesk License. Reply at 8 (arguing that Mr. Vernor's customers would make more copies than permitted by the Autodesk License).

Autodesk contends that "the law clearly rejects" Mr. Vernor's claim that he is free from the Autodesk License. Autodesk Mot. at 13-14. In doing so, however, it relies solely upon *Novell*, a case that provides no support for Autodesk's argument. *Novell*, like every other case the court has discussed in its order today, is concerned solely with whether a license makes the transaction between a copyright holder and the first transferee a "first sale." 2004 U.S. Dist. LEXIS 16861 at *22-39. Nothing in *Novell* supports the notion that downstream purchasers of software are bound by the terms of a license between the copyright holder and the first licensee.

Not only has Autodesk failed to surmount the thorny issues of privity and mutual assent inherent in its contention that its License binds Mr. Vernor and his customers, it has ignored the terms of the License itself. The Autodesk License is expressly "nontransferable." License: Grant of License. Autodesk does not explain how a nontransferable license can bind subsequent transferees.

The court cannot be certain if Autodesk actually asserts that its License binds Mr. Vernor or his customers. Autodesk certainly contends that the License negates a sale between itself and CTA. That issue is not to be conflated, however, with whether Mr. Vernor or his customers are bound by the License. Given the "nontransferable" terms of the License, and Autodesk's failure to cite authority for the proposition that the License binds downstream transferees, the court will not consider the issue further in this order.

ORDER – 19

If Autodesk believes that the License binds Mr. Vernor or his customers, it must file a new motion addressing that argument.

**D.     With One Possible Exception, Mr. Vernor's Unfair Competition Claims Withstand Dismissal.**

Mr. Vernor asserts that both Autodesk's enforcement practices and the License itself are unfair trade practices under either California or Washington law. 2d Amend. Complaint at ¶¶ 35-37. Autodesk does not make particularized arguments regarding the elements of these claims. Instead, it relies on its contentions that Mr. Vernor is attempting to infringe its copyright. The court has rejected that contention. To the extent that Mr. Vernor asserts that Autodesk's copyright enforcement methods are unlawful, the court has no basis to dismiss that claim or enter summary judgment against it.

As to Mr. Vernor's claim that the License itself is per se unlawful, he may lack standing. If, as the court discussed in Part III.C, *infra*, the License does not bind Mr. Vernor, then the court queries whether Mr. Vernor has standing to challenge Autodesk's use of the License. The Court therefore declines, at this time, to consider whether the License itself is unconscionable, or whether Autodesk's use of the License constitutes copyright misuse. The court will consider those questions only after determining whether the License binds Mr. Vernor.

**IV.   CONCLUSION**

For the reasons stated above, the court DENIES Autodesk's motion for dismissal or summary judgment (Dkt. # 20).

While awaiting the court's ruling on the instant motion, the parties have repeatedly stipulated to extensions of case management deadlines. Another stipulated extension is pending (Dkt. # 30). In light of its decision today, the court GRANTS the relief requested in the stipulation. The court amends the pending case management deadlines as follows:

ORDER – 20

| | |
|---|---|
| Fed. R. Civ. P. 26(f) Conference | June 13, 2008 |
| Fed. R. Civ. P. 26(a)(1) Initial Disclosures | June 27, 2008 |
| Joint Status Report and Discovery Plan | June 27, 2008 . |

In conferring pursuant to Fed. R. Civ. P. 26(f), the parties shall also discuss the following questions. The parties' joint status report shall state the parties' positions on these questions, but shall not offer extended argument.

1)   What issues remain in this litigation in the wake of this order? Will resolving those issues require additional discovery?

2)   Do Autodesk or Mr. Vernor contend that the License binds Mr. Vernor or persons to whom Mr. Vernor may sell his AutoCAD packages?

3)   In light of the parties' answers to the previous question, does Mr. Vernor have standing to pursue a claim that the Autodesk License itself is a form of unfair competition?

4)   Which state's law applies to Mr. Vernor's unfair competition claim(s)?

Dated this 20th day of May, 2008.

The Honorable Richard A. Jones
United States District Judge

ORDER – 21