1               Hon. Richard A. Jones

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

10 TIMOTHY S. VERNOR, an individual,   No. 2:07-cv-01189-RAJ

11     Plaintiff,     **AUTODESK'S MOTION FOR**
                **SUMMARY JUDGMENT**

12   v.

13 AUTODESK, INC., a Delaware corporation, **Note on Motion Calendar:**
                **March 27, 2009**

14     Defendant.     **ORAL ARGUMENT REQUESTED**

15

16

17

18

19

20

21

22

23

24

25

26

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF THE CASE ........................................................................................... 3

STATEMENT OF UNDISPUTED FACTS ......................................................................... 3

        1.     Autodesk's AutoCAD® Software and Licensing Practices ...................... 3

        2.     Licensing of the AutoCAD® Software to CTA ........................................ 5

        3.     Mr. Vernor's Purchase of the AutoCAD® Software from CTA ............... 7

ARGUMENT ................................................................................................................. 9

I.     NINTH CIRCUIT PRECEDENT REGARDING SIMILAR LICENSES
       FOR COMPUTER SOFTWARE COMPELS THE CONCLUSION THAT
       VERNOR'S SALE OF THE SOFTWARE WOULD INFRINGE
       AUTODESK'S COPYRIGHT ......................................................................... 9

     A.    Resale of the Software Would Contribute to Infringement of
         Autodesk's Exclusive Right to Reproduction of the Software. ........................... 9

     B.    Resale of the Software Would Infringe Autodesk's Exclusive Right
         to Distribution of the Software to the Public...................................................... 13

II.    NINTH CIRCUIT PRECEDENT REGARDING LICENSING OF
      COMPUTER SOFTWARE DOES NOT CONFLICT WITH *UNITED
      STATES V. WISE.* .................................................................................. 14

III.   DISTINGUISHING BETWEEN A REQUIREMENT FOR RETURN OF
      THE SOFTWARE AND DESTRUCTION OF THE SOFTWARE IS NOT
      REQUIRED BY *WISE* AND WOULD CREATE AN UNWARRANTED
      BURDEN ON SOFTWARE PUBLISHERS AND CONSUMERS. ............................. 19

IV.   NINTH CIRCUIT PRECEDENT REGARDING LICENSING OF
      COMPUTER SOFTWARE IS CONSISTENT WITH THE
      LEGISLATIVE HISTORY AND STATUTORY PURPOSES OF THE
      COPYRIGHT ACT. .................................................................................... 20

V.    NINTH CIRCUIT PRECEDENT REGARDING LICENSING OF
      COMPUTER SOFTWARE IS CONSISTENT WITH SOFTWARE
      INDUSTRY TRADE USAGE AND PRACTICE. ................................................. 24

CONCLUSION .............................................................................................................. 24

AUTODESK'S MOT. FOR SUMMARY JUDGMENT
2:07-cv-01189-RAJ – PAGE **i**

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*DSC Comm'ns Corp. v. Pulse Comm'ns, Inc.*,
   170 F.3d 1354 (Fed. Cir. 1999) ........................................................................... 13

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003) .............................................................................................. 22

*Emmert Indus. Corp. v. Artisan Assocs., Inc.*,
   497 F.3d 982 (9th Cir. 2007) ............................................................................... 10

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994) .............................................................................................. 22

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) ............................................................................ 9, 12

*Hampton v. Paramount Pictures Corp.*,
   279 F.2d 100 (9th Cir. 1960) .......................................................................... 15, 16

*MAI Systems Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993) .................................................................... 10, 21, 22

*MDY Industries, LLC v. Blizzard Entertainment, Inc.*,
   No. CV-06-2555-PHX-DGC, 2008 WL 2757357 (July 14, 2008 D. Ariz.) .......................... 12

*MGM Studios, Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ................................................................................................ 9

*Microsoft Corp. v. Software Wholesale Club, Inc.*,
   129 F. Supp. 2d 995 (S.D. Tex. 2000) ................................................................. 13

*Prieto-Romero v. Clark*,
   534 F.3d 1053 (9th Cir. 2008) ............................................................................. 13

*Triad Sys. Corp. v. Southeastern Express Co.*,
   64 F.3d 1330 (9th Cir. 1995) ............................................................................... 10

*United States v. Bily*,
   406 F.Supp. 726 (E.D. Pa. 1975) ........................................................................ 17

*United States v. Colahan*,
   635 F.2d 564 (6th Cir. 1980) ............................................................................... 22

AUTODESK'S MOT. FOR SUMMARY JUDGMENT
2:07-cv-01189-RAJ – PAGE ii

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

*United States v. Minor,*
756 F.2d 731 (9th Cir. 1985) ............................................................................. 17

*United States v. Santos,*
___ U.S. ___, 128 S. Ct. 2020 (2008) ............................................................... 10

*United States v. Wise,*
550 F.2d 1180 (9th Cir. 1977) .................................................................... *passim*

*Vernor v. Autodesk, Inc.,*
555 F.Supp.2d 1164 (W.D. Wash. 2008) ................................................... *passim*

*Wall Data Inc. v. Los Angeles Sheriff's Dep't,*
447 F.3d 769 (9th Cir. 2006) ...................................................................... *passim*


**STATUTES**

17 U.S.C.
§ 106(1) ..................................................................................................... *passim*
§ 106(3) ..................................................................................................... *passim*
§ 109 ............................................................................................... 2, 13, 20, 24
§ 109(a) ..................................................................................................... *passim*
§ 109(d) ............................................................................................................ 13, 20
§ 117 ......................................................................................................... *passim*
§ 117(a) ..................................................................................................... *passim*
§ 117(a)(1) ...................................................................................................... 1, 9, 10
§ 117(c) ............................................................................................................ 21, 22


**OTHER AUTHORITIES**

2 Raymond T. Nimmer,
INFORMATION LAW, § 11.70, at 11-155 (2006) .............................................. 13

BLACK'S LAW DICTIONARY 1259 (rev. 4th ed. 1968) ............................................ 10

*Final Report of CONTU,* at 1 (July 31, 1978) ............................................................ 21

H. R. Rep. No. 1476, 94th Cong., 2d Sess. 79 (1976) ............................................ 21

H.R. Rep. No. 551, 105th Cong., 2d Sess. 27 (1998) ............................................ 22

YARMUTH WILSDON CALFO PLLC

FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

**INTRODUCTION**

Plaintiff Timothy Vernor seeks a declaration that his resale of Autodesk, Inc.'s ("Autodesk") AutoCAD® software does not infringe Autodesk's copyright.  It is undisputed that Mr. Vernor obtained the copies of the AutoCAD® software that he seeks to sell (the "Software") from Cardwell/Thomas Architects, Inc., d/b/a as Cardwell Thomas & Associates, Inc. ("CTA").  It is also undisputed that CTA obtained the Software subject to the terms and conditions of the Autodesk Software License Agreement (the "Autodesk License"), which prohibited transfer of the Software and copying of the Software not authorized in the Autodesk License.  Because CTA was not an "owner" of the Software, and so could not transfer ownership to Mr. Vernor, and Mr. Vernor could therefore not transfer ownership to a subsequent purchaser, Mr. Vernor's resale of the Software infringes Autodesk's exclusive rights under the Copyright Act to (1) reproduce and (2) distribute the Software.  17 U.S.C. §§ 106(1) & (3).

First, Mr. Vernor's resale of the Software contributes to infringement of Autodesk's Section 106(1) exclusive reproduction right because the purchaser from Mr. Vernor is not an "owner" of the Software entitled to the Section 117(a)(1) "essential step" exception to Section 106(1), and use of the Software would necessarily require the purchaser to copy the Software onto the hard drive of the purchaser's computer.  Second, resale infringes Autodesk's Section 106(3) exclusive distribution right because Mr. Vernor is not an "owner" entitled to protection of the "first sale" exception to Section 106, which is codified at Section 109(a).

