Hon. Richard A. Jones

1

2

3

4

5

6

7    TIMOTHY S. VERNOR,                    No. 2:07-cv-01189-RAJ

8                    Plaintiff,            **PLAINTIFF TIMOTHY S. VERNOR'S**
                                           **MOTION FOR SUMMARY JUDGMENT**
9        v.                                **AND RESPONSE TO DEFENDANT'S**
                                           **MOTION FOR SUMMARY JUDGMENT**
    AUTODESK, INC.,
10                                         **Note on Motion Calendar:**
                    Defendant.            **March 27, 2009**
11
                                           **ORAL ARGUMENT REQUESTED**
12

13                            **INTRODUCTION**

14        More than a century ago, the Supreme Court in *Bobbs-Merrill Co. v. Straus* rejected a

15   book publisher's attempt to control the market for its books with a "license" purporting to

16   prohibit the books from being resold. 210 U.S. 339 (1908). The "first-sale doctrine" established

17   by *Bobbs-Merrill*, and since codified in the Copyright Act, 17 U.S.C. § 109, prohibits copyright

18   owners from imposing restrictions on aftermarket sales of their works. As Professor Raymond

19   Nimmer, Autodesk's copyright-law expert, wrote: the first-sale doctrine means that "Toni

20   Morrison . . . cannot stymie the aftermarket for *Beloved* by wrapping all copies in cellophane and

21   insisting that her readers obtain only a 'license' over the books in which they read her words."  2

22   Nimmer & Nimmer, *Nimmer on Copyright* § 8.12[B][1][d][ii] (2008).

23        Today, defendant Autodesk seeks to control the market for its AutoCAD software by

24   including a "license agreement" purporting to make the software "nontransferable." Decl. of

25   Evelyn LaHaie ("LaHaie Decl."), Exh. A. To enforce this restriction, Autodesk sent several

26   notices of claimed infringement to eBay under the Digital Millennium Copyright Act

("DMCA"), claiming that plaintiff Timothy Vernor's online resale of AutoCAD infringed the company's copyright. Declaration of Timothy S. Vernor (Vernor Decl.) ¶¶ 10-17. Autodesk did not argue that Vernor was selling unauthorized or pirated copies of AutoCAD. *Id.* ¶¶ 20-21. Instead, the company claimed the right to prohibit resale of *authentic*, lawfully purchased copies of its software. *Id.* ¶ 11. According to Autodesk, its "license agreement" allowed it to bypass the limitations of the first-sale doctrine, converting any subsequent resale of the software—or even the act of giving it away—into copyright infringement. *Id.* ¶¶ 10-11. In response to Autodesk's claims, eBay terminated Vernor's pending sales and eventually shut down his online business, closing off his primary source of income. Vernor Decl. ¶¶ 17-21.

At its heart, Autodesk's contention is that even if the first-sale doctrine prohibits restrictions on resale of books and other forms of media, the "very different technological context" of software entitles it to special protection under the law. Def.'s Mot. for Summ. J. (Doc. No. 49), at 19. Autodesk's argument, however, cannot be so easily limited to software. Music publishers could just as easily argue that widespread unlicensed downloading of music entitles *their* products to special protection. And, in this digital age, publishers of movies and electronic books could make similar arguments. Indeed, if merely characterizing a sale as a "license" were sufficient to eliminate the right to resell, publishers could put used book and music stores out of business with the simple expedient of attaching the proper language to their copyrighted works. That, however, is exactly what the Supreme Court in *Bobbs-Merrill* held that copyright owners cannot do.

Because Autodesk's claims of infringement are an abuse of its copyright and an unsupported intrusion into the rights of consumers over authentic works they have lawfully purchased, this Court should deny the company's motion for summary judgment. For the same reason, the Court should grant Vernor's cross-motion for summary judgment; enter a declaratory judgment that Vernor's resale of authentic, used copies of Autodesk's software does not infringe the company's rights; and issue a permanent injunction requiring Autodesk to rescind its notices

PLAINTIFF TIMOTHY S. VERNOR'S MOTION
FOR SUMMARY JUDGMENT AND RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
NO. 2:07-cv-01189-RAJ

2

Law Offices of Michael Withey
601 Union Street, Ste. 4200
Seattle, WA  98101
T: (206) 405-1800 F: (866) 793-7216

1   of claimed infringement against Vernor and prohibiting it from further interfering with Vernor's

2   sale of its software.

3                                 **STATEMENT OF UNDISPUTED FACTS**

4        Vernor makes the majority of his income selling used comic books, video games,

5   software, and collectibles on eBay. Vernor Decl. ¶¶ 2-3. Typically, Vernor finds things to resell

6   at garage sales, office sales, and flea markets. *Id.* ¶ 3. During the eight years he has operated an

7   eBay-based store, Vernor has built a reputation as a reliable seller, completing more than 10,000

8   transactions and accumulating a positive feedback rating of 99.4 percent. *Id.* ¶¶ 2-3.

9        The events giving rise to this case began in May 2005, when Vernor purchased an

10  authentic, used copy of Autodesk's AutoCAD Release 14 software (a software package used by

11  architects and engineers for design and drafting) at a garage sale and posted it for sale on eBay.