Interpreting the term "owner" for purposes of the Section 117(a) "essential step" exception, the Ninth Circuit has held:  "Generally if the copyright owner makes it clear that she or he is granting only a license to the copy of software and imposes significant restrictions on the purchaser's ability to redistribute or transfer that copy, the purchaser is considered a licensee, not an owner, of the software."  *Wall Data Inc. v. Los Angeles Sheriff's Dep't*, 447 F.3d 769, 785 (9th Cir. 2006).  That precedent controls the Section 117(a) issue in this case.  As this Court has acknowledged, application of that precedent to the Autodesk License, which is clearly identified

1    as a license and is at least as restrictive as the licenses at issue in the Section 117 precedent,

2    compels the conclusion that Autodesk's transfer of the Software to CTA was a license, not a sale.

3    Mr. Vernor's resale would, therefore, contributorily infringe Autodesk's Section 106(1)

4    exclusive reproduction right under controlling Ninth Circuit precedent.

5        The same Ninth Circuit precedent should be applied to the Section 109(a) "first sale"

6    exception and compels the conclusion that Mr. Vernor's resale also infringes Autodesk's Section

7    106(3) exclusive distribution right.  As this Court has noted, it must be "presum[ed] that identical

8    phrases used within the Copyright Act have identical meaning."  *Vernor v. Autodesk, Inc.*,

9    555 F.Supp.2d 1164, 1173 (W.D. Wash. 2008).  Consistent with the Ninth Circuit Section 117

10   precedent, CTA, in a Consent Judgment entered by the court in the Northern District of

11   California, has acknowledged that it was a licensee, not an owner, of the Software for purposes

12   of the "first sale" exception and that its transfer of the Software to Mr. Vernor therefore infringed

13   Autodesk's Section 106(3) exclusive right to authorize distribution.

14       This Court concluded, in denying Autodesk's motion to dismiss, that it was bound in

15   interpreting the "first sale" exception by the Ninth Circuit's decision in *United States v. Wise*,

16   550 F.2d 1180 (9th Cir. 1977).  As demonstrated within, *Wise* can be reconciled with the Section

17   117 precedent.  Indeed, when the *Wise* court's analysis and determinations with regard to the

18   various agreements at issue in that case are sorted out, it becomes apparent that the Ninth Circuit

19   followed a standard similar to that in its later Section 117 cases, emphasizing the characterization

20   of the transaction in the language of the agreement and not requiring that a licensee be obligated

21   to return the copyrighted material.  In addition, evidence now presented to the Court

22   demonstrates that Autodesk had replaced its return policy with a destruction policy only for

23   efficiency and convenience to itself and consumers without any change in the intent or effect of

24   the license.

25       This Court should therefore follow, for purposes of the Section 109 "first sale" exception,

26   the standard for ownership of computer software articulated in the Ninth Circuit Section 117

1  precedent.  As demonstrated within and in the declaration of licensing expert Raymond Nimmer

2  filed herewith, that standard is consistent with the legislative history and statutory purpose of the

3  Copyright Act and with trade usage and practice within the software industry.  Indeed, failure to

4  follow that standard would devastate well-established industry practice and commercial

5  expectations and result in increased costs to consumers.  The Court should, therefore, hold that

6  Mr. Vernor's resale would violate Autodesk's exclusive distribution right as well as its exclusive

7  reproduction right, and grant summary judgment for Autodesk on Mr. Vernor's remaining claim

8  for declaratory and injunctive relief.

9  **STATEMENT OF THE CASE**

10  In the First Amended Complaint (Dkt. # 8), plaintiff Timothy Vernor alleged claims

11  under the Declaratory Judgment Act ("First Claim for Relief") and for Unfair and Deceptive

12  Practices under the Washington Consumer Protection Act and/or the California Unfair

13  Competition Law ("Second Claim for Relief").  On January 15, 2008, Autodesk moved to

14  dismiss or, in the alternative, for summary judgment on both claims. (Dkt. # 20.)  In an order

15  filed on May 20, 2008, the Court denied that motion.  The parties subsequently settled Mr.

16  Vernor's Second Claim for Relief.  (Dkt. # 31.)  Discovery having been concluded, Autodesk

17  now moves for summary judgment on Mr. Vernor's remaining claim for declaratory and

18  injunctive relief.  The Court approved a schedule for filing and briefing cross motions for

19  summary judgment in an order issued on February 9, 2009.

20  **STATEMENT OF UNDISPUTED FACTS**

21  1.    **Autodesk's AutoCAD® Software and Licensing Practices**

22  Autodesk publishes and licenses an industry-leading computer-aided design software

23  product, the AutoCAD® program, and owns all copyright interests in that program.  Autodesk

24  has registered its copyright in the AutoCAD® software programs, including the version at issue

25  in this case, AutoCAD®, Release 14 ("Release 14 Software").  (Declaration of Greg Suppes in

26  Support of Autodesk, Inc.'s Motion for Summary Judgment ("Suppes Decl.") ¶ 5, Ex. A (pp. 10-

**AUTODESK'S MOT. FOR SUMMARY JUDGMENT**
**2:07-cv-01189-RAJ – PAGE 3**

**YARMUTH WILSDON CALFO PLLC**
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1    12.)

2        Since its founding over twenty-five years ago, Autodesk has distributed copies of its

3    software, including its AutoCAD® program, to customers through license agreements.  A user of

4    the AutoCAD® software must accept the terms and conditions of the license before the program

5    can be installed on the user's computer.  (*Id.* ¶ 8.)

6        Autodesk's software license agreements serve several important business functions.

7    They allow Autodesk to set forth what permissions it is granting the customer to use the

8    copyrighted software.  The permissions in an Autodesk license agreement may vary based on the

9    customer's needs for the software and the amount paid for the license.  For example, a small

10   architectural firm may license the AutoCAD® program for use on five computers.  By contrast, a

11   large manufacturing company may license the same program for use on 200 computers.  In either

12   case, the licensee may be provided only a single CD-ROM from which to load the program onto

13   its authorized number of computers.  (*Id.* ¶ 10.)

14       Like many software companies, Autodesk also uses its licensing programs to meet the

15   differing needs of different consumers.  For its AutoCAD® software, Autodesk offers several

16   distinct types of software licenses, based on the particular end-user's needs, including, for

17   example, (1) Commercial, (2) Educational, and (3) Educational-Student.  The terms of these

18   licenses vary.  For example, software provided under a Commercial license is eligible for

19   upgrade to future releases at a significantly reduced price; both types of Educational licenses

20   prohibit use of the software for commercial purposes, and the Educational-Student license is

21   typically for a limited time frame. (*Id.* ¶¶ 12-14.)  Autodesk's multi-tier licensing structure

22   allows the company to offer different pricing for essentially the same software, based on the uses

23   to which the software will be put.  Without different license structures, Autodesk would not be

24   able to offer AutoCAD® software to educational institutions or students at a price less than what

25   it charges to commercial users.  (*Id.* ¶ 15.)

26       By licensing its software rather than selling it, Autodesk is also better able to prevent

AUTODESK'S MOT. FOR SUMMARY JUDGMENT
2:07-cv-01189-RAJ – PAGE 4

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1    unauthorized copying of its software.  Through licenses that prohibit users from transferring

2    media to a subsequent purchaser, Autodesk has a basis to prevent a purchaser from installing the

3    software and then providing the medium to another purchaser who can install it on an additional

4    computer and sell it again to allow for even more installations.  (*Id.* ¶ 17.)  Over the years,

5    Autodesk has developed certain policies, procedures, and technology to ensure compliance with

6    its software licenses and prevent unauthorized distribution and copying.  A key component of

7    these procedures is Autodesk's assignment of a separate serial number to each package of

8    AutoCAD® software.  Autodesk maintains an extensive database, which tracks the registered

9    licensees for each package.  (*Id.* ¶ 18.)