12  *Id.* ¶ 6, 9. When Autodesk discovered Vernor's eBay auction, it sent, without warning, a notice

13  of claimed infringement to eBay under the DMCA, claiming that Vernor's listing infringed its

14  copyright. *Id.* ¶ 10. To take advantage of the DMCA's safe harbor against claims of secondary

15  liability for copyright infringement, 17 U.S.C. § 512, eBay regularly complies with such notices

16  of claimed infringement. Vernor Decl. ¶ 4; *see Dudnikov v. Chalk & Vermilion Fine Arts*, 514

17  F.3d 1063, 1068-69 & n.1 (10th Cir. 2008); *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082,

18  1085 (C.D. Cal. 2001).

19        Section 512 of the DMCA shields Internet Service Providers ("ISPs") such as eBay from

20  liability for infringing materials posted by their users if they act "expeditiously" to remove

21  allegedly infringing content upon receiving a notice of claimed infringement from a copyright

22  owner, and if they have a policy providing for termination of the accounts of repeat infringers.

23  Vernor Decl. ¶ 4; *see* 17 U.S.C. § 512(c)(1)(C), (i)(1)(A). When eBay receives a notice of

24  claimed infringement stating that a copyright owner has a good-faith belief that a particular

25  auction on eBay's system infringes its copyright, eBay automatically terminates the auction

26  without any investigation into the validity of the claim. Vernor Decl. ¶ 4; *see Dudnikov*, 514 F.3d

PLAINTIFF TIMOTHY S. VERNOR'S MOTION
FOR SUMMARY JUDGMENT AND RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
NO. 2:07-cv-01189-RAJ

3

Law Offices of Michael Withey
601 Union Street, Ste. 4200
Seattle, WA  98101
T: (206) 405-1800 F: (866) 793-7216

1    at 1068-69 & n.1. If the targeted eBay seller has a record of previous unresolved terminations,

2    eBay also suspends the seller's account. Vernor Decl. ¶ 4; *Dudnikov*, 514 F.3d at 1068-69 & n.1.

3        As Autodesk intended, its notice of claimed infringement caused the automatic

4    termination of Vernor's auction. Vernor Decl. ¶ 10. Believing that the software was authentic

5    and that Autodesk must have made a mistake, Vernor called Autodesk's counsel Andrew

6    MacKay to complain. *Id.* ¶ 11. Vernor told MacKay that he was selling an authentic, used copy

7    of the software and that he had never agreed to Autodesk's licensing terms. *Id.* MacKay

8    nevertheless refused to withdraw the notice of claimed infringement, telling Vernor that

9    Autodesk does not allow any resale of its software on eBay or otherwise. *Id.* In a letter that

10   followed, MacKay told Vernor that AutoCAD software is "licensed, not sold" and that

11   AutoCAD licenses are "'nontransferable,' meaning that they cannot be sold or transferred by any

12   other means." *Id.* ¶ 12. MacKay's letter asserted that a violation of Autodesk's licensing

13   agreements constituted copyright infringement. *Id.*

14       Vernor then submitted a counter notice to eBay contesting the validity of Autodesk's

15   copyright claim. *Id.* ¶ 5. Under the DMCA, a subscriber who is targeted by a notice of claimed

16   infringement can contest the notice with the ISP by submitting a counter notice stating that the

17   subscriber has a good faith belief that the material was removed as a result of mistake or

18   misidentification of infringing material. *Id.*; 17 U.S.C. § 512(g)(3). The ISP will continue to

19   enjoy a safe harbor from liability if it notifies the party who filed the notice of claimed

20   infringement that it will reinstate the removed material in ten business days, unless it receives

21   notice that there is a pending legal action to restrain the subscriber from continuing to post the

22   allegedly infringing content. Vernor Decl. ¶ 5, 13; 17 U.S.C. § 512(g)(2). When Autodesk did

23   not respond to Vernor's counternotice within the required period, eBay reinstated the auction and

24   Vernor sold the software to another eBay user. Vernor Decl. ¶ 13.

25       In April 2007, Vernor acquired four more copies of AutoCAD Release 14 at an office

26   sale at Cardwell/Thomas & Associates, an architectural firm in Seattle. *Id.* ¶ 14. Soon after the

1   purchase, Vernor put a copy up for sale on eBay. *Id.* ¶ 15. In response, Autodesk filed another

2   notice of claimed infringement. *Id.* Vernor then submitted a second counter notice, and, when

3   Autodesk failed to respond, the listing was again reinstated. *Id.* This pattern was repeated for the

4   next two copies of the software. *Id.* ¶ 16. As to each, Autodesk filed a notice of claimed

5   infringement and Vernor filed a counter notice. *Id.* When Vernor listed his final copy in June

6   2007, Autodesk filed yet another notice of claimed infringement, and this time eBay suspended

7   Vernor's account for repeat infringement. *Id.* ¶ 17.

8       While his account was suspended, Vernor filed a final counter notice and sent a letter to

9   Autodesk and MacKay contesting their interference with his business. *Id.* ¶ 18. Vernor told

10  Autodesk that he was selling an authentic copy of AutoCAD and was entitled to resell it under

11  17 U.S.C. § 109. *Id.* ¶ 18. Vernor also wrote that he had never installed the software or agreed to

12  any license agreement, and demanded that Autodesk contact eBay to withdraw its notices of

13  claimed infringement. *Id.* MacKay responded by letter, writing: "Please refrain from any further

14  attempts at the unauthorized sale of Autodesk software. If you do not, then I will have no choice

15  but to advise my client to take further action regarding this matter." *Id.* ¶ 19. When Autodesk

16  again failed to respond to Vernor's counter notice, eBay reinstated Vernor's eBay account on

17  July 5, 2007. *Id.* ¶ 20. Vernor was unable to earn income on eBay while his account was

18  suspended between June 5, 2007, and July 5, 2007. *Id.* ¶ 21.