10        In the 1980s and early 1990s, AutoCAD® software was provided to a customer on

11    multiple floppy discs.  One of those discs, "No. 1 Disc," was encoded with the product serial

12    number.  When a user wanted to upgrade to a newer version of the AutoCAD® software, he was

13    required to return "No. 1 Disc" of the earlier version.  Given the number of Autodesk customers,

14    and the large volume of discs returned during the upgrade process, Autodesk found that the

15    return policy was slow, unwieldy, and ultimately unworkable.  (*Id.* ¶ 19.)  Advances in

16    Autodesk's ability to track and monitor product serial numbers in its electronic databases also

17    made the return of No. 1 Disc less necessary.  Autodesk could ensure license compliance

18    following upgrades through other mechanisms.  These technological measures, such as its

19    software activation process, were designed to allow Autodesk to deter a customer who had

20    upgraded his or her AutoCAD® license from transferring the media with the older version of

21    AutoCAD® software to a different user.  (*Id.*)  Therefore, the company adopted a "return or

22    destroy" policy for media following a software upgrade because it was more efficient and the

23    physical return of the media was no longer necessary.  (*Id.*)  This policy also decreases the cost

24    to the user, and the time to obtain the upgraded software.  (*Id.*)

25                        **2.    Licensing of the AutoCAD® Software to CTA**

26        In connection with Autodesk's license compliance activities, Autodesk received a report

**AUTODESK'S MOT. FOR SUMMARY JUDGMENT**
**2:07-cv-01189-RAJ – PAGE 5**

**YARMUTH WILSON CALFO PLLC**
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

1    that CTA was engaging in unauthorized use of Autodesk's software products.  Autodesk and

2    CTA, which was represented by counsel, resolved this matter in March 1999 by entering into a

3    settlement agreement (the "CTA Agreement").  (Declaration of Evelyn LaHaie ("LaHaie Decl.")

4    (Dkt. # 21), attached as Ex. A to the Declaration of George C. Harris ("Harris Decl."), filed

5    herewith, at ¶ 8 (p. 6) & Ex. A (pp.8-17).)  Under the CTA Agreement, Autodesk agreed to ship

6    ten packages of Release 14 Software to CTA, and CTA warranted that it would adhere to all

7    terms of the Autodesk License, which was attached to the CTA Agreement and incorporated in

8    it.  (LaHaie Decl. ¶ 8 (p. 6) & Ex. A ¶ 5 (p. 10) .)  The parties thereby expressly agreed, among

9    other things, that:

10          a.      Autodesk would grant CTA a limited, non-transferable license to use the software

11   provided pursuant to the CTA Agreement (*Id*. Ex. A (Autodesk License Section entitled "Grant

12   of License") (p. 13));

13          b.      Autodesk retained "Title and copyrights to the Software and accompanying

14   materials and any copies" (*Id*. Ex. A (Autodesk License Section entitled "Copyright") (p. 14));

15          c.      CTA "may not . . . transfer all or part of the Software . . . ." (*Id*. Ex. A (Autodesk

16   License Section entitled "Restrictions") (p. 13); and

17          d.      In case of upgrades/updates, CTA "must destroy software previously licensed"

18   (*Id*. Ex. A (Autodesk License Section entitled "Upgrades and Updates") (p. 13).)

19          After CTA signed the Agreement and paid the settlement amount, Autodesk shipped ten

20   packages of Release 14 Software to CTA.  CTA opened the packages of Release 14 Software

21   and found in each a printed copy of the Autodesk License.  (Consent Judgment in *Autodesk,*

22   *Inc. v. Cardwell Architects, Inc.*, No. 4:09-CV-00397 (Feb. 6, 2009 N.D. Cal.), attached as Ex. B

23   to Harris Decl., at ¶ 4 (p. 25).)  Each package of Release 14 Software also contained a jewel case

24   enclosing a CD-ROM with the compiled code for Release 14 Software.  (*Id*. ¶ 5 (pp. 25-26).)

25   Each jewel case was sealed with a warning sticker that stated:  "This software is licensed subject

26   to the license agreement that appears during the installation process or is included in the package.

1    If after reading the agreement you do not wish to accept its terms, you may return the software."

2    (*Id.*)  CTA representatives broke the sticker on each jewel case and installed the Release 14

3    Software by inserting the CD-ROMs into personal computers, thereby creating a copy of the

4    software on the hard drives of the computers.  (*Id.*)

5         During the installation process for each package of the Release 14 Software, CTA was

6    again prompted to accept the terms of the Autodesk License by clicking through a screen that

7    stated:  "I have read the terms and conditions of the Autodesk Software License Agreement

8    contained in the Autodesk product box.  By pressing <Accept>, I agree to these terms and

9    conditions and understand that Software will be installed. . . ."  (*Id.* ¶ 6 (p. 26).)  After this

10   acceptance, CTA obtained an authorization code from Autodesk to activate the Release 14

11   Software, and CTA noted the code in handwriting on the CD-ROM jewel cases.  (*Id.* ¶ 5 (p. 26).)

12        About two years after executing the CTA Agreement, CTA purchased upgrades to

13   AutoCAD® 2000 software for all ten of the Release 14 Software licenses it had acquired

14   pursuant to the terms of the Agreement, and one disk for the ten upgrades was shipped to CTA.

15   (*Id.* ¶ 7 (pp. 26-27).)  By upgrading rather than purchasing new licenses, CTA received a

16   significant discount on the licenses it purchased for AutoCAD® 2000 software, paying $495 for

17   an upgrade of each license instead of the $3,750 price for a new license.  (*Id.*)  This discount was

18   based, in part, on CTA's express agreement to the requirement in the Autodesk License that

19   CTA would destroy the Release 14 Software copies in its possession.  According to the Autodesk

20   License, upon CTA's upgrade of the Release 14 Software, all of CTA's rights to use its license

21   to that software were extinguished, and CTA was obligated to destroy the Release 14 Software in

22   its possession.  (*Id.*)  The serial numbers for CTA's copies of the Release 14 Software were

23   identified in Autodesk's database as having been upgraded.  (LaHaie Decl. ¶ 4 (p. 5).)  Had a

24   new user requested an activation code, the request would have been denied.  (Suppes Decl. ¶ 22.)

25        **3.    Mr. Vernor's Purchase of the AutoCAD® Software from CTA**

26        Mr. Vernor sells a variety of used items on eBay and other Internet purchase sites as a

**AUTODESK'S MOT. FOR SUMMARY JUDGMENT**
**2:07-cv-01189-RAJ – PAGE 7**

**YARMUTH WILSDON CALFO PLLC**
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

1   business.  Over the past eight years, he has sold 200 to 300 "used" software products through

2   Internet websites, representing only about 5 percent of his business.  (Vernor Dep., attached as

3   Ex. C to Harris Decl., at 19, 32 (pp. 77, 78).)  Mr. Vernor typically obtains these products at

4   thrift sales or garage sales.  (*Id.* at 14 (p. 76).)

5       In April 2007, Mr. Vernor purchased from CTA at an office liquidation sale four of the

6   ten CD-ROMs with the Release 14 Software that CTA had agreed to destroy.  (First Amended

7   Complaint ¶ 23.)  Activation codes issued by Autodesk to CTA were handwritten on each jewel

8   case for the four CD-ROMs.  (Vernor Dep. at 121-122 (pp. 90-91).)

9       CTA has acknowledged in a Consent Judgment entered in *Autodesk, Inc. v. Cardwell*

10  *Architects, Inc.* that its sale to Mr. Vernor violated the CTA Settlement Agreement and the

11  Autodesk License and infringed Autodesk's exclusive right under 17 U.S.C. § 106(3) to

12  distribute the Software.  (Consent Judgment ¶ 11 (p. 43).)