19      Vernor then filed suit in this Court, seeking a declaratory judgment that the resale of

20  authentic, used copies of Autodesk software does not infringe Autodesk's copyright, and

21  injunctive relief against further interference with his business. Autodesk responded with a

22  motion to dismiss or for summary judgment (Doc. No. 20), arguing that Vernor's sale of

23  AutoCAD on eBay infringed the company's copyright in the software. This Court denied the

24  motion (Doc. No. 31), holding that Vernor's resale was protected by the first-sale doctrine.

25      Following discovery, Autodesk filed its second motion for summary judgment (Doc. No.

26  49), raising essentially the same legal arguments as it raised in its prior motion.

**ARGUMENT**

**I.    This Court Has Already Rejected Autodesk's Argument that Its "License Agreement" Restricts Vernor's Right to Resell the Company's Software.**

Autodesk's argument—that including a "license agreement" with its software cuts off the right of resale guaranteed by the first-sale doctrine—is foreclosed by this Court's decision denying the company's first motion for summary judgment. The Court's central holding in denying Autodesk's motion was that, notwithstanding Autodesk's self-serving characterization of the transaction as a "license," the company's transfer of the disputed Autodesk software was in fact a sale. Relying on *United States v. Wise*, 550 F.2d 1180 (1977), the Court held that "[t]he label placed on a transaction" does not determine whether the transaction is a license or sale. Order of July 29, 2008 ("Order"), at 8. Rather, "[i]n each case, the court must analyze the arrangement at issue and decide whether it should be considered a first sale." *Id.* (internal quotation omitted). In this case, the Court concluded that the "critical factor" was the fact that Autodesk's license agreement did not require that the AutoCAD disks be returned to the company upon termination of a license term. *Id.* at 10. Because Autodesk distributed AutoCAD without any expectation that it would regain control of it in the future, the Court held that the transfer, regardless of label, was in essence a "sale with restrictions on use." *Id.* at 10-11.

The Court thus rejected Autodesk's argument that resale of the AutoCAD software infringed the company's copyright in the software. As an owner, Vernor was "entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy." 17 U.S.C. § 109. The Court also rejected Autodesk's secondary argument that Vernor was liable for contributory copyright infringement. Order at 17-18. Autodesk argued that Vernor was a contributory infringer because whoever purchased the software from him would likely make incidental copies in a computer's memory and permanent storage during the process of installing and running it, thus infringing Autodesk's exclusive right to copy the software. *Id.* The Court held, however, that anyone who purchased the software from Vernor would also be an "owner"

PLAINTIFF TIMOTHY S. VERNOR'S MOTION
FOR SUMMARY JUDGMENT AND RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
NO. 2:07-cv-01189-RAJ

6

Law Offices of Michael Withey
601 Union Street, Ste. 4200
Seattle, WA  98101
T: (206) 405-1800 F: (866) 793-7216

1  of the software, entitled by the Copyright Act to make any copies necessary for installation and

2  operation of that software on a computer. *Id.*; *see* 17 U.S.C. § 117.

3      In its second motion for summary judgment, Autodesk rehashes the same two arguments

4  from its first motion, reversing only the order in which it presents them. Under the law of the

5  case doctrine, "a court is ordinarily precluded from reexamining an issue previously decided by

6  the same court, or a higher court, in the same case." *Richardson v. United States*, 841 F.2d 993,

7  996 (9th Cir. 1988) (internal quotation omitted). Autodesk has not invoked any exception to law

8  of the case or offered any reason why this Court's decision should not have preclusive effect. For

9  this reason alone, the Court should deny Autodesk's second motion for summary judgment and

10  grant Vernor's cross-motion.

11  **II.    Labeling a Transaction a "License" Does Not Make It a License.**

12      The only basis Autodesk asserts for interpreting its transfer agreement as a license is the

13  presence of "license language," or, in other words, the fact that the agreement *says* it is a license.

14  Def.'s Mot. for Summ. J. at 15. Autodesk relies on *Wise* for this point, reading the case to hold

15  that courts should look to whether an agreement is "phrased in terms of a license." *Id.* at 16-17.

16  Autodesk's reading of *Wise*, however, not only ignores the relevant facts at issue there, it runs

17  headlong into this Court's reading of the same case.

18      *Wise* involved movie prints "loaned to actors of major stature on rare occasions" pursuant

19  to agreements that "restrict[ed] the use of the prints to personal use." *Id.* The case examined a

20  variety of agreements, but the agreement most relevant to this case was one between Warner

21  Brothers and actress Vanessa Redgrave regarding the movie *Camelot*. *Id.* The agreement limited

22  Redgrave's use to "private home showings and library purposes" and provided that the print

23  could not be "sold, leased, licensed or loaned . . . to any other person." *Id.* Despite these

24  restrictions, the court concluded that Redgrave's payment for the film, "when taken with the rest

25  of the language of the agreement, [] reveals a transaction strongly resembling a sale with

26  restrictions on the use of the print." *Id.* In contrast, the court found that the transfer of another

PLAINTIFF TIMOTHY S. VERNOR'S MOTION
FOR SUMMARY JUDGMENT AND RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
NO. 2:07-cv-01189-RAJ