13      After obtaining the four copies of the Release 14 Software from CTA, Mr. Vernor listed

14  each of them for sale on eBay.  (Vernor Dep. at 85 (p. 81).)  Mr. Vernor did not open the CD-

15  ROM cases or install the Software before offering them for sale but observed the jewel cases on

16  the Software and their broken stickers with the statement, "'This software is licensed subject to

17  the license agreement . . . .'"  (*Id.* at 88-89 (pp. 84-85).)  Mr. Vernor reviewed and was aware of

18  the terms of the Autodesk License.  (*Id.* at 77, 97 (pp. 79, 89).)  He had also reviewed the

19  contents of the Software packages.  (*Id.* at 84-88 (pp. 80-84).)  He understood that, in order to

20  use the Software, a buyer would have to install the Software on a computer and that installation

21  of the Software would require making a copy of the Software on the hard drive of the buyer's

22  computer.  Mr. Vernor stated in his listing of the Software for sale that "'[t]his software is not

23  currently installed on any computer,'" but he did not know whether or not that was true.  (*Id.* at

24  93, Ex. 10 (pp. 88, 93-98).)

25

26

**YARMUTH WILSDON CALFO PLLC**
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

**ARGUMENT**

**I. NINTH CIRCUIT PRECEDENT REGARDING SIMILAR LICENSES FOR COMPUTER SOFTWARE COMPELS THE CONCLUSION THAT VERNOR'S SALE OF THE SOFTWARE WOULD INFRINGE AUTODESK'S COPYRIGHT**

It is undisputed that Autodesk owns the copyright to the Software that Mr. Vernor attempted to sell on eBay. As the copyright owner, Autodesk has the exclusive right to authorize reproduction and distribution of copies of the Software. 17 U.S.C. §§ 106(1) & (3). It is also undisputed that the copies of the Software at issue were obtained by Mr. Vernor from CTA, and that CTA obtained those copies from Autodesk pursuant to a 1999 Settlement Agreement in which CTA agreed to the terms and conditions of the Autodesk License. Because CTA became a licensee, not an owner, of the Software as a result of that transaction, neither CTA nor anyone who obtains possession of the Software through CTA or subsequent to CTA, enjoys the "essential step" privilege conferred on owners by Section 117(a)(1) or the "first sale" privilege conferred on owners by Section 109(a).

**A. Resale of the Software Would Contribute to Infringement of Autodesk's Exclusive Right to Reproduction of the Software.**

Though Mr. Vernor has not installed or used the Software, it is undisputed that he seeks to sell the Software with the knowledge and intent that buyers of the Software will install and use it. Without that anticipated installation and use, the CD containing the Software has no value. It is also undisputed that installation and use of the Software would require the buyer to copy the Software onto the hard drive of the buyer's computer. Since the anticipated buyer would have no authorization from Autodesk to make copies of the Software, Mr. Vernor's sale of the Software would be contributory copyright infringement unless the buyer would have a privilege to make copies without authorization from Autodesk. *See, e.g., MGM Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930 (2005) ("[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement"); *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir. 1996) ("knowingly contributes to the infringing conduct of another").

1       The only possible source of that privilege is the "essential step" exception to Section 106

2 — Section 117(a)(1), which provides:

> 3 Notwithstanding the provisions of section 106, it is not an infringement for the
> **owner** of a copy of a computer program to make or authorize the making of
> 4 another copy or adaptation of that computer program provided:
>
> 5 (1)  that such a new copy or adaptation is created as an essential step in the
> utilization of the computer program in conjunction with a machine that is used in
> 6 no other manner . . . .

7 17 U.S.C. § 117(a)(1) (emphasis added).  By its terms, this exception applies here only if CTA

8 was the "***owner***" of the Software and, therefore, could sell ownership rights to Mr. Vernor, who

9 could then sell those rights to a third party.

10       In distinguishing between an owner and a licensee of software for purposes of the Section

11 117 essential step exception, the Ninth Circuit held in *Wall Data Inc., supra,* that:

> 12 Generally, if the copyright owner makes it clear that she or he is granting only a
> license to the copy of software and imposes significant restrictions on the
> 13 purchaser's ability to redistribute or transfer that copy, the purchaser is considered
> a licensee, not an owner, of the software.

14 *Wall Data,* 447 F.3d at 785; *see also MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511,

15 518-19 & n.5 (9th Cir.1993) (MAI customers whose computers Peak was servicing did "not

16 qualify as 'owners'" under Section 117(a), because MAI only "licensed its software" to them);

17 *Triad Sys. Corp. v. Southeastern Express Co.,* 64 F.3d 1330, 1333 (9th Cir. 1995) (finding

18 license — not sale — in contract banning duplication or use of software by third parties and

19 contract requiring users to pay fee for selling software copies).

20       This interpretation is consistent with the plain meaning of the statutory language.

21 "Owner" is not defined in the Copyright Act, and therefore must be given its ordinary meaning.

22 *See, e.g.*, *United States v. Santos*, ___ U.S. ___, 128 S. Ct. 2020, 2024 (2008); *Emmert Indus.*

23 *Corp. v. Artisan Assocs., Inc.,* 497 F.3d 982, 987 (9th Cir. 2007).  An owner is commonly

24 understood to have not only possession but "[t]he bundle of rights allowing one to use, manage,

25 and enjoy property, including the right to convey it to others."  BLACK'S LAW DICTIONARY 1138

26

1    (rev. 8th ed. 2004) (defining "ownership").  Therefore, a purchaser who obtains a "license" that

2    "imposes significant restrictions on the purchaser's ability to redistribute or transfer that copy"

3    (*Wall Data*, 447 F.3d at 785) is not an "owner" within the ordinary meaning of the term.

4        The Wall Data click-through license stated that it "grant[ed] . . . the end user, a non-

5    exclusive license to use the enclosed software program . . . on a single Designated Computer for

6    which the software has been activated."  *Id.* at 775 n.5 (internal quotation omitted).  It prohibited

7    sharing with other computers or multiple user arrangements and allowed transfer of the software

8    to another "Designated Computer" no more often than once every 30 days.  *Id.*  It put no limit on

9    the duration of the license and did not require return of the software.  The Ninth Circuit noted,

10   "Such restrictions would not be imposed on a party who owned the software."  *Id.* at 785.  It held

11   that, "These restrictions were sufficient to classify the transaction as a grant of license to Wall

12   Data's software and not a sale of Wall Data's software" such that the purchaser was "not the

13   'owner' of copies of Wall Data's software for purposes of § 117."  *Id.*

14       Like the Wall Data software license, the Autodesk License agreed to by CTA "makes it

15   clear that [it] is granting only a license to the copy of software and imposes significant

16   restrictions on the purchaser's ability to redistribute or transfer that copy."  *Id.*  It states:

17           Autodesk, Inc. ("Autodesk") grants you a nonexclusive, nontransferable license to
             use the enclosed program (the "Software") according to the terms and conditions
18           herein.  This License Agreement permits you to install the Software on your
             primary computer, and to make one additional copy for use on a second computer
19           you may have, provided that (1) the additional copy is used only by you; (2) only
             one of the Software copies is in use at any one time at any one location; and (3)
20           the Software is not licensed and/or labeled for educational use only.

21   (LaHaie Decl. Ex. A (Autodesk License Section entitled "Grant of License") (p. 13).)  The

22   Autodesk License also provides that Autodesk retains "[t]itle and copyrights to the Software and

23   accompanying materials and any copies."  (*Id.*, Ex. A (Autodesk License Section entitled

24   "Copyright") (p. 14).)  It imposes further restrictions on the licensed use of the Software,

25   including that the Purchaser "MAY NOT . . . rent, lease, or transfer all or part of the Software,

26   Documentation, or any rights granted hereunder to any other person without Autodesk's prior

AUTODESK'S MOT. FOR SUMMARY JUDGMENT
2:07-cv-01189-RAJ – PAGE **11**

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

1    written consent." (*Id.* Ex. A (Autodesk License Section entitled "Restrictions") (p. 13).) If the

2    licensee purchases a Software upgrade, the Autodesk License requires the licensee to "destroy

3    the software previously licensed to you, including any copies resident on your hard disk drive."

4    (*Id.* Ex. A (Autodesk License Section entitled "Upgrades and Updates") (p. 13).)