7

Law Offices of Michael Withey
601 Union Street, Ste. 4200
Seattle, WA  98101
T: (206) 405-1800 F: (866) 793-7216

1    film was *not* a sale where the agreement required the recipient to return the film on demand. *Id.*

2    Considering the different results reached as to these agreements, this Court concluded that *Wise*

3    stands for the proposition that "[t]he label placed on a transaction" does not determine the nature

4    of that transaction. Order at 8. Rather, courts are required to look beyond the label of the

5    transaction and to the "terms of the agreements." *Wise*, 550 F.2d at 1191.[1]

6        Autodesk's position to the contrary—that a copyright owner can limit the scope of a

7    purchaser's distribution rights with a "notice" that purports to create a "license"—was rejected

8    more than a century ago by the Supreme Court in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339. In

9    *Bobbs-Merrill*, a book publisher attempted to prop up the prices of its novels by limiting the

10   price at which they could be resold. *Id.* at 341. The publisher tried to accomplish that objective

11   by printing a statement below the copyright notice stating: "The price of this book at retail is $1

12   net. No dealer is licensed to sell it at a less price, and a sale at a less price will be treated as an

13   infringement of the copyright." *Id.* Admitting that it knew about the printed statement, Macy's

14   department store purchased the books from a wholesaler and sold them at retail for 89 cents per

15   copy. *Id.* at 342.

16       The publisher then sued for copyright infringement, arguing that Macy's had exceeded

17   the scope of its granted license. *Id.* at 341-42. The publisher argued that the copyright statute's

18   grant of the exclusive right to "vend" copyrighted works "vested the whole field of the right of

19   exclusive sale in the copyright owner; that he can part with it to another to the extent that he sees

20   fit, and may withhold to himself, by proper reservations, so much of the right as he pleases." *Id.*

21   at 349. In other words, the publisher took the position that, because the copyright statute granted

22
23       [1] *See also UMG Recordings*, 558 F. Supp. 2d 1055 ("Licensing language does not create a license.");
     *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785, 2004 WL 1839117 at *9 (N.D. Cal. Aug. 17, 2004) ("In
24   determining whether a transaction is a sale or license, the Court reviews the substance of the transaction, rather than
     simply relying on the plaintiff's characterization of the transaction."); *Softman Prods. Co. v. Adobe Sys., Inc.*, 171 F.
     Supp. 2d 1075, 1084 (C.D. Cal. 2001) ("It is well-settled that in determining whether a transaction is a sale, a lease,
25   or a license, courts look to the economic realities of the exchange."); *Applied Info. Mgt. Inc. v. Icart*, 976 F. Supp.
     149, 154 (E.D.N.Y. 1997) ("Ownership of a copy should be determined based on the actual character, rather than
26   the label, of the transaction by which the user obtained possession."); *Parfums Givenchy, Inc. v. C & C Beauty
     Sales, Inc.*, 832 F. Supp. 1378, 1389 (C.D. Cal. 1993) (noting that courts use a "functional" approach to determining
     whether a sale has occurred).

1  it the right to "vend" its books, it necessarily had the right to limit the grant of a license to limit

2  the right of downstream purchasers to vend them. The Supreme Court disagreed. The Court held

3  that the right to "vend" under the copyright statute granted the right to sell each copy of a

4  copyrighted work *one time. Id.* at 350. It did not, however, "create the right to impose, by notice .

5  . . a limitation at which the book shall be sold at retail by future purchasers, with whom there is

6  no privity of contract." *Id.* The Court held that Congress did not intend to include in the right to

7  "vend" the "the authority to control all future retail sales." *Id.* at 351. Since then, the *Bobbs-*

8  *Merrill* rule has been reaffirmed by more than a century of Supreme Court and lower court

9  precedent. *See Quality King Distribs. v. L'anza Rsch. Int'l., Inc.*, 523 U.S. 135, 140 & n.4

10  (1998).[2]

11      There is no meaningful difference between Sears's license limiting the resale of books

12  ("[n]o dealer is licensed to sell it at a less price, and a sale at a less price will be treated as an

13  infringement of the copyright") and Autodesk's license attempting to accomplish the same

14  objective with software ("Autodesk . . . grants you a nonexclusive, nontransferable license to use

15  the enclosed program . . . ."). LaHaie Decl., Exh. A. If anything, the license in *Bobbs-Merrill*

16  restricted resale more clearly than the license here because it explicitly stated that a prohibited

17  resale would be considered copyright infringement, while Autodesk's license agreement states

18  only that "[u]nauthorized *duplication* of the Software constitutes copyright infringement." *Id.*

19  (emphasis added). In either case, "a copyright owner cannot, with a printed statement, qualify the

20  title of a future purchaser" by reserving certain rights. *Id.* at 351.

21  **III.    The Economic Reality of the Relevant Transaction Indicates a Sale, Not a License.**

22      Because an agreement's "label[ing] itself a 'license' . . . does not control [the] analysis,"

23  courts must look instead to the "economic realities" of the situation to determine whether a

24  transfer is "basically a sale." *In re DAK Indus.*, 66 F.3d 1091, 1095 & n.2 (9th Cir.1995); *see*

25

26  _____

      [2] The current version of the Copyright Act replaces the right to "vend" with the right to "distribute." 17 U.S.C. § 109(a). "Like the exclusive right to 'vend' that was construed in *Bobbs-Merrill*, the exclusive right to distribute is a limited right." *Quality King Distribs.*, 523 U.S. at 144.