5        As this Court has found, "The terms of the Autodesk License are either indistinguishably

6    similar to or more restrictive than the licenses found not to be sales in [*Wall Data, MAI Syst.*

7    *Corp.,* and *Triad Sys. Corp.*]." *Vernor v. Autodesk, Inc*., 555 F.Supp.2d at 1172. Indeed, "[t]he

8    restrictions in the [Autodesk] License are more severe, because they prohibit resale of the

9    software without Autodesk's permission." *Id.* Applying the Ninth Circuit precedent interpreting

10   Section 117, therefore, compels the conclusion that "the transfer of AutoCAD® copies from

11   Autodesk to CTA was not a sale." *Id.*

12       This Ninth Circuit precedent is controlling with regard to the proper interpretation of the

13   Section 117 "essential step" exception. *See MDY Industries, LLC v. Blizzard Entertainment,*

14   *Inc.*, No. CV-06-2555-PHX-DGC, 2008 WL 2757357, at *8 (July 14, 2008 D. Ariz.) (finding

15   contributory copyright infringement and noting that "[t]he resolution of [the Section 117] issue is

16   controlled by Ninth Circuit law. At least three cases—*MAI, Triad,* and *Wall Data, Inc. . . .* hold

17   that licensees of a computer program do not 'own' their copy of the program and therefore are

18   not entitled to a section 117 defense"). It is undisputed that the copies of the Software that Mr.

19   Vernor attempted to sell could be used and would have value only if they were copied by the

20   buyer onto the hard drive of the buyer's computer. *Vernor,* 555 F.Supp.2d at 1171 ("Section 117

21   is critical for software users, because in using software, a user's computer inevitably makes one

22   or more copies of it."). Because Mr. Vernor is not an "owner" and cannot sell rights of

23   ownership within the established meaning of Section 117, his sale of the Software would

24   "knowingly contribute[] to the infringing conduct of another," *Fonovisa,* 76 F.3d at 264, and,

25   therefore, constitute contributory copyright infringement in violation of Autodesk's exclusive

26   right of reproduction under Section 106(1).

**YARMUTH WILSDON CALFO PLLC**
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

**B.    Resale of the Software Would Infringe Autodesk's Exclusive Right to Distribution of the Software to the Public.**

To avoid liability for distributing copies of the Software without authorization by Autodesk under 17 U.S.C. § 106(3), Mr. Vernor relies on the "first sale" exception to Section 106(3), which is codified at 17 U.S.C. § 109(a) and provides in part:

> Notwithstanding the provisions of section 106(3), the **owner** of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. § 109(a) (emphasis added).  That section by its terms applies only to an "owner," and the statute separately provides that it does not apply to a licensee, that is, "to any person who has acquired possession of the copy or phonorecord from the copyright owner, by rental, lease, loan, or **otherwise**, without acquiring ownership of it."  17 U.S.C. § 109(d) (emphasis added).  Since CTA could convey to Mr. Vernor only what rights it had in the Software, Mr. Vernor's reliance on the "first sale" exception depends on CTA having owned rather than licensed the Software. *See, e.g., Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 2d 995, 1002 (S.D. Tex. 2000) ("[U]nless title to the copy passes through a "first sale" by the copyright holder, subsequent sales do not confer good title.") (internal quotation & citation omitted).

As this Court has recognized, there is no plausible basis to interpret "owner" differently for purposes of the Section 109 "first sale" exception than for purposes of the Section 117 "essential step" exception. *Vernor*, 555 F. Supp. 2d at 1173 ("[B]oth statutes use the same 'owner of a . . . copy' language.  The court presumes that identical phrases used within the Copyright Act have identical meaning."); *see also Prieto-Romero v. Clark,* 534 F.3d 1053, 1061 n.7 (9th Cir. 2008) (it is a "well-established principle" that "the same words or phrases are presumed to have the same meaning when used in different parts of a statute") (internal quotation & citation omitted).  Other courts and commentators have agreed that "owner" has the same meaning in both provisions. *See, e.g., DSC Comm'ns Corp. v. Pulse Comm'ns, Inc.*, 170 F.3d 1354, 1361-62 (Fed. Cir. 1999); 2 Raymond T. Nimmer, INFORMATION LAW, § 11:70, at

YARMUTH WILSON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1    11-155 (2006).

2    Ninth Circuit precedent interpreting Section 117(a) thus compels the conclusion that Mr.

3    Vernor was also not an "owner" for purposes of Section 109(a) and the "first sale" exception.

4    His sale without permission of the Software therefore infringes Autodesk's exclusive distribution

5    right under Section 106(3) as well as its exclusive reproduction right under Section 106(1).

6    Consistent with controlling Ninth Circuit precedent and this analysis, CTA has agreed

7    that its transfer of copies of the Software to Mr. Vernor infringed Autodesk's copyright.  A

8    Consent Judgment entered against CTA in the Northern District of California provides:

> Cardwell/Thomas's transfer of the AutoCAD® programs to Vernor exceeded the
> scope of Autodesk's license grant to Cardwell/Thomas pursuant to the Settlement
> Agreement and Autodesk Software License Agreement.  By transferring copies of
> AutoCAD® software without Autodesk's consent, approval or license, Cardwell/
> Thomas infringed Autodesk's exclusive rights, as copyright owner, "to distribute
> copies . . . by sale or other transfer of ownership, or by rental, lease, lending . . ."
> 17 U.S.C. § 106(3); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F. 2d 511, 519,
> n.5 (9th Cir. 1993); *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F. 3d 1330,
> 1333 (9th Cir. 1995); *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447
> F.3d 769, 785 (9th Cir. 2006); *Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F.
> Supp. 2d 1086, 1092 (N.D. Cal. 2000); *Adobe Sys. Inc. v. Stargate Software, Inc.*,
> 216 F. Supp. 2d 1051,1058 (N.D. Cal. 2002)

(Consent Judgment ¶ 11 (p. 28).)  Because CTA infringed Autodesk's exclusive right as

copyright owner to distribute copies of the Software when CTA transferred copies to Mr. Vernor,

so too would Mr. Vernor's transfer of those copies to another purchaser.

## II.    NINTH CIRCUIT PRECEDENT REGARDING LICENSING OF COMPUTER SOFTWARE DOES NOT CONFLICT WITH *UNITED STATES V. WISE*.

20    In its prior order denying summary judgment to Autodesk, this Court concluded that it

21    was bound, in interpreting the "first sale" exception, by the Ninth Circuit's decision in *United*

22    *States v. Wise*, *supra*, and that *Wise*, contrary to Ninth Circuit precedent interpreting Section 117,

23    compels the conclusion that CTA was an "owner" of the Software.  The analysis in *Wise* can be

24    reconciled, however, with the Ninth Circuit's interpretation of "owner" as applied to computer

25    software in the Section 117 context.  *See Wall Data Inc.*, 447 F.3d at 785 (not a sale if "copyright

26    owner makes it clear that she or he is granting only a license . . . and imposes significant

1    restrictions"). Indeed, *Wise* applies a similar test to the film prints at issue in that case.

2        This Court concluded that for the *Wise* court, in distinguishing a sale from a license, "the

3    critical factor is whether the transferee kept the copy acquired from the copyright holder" and

4    was not required to return the prints. *Vernor*, 555 F. Supp. 2d at 1170. The *Wise* opinion does

5    not, however, articulate this factor as determinative or even identify it explicitly as part of a test.

6    To the degree that the *Wise* opinion discusses a general test to distinguish between a license and

7    a sale, it emphasizes license language in the agreement but makes an exception for agreements

8    that do not specifically reserve title in the copyright owner but whose terms are consistent with

9    those of a limited license.