1    *also Krause v. Titleserv, Inc.*, 402 F.3d 119, 124 (2d Cir. 2005) (holding that the "possessor of

2    the copy enjoys sufficiently broad rights over it to be sensibly considered its owner"). As already

3    noted, a "critical factor" in this case is that the software does not have to be returned to Autodesk

4    at the end of a license period. Order at 10. Possessors of AutoCAD can keep it indefinitely or

5    destroy it without restriction. Under *Wise*, that factor alone is enough to demonstrate that a

6    transaction is actually a sale. *Id.*[3]

7        The failure to return, however, is only one of the indications indicating that a sale

8    occurred here. The payment arrangements governing sale of AutoCAD also strongly indicates a

9    sale. Unlike a typical license, a purchaser of AutoCAD pays the full price up front, and the

10   license agreement provides no obligation to make future payments. LaHaie Decl. Exh. A.

11   Moreover, the license term is perpetual, without any requirement of periodic license renewal. *Id.*

12   In these ways, AutoCAD's license is indistinguishable from the license at issue in *Softman*

13   *Products Co. v. Adobe Systems, Inc.*, 171 F. Supp. 2d 1075 (C.D. Cal. 2001). As the court held in

14   *Softman*, "a single payment for a perpetual transfer of possession is, in reality, a sale of personal

15   property and therefore transfers ownership of that property, the copy of the software." Softman,

16   171 F. Supp. 2d at 1086;

17       Indeed, everything about the process of buying AutoCAD resembles a traditional retail

18   transaction rather than a licensing arrangement. AutoCAD Release 14 software is sold retail in

19   shrinkwrapped boxes, with the license agreement inside and no indication on the outside of the

20   box that the buyer is acquiring anything less than full ownership. Vernor Decl. ¶ 6. The software

21   can also be purchased at online stores, where shoppers add the software to a "shopping cart" and

22   click "check out" when ready to purchase. *Id.* ¶ 7. Like retail stores, these websites fail to do

23

24       [3] *See also Krause*, 402 F.3d at 124-25 (finding ownership despite the presence of a purported "license"
     where the purchaser had the right "to possess and use a copy indefinitely without material restriction, as well as to
25   discard or destroy it at will"); *United States v. Drebin*, 557 F.2d 1316, 1326 (9th Cir. 1977) (holding that transfer
     agreements created licenses rather than sales where the agreements "required return of the films at the end of the
     license period"); *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055, 1060-61 (C.D. Cal. 2008) (noting that
26   *Wise* "demonstrates the importance of regaining possession of the licensed product"); *Novell, Inc. v. Unicom Sales,
     Inc.*, No. 03-2785, 2004 WL 1839117, at *9 (N.D. Cal. Aug. 17, 2004).

1   anything to dispel the impression that they propose something other than a typical retail

2   transaction. The listing for the software on the website for computer-maker Dell, for example,

3   advertises AutoCAD as a "retail box." *Id.*, Exh. 1. The software's listing on the website of

4   computer-supply company CDW looks very similar, but includes an option, as an *alternative* to

5   purchasing the software, to "lease" it for a monthly fee. *Id.*, Exh. 1. Even Autodesk's own

6   website offers no indication that the software is not for sale and encourages visitors to "purchase

7   software online." *Id.*, Exh. 1.

8          In short, a consumer who logs onto Autodesk's website, clicks a link to "buy AutoCAD

9   software," and charges the full price of the software on a credit card would not be unreasonable

10  to assume, when the software arrived two days later, that a purchase had occurred. The

11  "economic realities" of that situation indicate only a sale, and the inclusion of a sheet of fine

12  print "license" terms inside the box does nothing to change that.[4]

13  **IV.    The First-Sale Doctrine Does Not Include a Software Exception.**

14         **A.     The Copyright Act Provides No Basis for Giving Special Rights to Owners of
                    Copyright in Software.**

15         Apparently recognizing the futility of insisting that the simple expedient of a "license"

16  can destroy the first-sale doctrine as to books, music, and movies, Autodesk stakes most of its

17  argument on its contention that the "very different technological context" of software justifies a

18  different result. Def.'s Mot. for Summ. J. at 19. As this Court has already held, however, the

19  Copyright Act does not draw the distinction that Autodesk tries to read into it. Order at 15-16. To

20

21         [4] Autodesk relies on a few district court cases in which the courts appear to have uncritically accepted a
    software company's characterization of a sale as a "license." These decisions have been widely criticized, including
22  by Professor Nimmer, who described the *Adobe v. One Stop* decision as "untenable," and wrote that, if the court in
    *Microsoft v. Harmony* "inferred simply from the fact that the copyright to the software was licensed to end-users that
23  Section 109(a) was therefore somehow inapplicable, then it entirely misunderstood the first sale doctrine."
    2 Nimmer § 8.12[B][1][d][i]. Moreover, this Court has already held that the "*MAI* Trio" are preempted by *Wise*, but
24  it is worth noting that those cases too stressed the importance of the economic realities in a transaction. The court in
    *MAI Systems Corp. v. Peak Computer, Inc.* characterized as a license a strict contractual arrangement that allowed
25  only three employees permission to access the software, which was installed and maintained on clients' computers
    by the copyright owner. 991 F.2d 511, 517 (9th Cir. 1993); *see Storage Tech. Corp. v. Custom Hardware Eng'g &
26  Consult., Inc.*, 421 F.3d 1307, 1317 (Fed. Cir. 2005) (noting that the court in MAI Systems rested its decision on the
    "severe, explicit restrictions" in the agreement there). Moreover, *Wall Data* noted "severe restrictions" in a license
    there. *Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769 (9th Cir. 2006).

the contrary, the Copyright Act defines a "copy" as a fixation of a work "*by any method* now known or later developed," regardless of whether the purchaser can read the copyrighted material "directly *or with the aid of a machine*." 17 U.S.C. § 101 (emphasis added). The owner of a copy of software is thus, by the express language of the statute, the "owner of a particular copy" for purposes of the first-sale doctrine, 17 USC § 109.