10           Without detailing each of the specific transactions, it is clear that most of the
             agreements pertaining to the other films, which were received in evidence
11           likewise constituted licenses rather than sales. Although some of the contracts did
             not provide expressly for reservation of title in the copyright owner, the remaining
12           terms of the agreements were consistent with the theory of a limited license and
             inconsistent with the concept of a sale. The mere failure to expressly reserve title
13           to the films does not require a finding that the films were sold, where the general
             tenor of the entire agreement is inconsistent with such a conclusion.
14
     *Wise*, 550 F.2d at 1191.
15
         The *Wise* opinion's discussion of *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100
16
     (9th Cir. 1960), also supports the conclusion that the *Wise* court put primary emphasis on the
17
     language of the agreement and did not hold that an agreement must require return of the
18
     copyrighted material to be treated as a license for purposes of the "first sale" exception.
19
     *Wise*, 550 F.2d at 1189. Although, as this Court has noted, *Hampton* did not involve the ""first
20
     sale" issue, but rather a dispute about whether the defendant could *display* the movie," *Vernor*,
21
     555 F. Supp. 2d at 1170 n.4 (emphasis in original), the *Wise* opinion characterizes *Hampton* as a
22
     case considering "[t]he question of what constitutes a "first sale"" (550 F.2d at 1189 (internal
23
     quotation & citation omitted)) and characterizes its own decision as following *Hampton*. *See id.*
24
     at 1190 ("In accordance with the holding and reasoning of Hampton v. Paramount Pictures,
25
     Corporation, supra, we find that none of these agreements constituted first sales, since both on
26

AUTODESK'S MOT. FOR SUMMARY JUDGMENT
2:07-cv-01189-RAJ – PAGE 15

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

their face and by their terms they were restricted licenses and not sales.") & n.17 ("we adhere to the reasoning of *Hampton*"). *Wise* also notes that the "definition of assignment [argued for by the plaintiff in *Hampton* — loss of "all 'power to restrict the use of the picture'"] appears to be equivalent to the definition of a sale." *Id.* at 1189 n.15. Its discussion of *Hampton* is, therefore, revealing of the standard that it adhered to in applying the "first sale" exception.

*Wise* notes that the *Hampton* court determined that the agreement at issue "was a restricted license" despite the fact that "'the contract contains no limitation as to time; a flat lump-sum payment was to be made for each film transferred; there was no requirement that outstanding prints and negatives were to be returned; no limitation was placed on the right to alter or abridge the films transferred; and the contract gave [the lessee] exclusive territorial rights coextensive with the rights of [the lessor].'" *Id.* at 1189 (citation omitted). As recognized by the court in *Wise*, *Hampton* disregarded this lack of restrictions and held that the agreement was a license, not an assignment, because it was characterized as a "license" in the language of the agreement.

> If the contract in question were ambiguous with regard to its nature as an assignment or a license or as to the purposes for which Kodascope might make reproductions, the fact that provisions of the kind referred to above were present or absent would be helpful in construing the instrument. Here, however the **contract expressly provides that Paramount "licenses"** Kodascope to do certain things, ***thereby precluding a construction that there was an assignment***.

*Hampton*, 279 F.2d at 103 (emphasis added); *see also Wise*, 550 F.2d at 1189 ("But the court found the agreement [in *Hampton*] on its face to be clearly a license, thereby 'precluding a construction that there was an assignment.'") (citation omitted).

This emphasis on whether the agreement on its face characterizes the transaction as a license or a sale, with consideration of other factors only in the absence of clear language, is consistent with the determinations made by the *Wise* court with regard to the various agreements at issue in that case. Indeed, some of the agreements deemed licenses in *Wise* apparently did not require the return of the copyrighted work, and the only common attributes of the few

transactions that *Wise* found to be sales were that, unlike the Autodesk license at issue here, none of them had a provision reserving title in the copyrighted work and none was "phrased in terms of a license." *Wise* at 1191-93.

Because the *Wise* court reviewed a conviction for criminal copyright infringement, it necessarily applied a more rigorous standard for finding a "license" and a more forgiving standard for finding a "sale" than apply in a civil infringement action. *Wise* sought to determine whether the government had met its burden of proving all of the elements of criminal copyright infringement beyond a reasonable doubt, including whether the relevant transactions were sales rather than licenses, with resulting "first sale" protection to the defendant. *Wise*, 550 F.2d at 1189, quoting *United States v. Bily*, 406 F.Supp. 726, 733 (E.D. Pa. 1975) ("each element of the crime must be proved beyond a reasonable doubt"); *see also United States v. Minor*, 756 F.2d 731, 734 (9th Cir. 1985) ("rational jury could find beyond a reasonable doubt that [defendant] knew the records charged in the indictment were not the subject of a valid first sale, and was therefore a willful infringer"). By contrast, in a civil infringement case, the copyright holder must only prove infringement by a preponderance of the evidence and, as this Court has acknowledged, there is authority that the defendant has the burden of proving application of the "first sale" exception. *Vernor,* 555 F.Supp.2d at 1173.

The *Wise* court reversed conviction on two counts on the basis that "the Government fail[ed] to establish an absence of a 'first sale'" — one with regard to the film "Funny Girl" (Count VII) and one with regard to the film "Camelot" (Count III). 550 F.2d at 1194. In reversing Count VII, based on an agreement in which ABC granted Screen Gems the right to televise "Funny Girl," the court found:

> This agreement, ***which is not phrased in terms of a license*** has a provision in paragraph 9(c) for the return of prints similar to the NBC contract, except that ***no provision is made for the retention of title to the prints in Screen Gems.*** Accordingly, appellant's conviction on Count VII must be reversed.

*Id.* at 1191 (emphasis added). Similarly, with regard to the Count III agreement in which Warner

1  Brothers furnished a print of "Camelot" to Vanessa Redgrave, the opinion emphasizes the

2  language of the agreement, which also was not phrased in terms of a license:

3      While the provision for payment for the cost of the film ["You will pay us our
       cost for said print. . .], standing alone, does not establish a sale, when taken with

4      the rest of the language of the agreement, it reveals a transaction strongly
       resembling a sale with restrictions on the use of the print.  No evidence was

5      presented with respect to the whereabouts of the print furnished to Vanessa
       Redgrave.  In the absence of such proof we conclude that the Government has

6      failed to carry its burden of showing that there was no first sale.  Accordingly we
       reverse the conviction on Count III.

7
   *Id.* at 1191-92.

8
       In discussing three other "V.I.P. Contracts," which it characterizes as loans or licenses,

9
   the *Wise* opinion again emphasizes the license language; and, according to its description, only

10
   one of the three ("Paper Moon") required return of the print:

11
       V.I.P. agreements were made with respect to the photoplays "The Sting",

12     "Camelot", "Paper Moon", and "Funny Girl".  The agreement pertaining to "The
       Sting", made with Robert Redford, George Ray Hill, and the Summa Corporation,

13     ***granted a "revocable, nonexclusive consent" to use the print and retained title
       to the print in Universal Pictures.*** . . .  "Paper Moon" was ***"loaned"*** to Peter

14     Bogdanovich ***pursuant to an agreement in which Paramount Pictures retained
       title to the print and required its return upon the request of Paramount.*** . . .   The

15     movie "Funny Girl" was furnished to Barbra Streisand, Ray Stark, and William
       Wyler under ***an agreement which reserved to Columbia "all rights in, to and

16     with respect to" the film,*** "subject to such limited rights" as were granted to the
       V.I.P's by the agreement which consisted of the right to privately exhibit the film

17     at the residence of the V.I.P. . . .   ***All of these agreements required the licensee
       to retain the film print in his possession at all times and prohibited him from

18     copying or duplicating it.***  We find the terms of these agreements to be consistent
       with their designation as loans or licenses, and that they do not effect sales of the

19     motion pictures.

20  *Id.* at 1192 (emphasis added).[1]

21      The analysis in *Wise* is, therefore, not at odds with the later Ninth Circuit precedent

22  interpreting "ownership" for purposes of Section 117.  *Wise*, like the later cases addressed

23  specifically to computer software, emphasizes whether the agreement is "phrased in terms of a

24  license" and does not require a provision for return of the copyrighted material.