Autodesk primarily looks to 17 U.S.C. § 117, a provision that grants the right to make incidental copies in the course of installing software on a computer. Unlike other sorts of works, software must be copied into a computer's temporary memory and permanent storage every time it is installed or used. Section 117 ensures that, even if these are technically "copies" under the language of the Copyright Act, they will not infringe any right of the copyright owner. Autodesk argues that since its software is "licensed" rather than sold, purchasers are not "owners" of the software and therefore are not entitled to install it on any computers without permission. Mot. at 10. At the same time, however, Autodesk admits that the meaning of "owner" in § 117 is the same as the meaning of the same word in the first-sale provision, § 109. Thus, Autodesk's theory provides no basis for distinguishing software from other sorts of copyrighted works. An "owner" of software for purposes of first sale will, by necessity, have the right to install and use that software under § 117.[5]

**B.  Professor Nimmer's Declaration Does Not Support Autodesk's Position.**

Autodesk also relies on the declaration of Professor Nimmer for its theory that software is entitled to special protection. Nimmer is a respected law professor in the area of copyright, but there is no indication that his expertise will shed any light on issues of fact in this case. Nimmer's professional background is dominated by his experience as a professor and scholar of copyright law. Nimmer also claims to have had "broad involvement with and obtained

---

[5] Any other holding would mean, as this Court noted, that Congress enacted § 117 as a "*sub silentio* partial nullification of § 109 as it applies to computer software purchases." Order at 18 n.10. Autodesk's reading of § 117 as a dramatic expansion of the rights of software companies is especially difficult to accept given that the provision styles itself as a "[l]imitation" on the exclusive rights of copyright owners. The apparent purpose of § 117 is to protect consumers from limitations on their right to use software, *not* to give software companies a way to impose new forms of limitations.

PLAINTIFF TIMOTHY S. VERNOR'S MOTION
FOR SUMMARY JUDGMENT AND RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
NO. 2:07-cv-01189-RAJ

12

Law Offices of Michael Withey
601 Union Street, Ste. 4200
Seattle, WA  98101
T: (206) 405-1800 F: (866) 793-7216

1   knowledge of the distribution methods used in the software industry," but this involvement

2   appears to be limited to acting as a consultant on issues of law and representing companies in the

3   capacity as an attorney. Unsurprisingly, the vast majority of Nimmer's declaration is thus made

4   up of legal argument regarding copyright law. Because interpretation of the law is a job for the

5   Court, expert opinions on the law ordinarily "should not be received, much less considered."

6   *Mola Development Corp. v. U.S.*, 516 F.3d 1370 (Fed. Cir. 2008).

7           Parts of Nimmer's declaration are not clear about whether his opinion is based on

8   copyright or contract law. Contract law is not at issue here because, as a downstream purchaser

9   of the software, Vernor never agreed to abide by Autodesk's terms. *See Quality King*, 523 U.S.

10  at 143 (noting that *Bobbs-Merrill* recognized "the critical distinction between statutory rights and

11  contract rights"); *United States v. Wise*, 550 F.2d 1180, 1187 n.10 (9th Cir. 1977) ("If a vendee

12  breaches an agreement not to sell the copy, he may be liable for the breach but he is not guilty of

13  infringement."). At those points where Nimmer does say that violation of a license would

14  constitute copyright infringement, he is generally referring to license terms that "give the

15  licensee conditional permission to use the software in ways that are otherwise exclusively within

16  the rights of the copyright owner." Nimmer Decl. ¶ 10. But Vernor has never disputed that a

17  copyright owner could, for example, grant a limited license to make a specified number of copies

18  or to display a movie a limited number of times. The difference between those cases and this one

19  is that a copyright owner generally has a right to prohibit copies and displays of a copyrighted

20  work, and thus also has the right to dictate the number of copies and the number of displays that

21  are allowed. As *Bobbs-Merrill* made clear, however, the copyright owner has *no* right to prohibit

22  downstream sales, and thus has no right under the copyright law to set limits on the resale right.

23          Tellingly, Nimmer never offers an opinion about the particular facts of *this case*.

24  Although he restates the language of the license agreement, he draws no legal or factual

25  conclusions from it. Nimmer Decl. ¶ 13. In other contexts, however, he has written that

26  "[o]wnership of a copy should be determined based on the actual character, rather than the label,

of the transaction by which the user obtained possession." Raymond Nimmer, *The Law of Computer Technology* § 1.18[1] (1992).  Moreover, Nimmer has argued that allowing license agreements to deprive downstream purchasers of their rights under the first-sale doctrine would "transform a contractual term that [companies] unilaterally include in their contracts into a binding provision on the world—even on parties who are not in privity of contract—and one that, moreover, undoes the dictates of Congress by undermining an essential feature of the Copyright Act!"  2 Nimmer § 8.12[B][1][d][i]; *see also* Nimmer, Brown & Frischling, *The Metamorphosis of Contract Into Expand*, 87 CAL. L. REV. 17, 34-40 (1999). Nimmer's views on both issues reflect a near-consensus position among academic commentators. *See* Mark A. Lemley, Peter S. Menell, Robert P. Merges & Pamela Samuelson, *Software and Internet Law* 314 (3d ed. 2007); *see also, e.g.*, John A. Rothchild, *The Incredible Shrinking First Sale Rule: Are Software Resale Limits Lawful?*, 57 RUTGERS L. REV. 1, 37-43 (2004).