25
       [1] The V.I.P. Contract for the "Funny Girl" print was a different agreement from that with regard to "Funny

26  Girl" between ABC and Screen Gems that was the basis of Count VII and is discussed above.

AUTODESK'S MOT. FOR SUMMARY JUDGMENT
2:07-cv-01189-RAJ – PAGE 18

YARMUTH WILSDON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

1
2

**III.    DISTINGUISHING BETWEEN A REQUIREMENT FOR RETURN OF THE SOFTWARE AND DESTRUCTION OF THE SOFTWARE IS NOT REQUIRED BY *WISE* AND WOULD CREATE AN UNWARRANTED BURDEN ON SOFTWARE PUBLISHERS AND CONSUMERS.**

3

4

5

6

7

8

9

10

Under the Autodesk License, CTA was required to destroy the Software when it upgraded to a newer version of AutoCAD® software in 2002.  (Consent Judgment ¶ 7 (pp. 26-27)**.**)  Based on its reading of *Wise*, however, the Court in its prior order found this requirement not equivalent to a requirement for return of the Software and not indicative of a license rather than a sale.  *Vernor*, 555 F. Supp. 2d at 1170-71 ("Similar to the salvage transactions in *Wise,* the License required CTA to destroy the software in the event it purchased a software upgrade . . . Under *Wise*, however, this is a 'sale with restrictions on use,' and is a sufficient basis to invoke the first sale doctrine.").

11

12

13

14

15

16

17

The "salvage" contracts discussed in *dicta* in *Wise* are, first of all, distinguishable from the requirement in the Autodesk License that the licensee destroy the Software at the time of an upgrade.[2]  The salvage contracts in *Wise* contemplated complete control by the purchaser to the point of destruction.  The Autodesk License requirement, on the other hand, puts a significant restriction on the use of the Software — in order to obtain an upgrade, the licensee must terminate use of the original version of the Software, which would otherwise have significant continuing value.

18

19

20

21

22

Moreover, *Wise* was decided in a very different technological context.  The film reels at issue in *Wise* were in an analog format with substantial intrinsic value.  Those analog film reels when copied would result in a degraded product, making the original product valuable.  Today, the V.I.P. transferees in *Wise* would probably have received a DVD worth pennies rather than

23

24

25

26

_____

[2] The *Wise* opinion noted, "With respect to the general practice followed by the studios in the sale of film for salvage, it is established that the Film Salvage Company destroys the photoplays and does not resell them." 550 F.2d 1193.  The court noted in *dicta* that, "Assuming, as appellant argues, that a photoplay cannot exist independent of the film upon which it is depicted, there would of course be a 'first sale' of any film sold for salvage.  *Id.*  It found no basis for applying the "first sale" exception to reverse the defendant's conviction, however, because "the Government's evidence proved beyond a reasonable doubt that the prints sold by appellant were not films which had been sold for salvage." *Id.*

**YARMUTH WILSDON CALFO PLLC**
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1  reels of film worth hundreds if not thousands of dollars.  For that reason, the transfer agreements

2  would likely have called for destruction rather than return.  In the context of contemporary

3  technology, destruction may be the functional and more efficient equivalent of return.  In this

4  case, the value to Autodesk of the returned medium used to transfer the copy of the software to

5  the licensee is worth less than the cost to return it.  (Suppes Decl. ¶ 19.)

6         There is no meaningful distinction between return and destruction of licensed software

7  other than the comparative burden on the software publisher and its consumers.  Indeed,

8  Autodesk used to require return of software as a condition of upgrade but switched to a "return

9  or destroy" policy because, given the number of customers affected, "the return policy was slow,

10  unwieldy and ultimately unworkable" and because use of authorization codes made return

11  unnecessary.  (*Id*.)  Autodesk and other software publishers should not be penalized by loss of

12  copyright enforcement for adopting a policy that is more efficient for them and their consumers.

13         Providing for the return of a software disk would also not accomplish the purpose of

14  protecting against unauthorized use by obtaining possession of the copyrighted product from the

15  user, as it would with regard to the film prints at issue in the *Wise* case.  Because the software

16  has already been copied onto the user's computer, return of the disk is insufficient.  The real

17  issue is destruction — both of the disk **and** the copies of software on the user's computer.

18  Hence, the need for software companies such as Autodesk to control the use and copying of their

19  software programs through license agreements such as that at issue in this case.

20  **IV.    NINTH CIRCUIT PRECEDENT REGARDING LICENSING OF COMPUTER
        SOFTWARE IS CONSISTENT WITH THE LEGISLATIVE HISTORY AND
21      STATUTORY PURPOSES OF THE COPYRIGHT ACT.**

22         In codifying the "first sale" exception in Section 109, Congress specifically distinguished

23  an "owner" from a broad category of those who acquire possession by any other means — "by

24  rental, lease, loan *or otherwise*, without acquiring ownership of it."  17 U.S.C. § 109(d)

25  (emphasis added).  The legislative history also emphasizes Congress' intent to limit application

26  of the "first sale" exception strictly to transactions in which complete ownership rights are

YARMUTH WILSON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1  transferred.  The House Report described it as applying to those who acquire the copyrighted

2  material by "outright sale."  H. R. Rep. No. 1476, 94th Cong., 2d Sess. 79 (1976).  This is

3  consistent with the conclusion that Congress did not intend the "first sale" exception to apply to a

4  "license" that imposes "significant restrictions on the purchaser's ability to redistribute or

5  transfer" the copyrighted material.  *Wall Data*, 447 F.3d at 785.

6       The legislative history of Section 117(a) also supports a narrow reading of the term

7  "owner."  When Congress amended the Copyright Act in 1976, it created the National

8  Commission on New Technological Uses of Copyrighted Works ("CONTU") to make

9  "recommendations concerning those changes in copyright law or procedure needed both to

10  assure public access to copyrighted works used in connection with computer and machine

11  duplication systems and to respect the rights of owners of copyrights in such works, while

12  considering the concerns of the general public and the consumer."  *Final Report of CONTU*, at 1

13  (July 31, 1978).  In its final report, CONTU proposed an amendment that became essentially

14  what are now Sections 117(a) and (b) of the Copyright Act.  *Id.* at 12 (proposing new Section

15  117 regarding "*Limitations on exclusive rights: computer programs*").  The CONTU proposal

16  would have given "essential step" and "archival" reproduction privileges to "the rightful

17  possessor of a copy of a computer program."  *Id.*  But Congress chose instead to use the term

18  "owner."  That choice supports a reasonable inference that Congress intended, as held by the

19  Ninth Circuit, not to include a typical licensee, who receives a software copy under a "license"

20  and subject to "significant restrictions on the purchaser's ability to redistribute or transfer" the

21  software.  *Wall Data*, 447 F.3d at 785.

22       The legislative history of Section 117(c), which makes an exception to Section 106 for

23  machine maintenance or repair, also supports the Ninth Circuit's interpretation of "owner" in the

24  computer software cases.  That section was enacted in 1998 in direct response to the Ninth

25  Circuit's decision in *MAI Systems Corp. v. Peak Computer, Inc.*, *supra*, which held that RAM

26  copies are reproductions for purposes of Section 106(1) and that software licensees are not

1   "owners" for purposes of Section 117(a).  *See* H.R. Rep. No. 551, 105th Cong., 2d Sess. 27

2   (1998).  Rather than overruling the holding in *MAI Systems Corp.*, Congress enacted a narrow

3   exception for a copy of a computer program made solely for maintenance or repair of a machine

4   and authorized by the owner or lessee of the machine.  17 U.S.C. § 117(c).  Congress's decision

5   not to alter the Ninth Circuit's interpretation of "owner" in *MAI Systems Corp.* shows that it

6   believed the Ninth Circuit's interpretation was correct.  *See United States v. Colahan,* 635 F.2d

7   564, 568 (6th Cir. 1980) (when "interpretation of a statute has been brought to the attention of

8   Congress, and Congress has not sought to alter that interpretation although it has amended the

9   statute in other respects, then presumably the legislative intent has been correctly discerned.").