### C.     Whether Software Should Be Given Special Protection Is a Question of Policy to Be Answered by Congress, Not the Courts.

As this Court recognized in denying Autodesk's first motion for summary judgment, whether to extend greater protection to one kind of work than to another is not a question of law, but a "policy judgment." Congress can and does modify the Copyright Act to resolve problems inherent to certain types of media, and in fact has already added provisions specific to software. If policy argument were a sufficient basis for courts to eliminate the first-sale doctrine in an entire industry, there would be no way to limit the logic to the context of software. Producers of music, movies, and electronic books, for example, could argue that unlicensed distribution of their works on the Internet entitles them to at least as much protection as Autodesk deserves for its old-fashioned, packaged software of the sort sold by Vernor. Moreover, companies invoke copyright to protect a wide range of other products, from watches, *Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982 (9th Cir. 2008), to hair-care products, *Quality King*, 523 U.S. 135. Watchmakers could make a credible argument that the ready availability of knock-offs on the streets of New York justifies special copyright protection for their products, and clever

PLAINTIFF TIMOTHY S. VERNOR'S MOTION
FOR SUMMARY JUDGMENT AND RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
NO. 2:07-cv-01189-RAJ

14

Law Offices of Michael Withey
601 Union Street, Ste. 4200
Seattle, WA  98101
T: (206) 405-1800 F: (866) 793-7216

1  lawyers for the hair-care company may come up with creative arguments of their own too. The

2  point is that if these policy choices are to be made, they should be made by Congress.[6]

3  **V.    Copyright Misuse**

4      Under the doctrine of copyright misuse, courts refuse to allow copyright owners to

5  enforce their rights when the owners are exercising those rights to the detriment of the public

6  interest. *See Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1079 (N.D. Cal. 2007). The Ninth Circuit

7  and other courts have recognized that the use of "unduly restrictive licensing agreements" is one

8  form of misuse. *Id.*; *Practice Mgmt. Info. Corp. v. AMA*, 121 F.3d 516 (9th Cir.1997);

9  *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 977 (4th Cir.1990).

10     A copyright owner commits misuse when it leverages its copyright to "secure an

11 exclusive right or limited monopoly not granted by the Copyright Office." *Practice Mgmt. Info.*

12 *Corp.*, 121 F.3d at 520. The Copyright Act represents a careful balance struck by Congress

13 between the interests of copyright owners and the interests of the public in the exchange and

14 development of ideas. Rothchild, *supra* at 9-10, 103. By granting a limited monopoly to

15 copyright owners, the Act encourages those owners to create new works. *Id.* at 103.

16     At the same time, however, the Act imposes fundamental limitations on the copyright

17 monopoly to ensure that the public interest will be protected. *Id.* One of the most important of

18 these limitations on copyright is the first-sale doctrine. *Id.* at 9. The doctrine reflects Congress's

19 judgment that the right to control downstream sales is not a necessary incentive to promote the

20 creation of new works and thus causes more harm to free expression than good. *See Brilliance*

---

21
22   [6] Autodesk also argues that software deserves special protection because software publishers sometimes license software for certain types of use, such as, for example, publishing an academic version of software. In *Adobe Systems, Inc. v. One Stop Micro*, 84 F. Supp. 2d 1086, 1092 (N.D. Cal. 2000), the court expressed a similar concern
23   that the defendant had purchased software licensed for educational use and resold it to commercial users, thereby frustrating Adobe's efforts to segment the market and charge different prices to different sorts of users. *Id.* at 1052
24   Whether this kind of price discrimination is legitimate or economically valuable has been debated, see William F. Fisher, *When Should We Permit Differential Pricing of Information?*, 55 UCLA L. Rev. 1, 10-37 (2007), but
25   *Stargate Software* erred to the extent it overrode the statutory first-sale right based on its own policy views. In any case, the concern about circumvention of price discrimination policies that appeared to drive the court in *Stargate Software* is absent here. There is no dispute that Vernor bought a full commercial version of the software, not one
26   that was limited to educational use. That *other* agreements limit distribution to a particular class of consumers is no reason to find that *this* agreement is a license rather than a sale.

1    *Audio, Inc. v. Haights Cross Comms., Inc.*, 474 F.3d 365, 373-74 (6th Cir. 2007) ("Once a

2    copyright holder has consented to distribution of a copy of that work, [the copyright] monopoly

3    is no longer needed because the owner has received the desired compensation for that copy.").

4    Here, by leveraging its AutoCAD software to impose restrictive license agreements that cut off

5    the right of resale, Autodesk is attempting to expand its limited monopoly to secure a right

6    specifically denied it by the Copyright Act. Autodesk's actions therefore constitutes classic

7    copyright misuse.