10      The Ninth Circuit's interpretation of "owner" in the software cases is also consistent with

11   the statutory purposes of the Copyright Act to "enrich[] the general public through access to

12   creative works," *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 527 (1994), and "*promote* the creation

13   and publication of free expression" by rewarding authors.  *Eldred v. Ashcroft,* 537 U.S. 186, 219

14   (2003) (emphasis in original).  As demonstrated in the declaration of licensing expert Raymond

15   Nimmer, interpreting "owner" more broadly to cover software licensees, such as CTA here,

16   would impair public access to software and thereby create disincentives for software innovation.

17      Public access would be harmed by a broad definition of "owner" because it would not

18   allow for price differentiation through licensing with efficient matching of consumer needs and

19   prices.  As explained by Professor Nimmer:

> Software publishers use licenses to fit their software products to the relevant
> market and to the price charged.  Because digital information does not change in
> quality when copied, a ruling that might limit the effect of license restrictions to
> the immediate parties to a license would *increase* costs to consumers because
> licensors could not rely on enforcing copyright limits on the use of their software
> after the first, limited transfer.

(Nimmer Decl. ¶ 26.)

24      Licensing allows a software publisher to define a product and to match the price to the

25   product.  Different license terms for the same software can result in very different products and

1    resulting prices. (*Id.* ¶ 27.) Copyright enforcement of license restrictions makes this kind of

2    price differentiation possible. Lack of copyright enforcement would "increase costs to

3    consumers because it would force consumers to pay prices based on uses that consumers would

4    not ordinarily desire to purchase, such as the right to resell a copy or to use it for business

5    purposes." (*Id.* ¶ 29.) Prices would be higher, in particular, for consumers who are satisfied with

6    limited uses, such as single-user licensees and educational use licensees, who would be forced to

7    pay for uses they do not desire.

8    As demonstrated by this case, licensing rather than sale is also crucial to enforcement of

9    the copyright owner's exclusive right to control reproduction of the copyrighted material. Once

10   a licensee loads computer software onto her computer, she no longer needs the original medium

11   in order to use the software. (Suppes Decl. ¶ 17.) Without enforceable restrictions on transfer,

12   purchasers could retain a copy of the installed software while transferring the media to

13   subsequent purchasers, who could install the software and then sell it again. (*Id.*) Transfer of a

14   copy of software is unlike the transfer of a book. (*Id.*) The original purchaser of the book gives

15   up its value when she sells the physical copy. (*Id.*) A software user, on the other hand, can

16   retain what is valuable — a working copy of the software loaded on her computer — while

17   selling the physical medium to a new user. (*Id.*) A software publisher's ability to restrict resale

18   through copyright is necessary to protect against this kind of unauthorized reproduction. As Mr.

19   Vernor has admitted in this case, he had no way to know whether CTA had deleted from its

20   computers copies of the previously installed Software. (Vernor Dep. at 89-90, 93 (pp. 85-86,

21   88).)

22   Broadly construing "owner" and thus limiting the use of licensing would provide a

23   disincentive for innovation because it would undermine the commercial practices that support the

24   software industry. As Professor Nimmer states, a decision "that delivery of a copy for a single

25   fee is a sale of that copy creating first-sale rights would undermine commercial practices

26   throughout the information industries and ignore the economic reality of the transactions."

AUTODESK'S MOT. FOR SUMMARY JUDGMENT
2:07-cv-01189-RAJ – PAGE 23

YARMUTH WILSON CALFO PLLC
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800  F 206.516.3888

1   (Nimmer Decl. ¶ 36.)  Indeed, copyright enforcement of license limitations "is critically

2   important to the continued success of the digital information industries."  (*Id.* ¶ 17.)  Applying

3   the "first sale" exception to license agreements like that at issue here would effectively put an

4   end to an industry-wide practice and result in unnecessarily increased costs to software

5   consumers.

6   **V.     NINTH CIRCUIT PRECEDENT REGARDING LICENSING OF COMPUTER
SOFTWARE IS CONSISTENT WITH SOFTWARE INDUSTRY TRADE USAGE
7        AND PRACTICE.**

8        Licensing rather than sale of software is accepted practice in the software industry.  As

9   Professor Nimmer explains:

10        Licenses are typically not viewed by the original licensees or licensors, or by
         subsequent purchasers, as a sale of a copy.  A tangible copy, if any is used to
11       deliver the software, is immaterial to the core of the transaction, which focuses on
         rights to use of the software.  The terms of the license control.  A licensee is not
12       the owner of a copy if its rights under the license are inconsistent with ownership
         or if the license so provides.
13

14   (Nimmer Decl. ¶ 37.)  Trade usage in the software industry thus supports application of the

15   standard established by the Ninth Circuit Section 117 cases and the resulting conclusion that the

16   Autodesk License creates a license, not a sale, for purposes of the Section 109 "first sale"

17   exception as well as the Section 117 "essential step" exception.  "Licensing is a widespread

18   practice amounting to an ordinary usage of trade in the software industry and throughout its

19   distribution systems.  As such, it reflects the background against which transactions should be

20   interpreted, especially when, as in this case, the terms of the agreement are consistent with the

21   existing trade usage."  (*Id.* ¶ 23.)  Failure to follow the standard established in the Section 117

22   cases would undermine well-established, industry-wide practice and reasonable commercial

23   expectations based on that practice.

24                **CONCLUSION**

25        For all of the reasons stated above, the Court should grant Autodesk's motion and enter

26   judgment for Autodesk on Mr. Vernor's claim for declaratory and injunctive relief.

**AUTODESK'S MOT. FOR SUMMARY JUDGMENT
2:07-cv-01189-RAJ – PAGE 24**

**YARMUTH WILSDON CALFO PLLC**
FOURTH & MADISON
925 FOURTH AVENUE, SUITE 2500
SEATTLE WASHINGTON 98104
T 206.516.3800   F 206.516.3888

1  DATED:  February 20, 2009          MORRISON & FOERSTER LLP

2

3                                     By: /s/ George C. Harris
                                          Michael A. Jacobs (*pro hac vice*)
4                                         George C. Harris (*pro hac vice*)
                                          Lynn M. Humphreys (*pro hac vice*)
5                                         425 Market Street
                                          San Francisco, CA  94105-2482
6                                         Telephone:  (415) 268.7000
                                          Fax:  (415) 268.7522
7                                         Email:    MJacobs@mofo.com
                                                    GHarris@mofo.com
                                                    LHumphreys@mofo.com
8

9                                     DONAHUE GALLAGHER WOODS LLP

10                                    By: /s/ Lawrence K. Rockwell
                                          Lawrence K. Rockwell (*pro hac vice*)
11                                        Eric W. Doney (*pro hac vice*)
                                          Julie E. Hofer (*pro hac vice*)
12                                        300 Lakeside Drive, Suite 1900
                                          Oakland, CA  94612
13                                        Telephone:  (510) 451-0544
                                          Fax:  (510) 832-1486
14                                        Email:    julie@donahue.com
                                                    eric@donahue.com
15                                                  larry@donahue.com

16                                    YARMUTH WILSDON CALFO PLLC

17

18                                    By: /s/ Jeremy E. Roller
                                          Angelo J. Calfo, WSBA #27079
                                          Jeremy E. Roller, WSBA #34883
19                                        Fourth & Madison
                                          925 Fourth Avenue, Suite 2500
20                                        Seattle, WA 98104
                                          Phone: (206) 516-3800
21                                        Fax: (206) 516-3888
                                          Email:    acalfo@yarmuth.com
22                                                  jroller@yarmuth.com

23                                    Attorneys for Defendant Autodesk, Inc.

24

25

26  sf-2634624

AUTODESK'S MOT. FOR SUMMARY JUDGMENT
2:07-cv-01189-RAJ – PAGE 25