8            Moreover, "misuse often exists where the . . . copyright holder has engaged in some form

9    of anticompetitive behavior." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d

10   191, 204 (3d Cir. 2003); *see Practice Mgmt.*, 121 F.3d at 520-21 (holding that conditioning a

11   license on a promise not to use competitors' products constituted misuse); *Lasercomb*, 911 F.2d

12   at 979 (holding that licensing agreements that included a provision prohibiting the development

13   of competing goods constituted misuse). For this reason, too, Autodesk's prohibition of the

14   secondary market is misuse. A key interest behind the first-sale doctrine is the law's traditional

15   aversion to restraints on trade. *See Parfums Givenchy*, 832 F. Supp. at 1388-89; Rothchild, *supra*

16   at 79-80. By creating a secondary market, the first-sale doctrine promotes both competition and

17   the distribution of copyrighted works. Rothchild, *supra* at 79-80. Conversely, by eliminating the

18   right of resale, Autodesk eliminates the need to compete with used versions of its own products,

19   thus forcing consumers to buy new copies at higher prices. *Id.*

20           Many companies would undoubtedly like to achieve the effect that Autodesk believes it

21   has achieved here. Book publishers, for example, would make more money if they could

22   eliminate used bookstores by including a no-resale agreement in the front cover of books. No

23   court, however, would countenance such an anticompetitive scheme. Nor should this Court

24   countenance Autodesk's attempt to "use[] its copyright . . . to control competition in an area

25   outside [its] copyright." *Lasercomb*, 911 F.2d at 979.

26

PLAINTIFF TIMOTHY S. VERNOR'S MOTION            16            Law Offices of Michael Withey
FOR SUMMARY JUDGMENT AND RESPONSE                        601 Union Street, Ste. 4200
TO DEFENDANT'S MOTION FOR SUMMARY                           Seattle, WA  98101
JUDGMENT                                          T: (206) 405-1800 F: (866) 793-7216
NO. 2:07-cv-01189-RAJ

1

**CONCLUSION**

2          Autodesk's motion for summary judgment should be denied. Vernor's cross-motion for

3    summary judgment should be granted.

4
                                    Respectfully submitted,

5
                                    /s/ Gregory A. Beck
6                                   **GREGORY A. BECK**
                                    DC Bar No. 494479, pro hac vice
7                                   PUBLIC CITIZEN LITIGATION GROUP
                                    1600 20th Street NW
8                                   Washington, DC  20009
                                    Phone:  (202) 588-1000
9                                   Fax:  (202) 588-7795
                                    Email: gbeck@citizen.org
10                                  Attorney for plaintiff

11
                                    **MICHAEL WITHEY**
12                                  WSBA Bar No. 4787
                                    Law Offices of Michael Withey
13                                  601 Union Street
                                    Two Union Square, Suite 4200
14                                  Seattle, WA  98101
                                    Phone: (206) 405-1800
15                                  Fax: (866) 793-7216
                                    Email: mike@witheylaw.com
16                                  Attorney for plaintiff

17

18

19

20

21

22

23

24

25

26

PLAINTIFF TIMOTHY S. VERNOR'S MOTION          17          Law Offices of Michael Withey
FOR SUMMARY JUDGMENT AND RESPONSE                        601 Union Street, Ste. 4200
TO DEFENDANT'S MOTION FOR SUMMARY                        Seattle, WA  98101
JUDGMENT                                                 T: (206) 405-1800 F: (866) 793-7216
NO. 2:07-cv-01189-RAJ

# CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Eric W Doney
DONAHUE GALLAGHER WOODS LLP
300 LAKESIDE DRIVE
STE 1900
OAKLAND, CA 94612
Email: eric@donahue.com

Julie E Hofer
DONAHUE GALLAGHER WOODS LLP
300 LAKESIDE DRIVE
STE 1900
OAKLAND, CA 94612
Email: julie@donahue.com

Lawrence K Rockwell
DONAHUE GALLAGHER WOODS LLP
300 LAKESIDE DRIVE
STE 1900
OAKLAND, CA 94612
Email: larry@donahue.com

Angelo J Calfo
YARMUTH WILSDON CALFO
925 FOURTH AVE
STE 2500
SEATTLE, WA 98104
Email: acalfo@yarmuth.com

Jeremy E Roller
YARMUTH WILSDON CALFO
925 FOURTH AVE
STE 2500
SEATTLE, WA 98104
Email: jroller@yarmuth.com

PLAINTIFF TIMOTHY S. VERNOR'S MOTION          18          Law Offices of Michael Withey
FOR SUMMARY JUDGMENT AND RESPONSE                         601 Union Street, Ste. 4200
TO DEFENDANT'S MOTION FOR SUMMARY                         Seattle, WA  98101
JUDGMENT                                                  T: (206) 405-1800 F: (866) 793-7216
NO. 2:07-cv-01189-RAJ

1    I hereby certify that I have caused this document to be served via U.S. Postal Service, facsimile
     or messenger to the following:

2
     NONE
3

4    DATED this 7th day of March, 2009.

5    /s/ Gregory A. Beck
     _____
6    **GREGORY A. BECK**
     DC Bar No. 494479, pro hac vice
7    PUBLIC CITIZEN LITIGATION GROUP
8    1600 20th Street NW
     Washington, DC  20009
9    Phone:  (202) 588-1000
     Fax:  (202) 588-7795
10   Email: gbeck@citizen.org
11   Attorney for plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26