HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TIMOTHY S. VERNOR,

          Plaintiff,

    v.

AUTODESK, INC.,

          Defendant.

CASE NO. C07-1189RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on cross-motions for summary judgment. Dkt. ## 49, 54.  The court has reviewed the parties' briefs and documentary evidence, and has heard from the parties at oral argument.  For the reasons stated below, the court DENIES Defendant's summary judgment motion (Dkt. # 49) and GRANTS in part and DENIES in part Plaintiff's summary judgment motion (Dkt. # 54).  The clerk shall enter judgment for Plaintiff.

## II.  BACKGROUND

The court first addressed this dispute in a May 20, 2008 order denying the motion of Defendant Autodesk, Inc. ("Autodesk") to dismiss Plaintiff Timothy Vernor's complaint. *Vernor v. Autodesk*, 555 F. Supp. 2d 1164 (W.D. Wash. 2008).  Mr. Vernor makes a living selling merchandise on eBay, the well-known internet marketplace.  In 2005 and 2007, he attempted to sell what the court will refer to as "AutoCAD packages."  Each AutoCAD package is an Autodesk-commissioned box, inside which is a "jewel

ORDER – 1

case" containing a compact disk encoded with Autodesk's copyrighted AutoCAD software. LaHaie Decl. (Dkt. # 21) ¶¶ 10-11. The jewel case is sealed with a sticker advising that, among other things, "[t]his software is subject to the license agreement that appears during the installation process or is included in the package." *Id.* ¶ 11 & Ex. B. The box also contains a copy of the Autodesk Software License Agreement (the "License"), and possibly other documentation as well. *Id.* ¶ 14.

Upon discovering Mr. Vernor's attempted eBay sale of AutoCAD packages, Autodesk invoked the "takedown" provisions of the Digital Millennium Copyright Act. 17 U.S.C. § 512; *see also Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1179 (C.D. Cal. 2001) (describing takedown procedure). Autodesk's 2005 takedown efforts delayed Mr. Vernor's sales. Its 2007 takedown efforts not only delayed one or more sales, they caused eBay to bar Mr. Vernor from selling anything for a month.

Autodesk directed its 2007 takedown notices at Mr. Vernor's attempted sales of AutoCAD packages that he acquired from a Seattle architecture firm, Cardwell/Thomas Associates ("CTA"), in a 2007 sale of office equipment. Although CTA had broken the sticker sealing the jewel case in each AutoCAD package, there is no dispute that the packages and their contents were authentic and otherwise identical to AutoCAD packages as Autodesk distributes them. There is no evidence or assertion that Mr. Vernor used AutoCAD software himself, or even installed it on his computer.

Mr. Vernor succeeded in selling two of the AutoCAD packages he acquired from CTA, and brought this action seeking a declaratory judgment that his sales of the other two AutoCAD packages, and any other AutoCAD packages that he might acquire in the future, would not violate the Copyright Act.[1] He also claimed that Autodesk's campaign to stop his sales was an unfair trade practice under Washington law.

---

[1] The court previously rejected Autodesk's contention that Mr. Vernor lacked Article III standing to seek declaratory judgment. *Vernor*, 555 F. Supp. 2d at 1167. Autodesk has not challenged that ruling in its current motion, and the court is aware of no changed circumstances undermining Mr. Vernor's standing.

ORDER – 2

1    In *Vernor*, the court denied Autodesk's motion to dismiss Mr. Vernor's claims. It

2   held that the first sale doctrine codified at 17 U.S.C. § 109(a) permitted Mr. Vernor to sell

3   the AutoCAD packages without copyright liability. *Vernor*, 555 F. Supp. 2d at 1174. It

4   also held that because persons to whom Mr. Vernor would sell the packages would use

5   the software in accordance with 17 U.S.C. § 117, Mr. Vernor would not be liable for

6   contributory copyright infringement. *Id.* at 1175. Factual disputes prevented the court

7   from resolving Mr. Vernor's state law claims. *Id.* at 1176-77.

8    Little has changed in this matter in the seventeen months since the court decided

9   *Vernor*. The parties have taken discovery, but it has revealed no facts materially different

10  than those before the court in May 2008. The new developments are as follows:

11       1) The parties settled Mr. Vernor's state law claim, and the court dismissed it at

12          the parties' request. Dkt. # 47.

13       2) Autodesk obtained a consent judgment against CTA in the United States

14          District Court for the Northern District of California. Harris Decl. (Dkt. # 51),

15          Ex. B (Feb. 6, 2009 judgment in Case 09-397-WHA). According to the

16          recitals in the consent judgment, CTA agreed in 2002 to destroy all copies of

17          AutoCAD software in the AutoCAD packages that it transferred to Mr. Vernor

18          in 2007. *Id.*, Ex. B at ¶ 7. CTA entered the 2002 agreement when upgrading

19          its AutoCAD software. In the consent judgment, CTA agreed that it had

20          breached its promise to destroy the AutoCAD packages, and that it had

21          transferred those packages to Mr. Vernor in violation of Autodesk's copyright.

22          *Id.*, Ex. B at ¶ 11

23       3) Autodesk retained professor Raymond Nimmer as an expert witness. Mr.

24          Nimmer provided two declarations in support of Autodesk's summary

25          judgment motion. Dkt. ## 52, 60. Mr. Vernor did not depose him, and he did

26          not appear at oral argument.

28   ORDER – 3

4)  Autodesk submitted a declaration from an employee regarding its licensing practices.  Suppes Decl. (Dkt. # 50).

5)  Two district courts wrote decisions bearing on the issues that this court addressed in *Vernor*.  *MDY Indus., LLC v. Blizzard Entm't, Inc.*, No. CV-06-2555-PHX-DGC, 2008 U.S. Dist. LEXIS 53988 (D. Ariz. Jul. 14, 2008); *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055 (C.D. Cal. 2008).

Despite these new developments, the motions before the court present the same issues that the court resolved in May 2008.  The parties disagree over whether Mr. Vernor has a first sale right to resell the AutoCAD packages, and they disagree over whether Mr. Vernor's sales are contributory copyright infringement.  The court answered both questions in Mr. Vernor's favor in May 2008, and for the reasons stated below, it does so again today.

## III.  ANALYSIS

The court begins by observing that nothing prevents it from revisiting the issues it resolved in *Vernor*.  That order did not result in the entry of judgment for any party, and Federal Rule of Civil Procedure 54(b) confirms that the court can revise such orders at any time before the entry of final judgment.  Of course, a prudent court will not change one of its orders absent new evidence or a demonstration that it committed legal error.  Typically, a request to revise an order comes in the form of a motion for reconsideration, and there is no dispute that the time for such a motion has long passed.  Local Rules W.D. Wash. CR 7(h)(2).  In this case, however, Autodesk has asked the court to revisit its prior ruling not merely in light of new legal arguments that target that ruling, but in light of the new developments listed above.  This distinguishes Autodesk's motion from an untimely motion for reconsideration.

The court considers the parties' new and old evidence and argument under the familiar summary judgment standard.  The court must resolve all disputes of fact in favor of the non-moving party, and grant summary judgment only if disputes resolved in this

ORDER – 4

manner, coupled with undisputed facts, establish that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  The court applied this standard in *Vernor*, because Autodesk relied on evidence beyond the scope of Mr. Vernor's complaint in its motion to dismiss.  555 F. Supp. 2d at 1167 (citing Fed. R. Civ. P. 12(d)).  As was the case in May 2008, and as the parties confirmed at oral argument, there are no disputes of material fact.  Although the parties have some factual disagreements, they agree upon every fact that is material to the court's decision.  The parties' material disputes are purely legal.

## A.   Rights Belonging to an "Owner" of a Copy of Copyrighted Material:  The First Sale Doctrine of § 109 and the Reproduction Exception of § 117

Some of the copyright principles bearing on this dispute are not controversial, and the court summarizes them here.  No one disputes that Autodesk holds the copyright in the AutoCAD software and the printed materials in the AutoCAD packages.  The Copyright Act grants several exclusive rights to copyright holders.  17 U.S.C. § 106.  Most relevant to this dispute are the exclusive rights to control distribution (§ 106(3)) and reproduction (§ 106(1)) of copyrighted material.  Exceptions to these rights inure to an "owner" of a copy of copyrighted material.[2]  The first, commonly known as the "first sale" right, entitles the "owner of a particular copy" of copyrighted material to "sell or otherwise dispose of" that copy despite the copyright holder's distribution monopoly.  17 U.S.C. § 109(a).  The second is the privilege of the "owner of a copy of a computer program" to reproduce the program if doing so is an "essential step in the utilization of the computer program."  17 U.S.C. § 117(a)(1).  Because the ordinary use of a computer program inevitably entails copying all or part of the program in the computer's memory, § 117 ensures that people who own computer software copies can use them without fear

---

[2] Although the phrase "copy of copyrighted material" is awkward, the court uses it to emphasize the distinction between the copy and the copyrighted material.  *See* 17 U.S.C. § 202.  Autodesk's copyrighted AutoCAD software is its intellectual property, and Mr. Vernor makes no claim to it.  Copies of AutoCAD software are personal property embodied in compact disks and other media scattered across the world.  Mr. Vernor claims to be the owner of two such copies, contained in the two AutoCAD packages still in his possession.

ORDER – 5

of copyright liability.  *See Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 537-38 (M.D.N.C. 2005).

Mr. Vernor claims to be the "owner" of the copies of software in the AutoCAD packages in his possession, and seeks refuge in both § 109 and § 117.  He contends that Autodesk transferred ownership of the AutoCAD packages to CTA, that CTA transferred ownership to him, and that he has a first sale right to sell those packages.  For the same reason, he contends that anyone to whom he sells an AutoCAD package will become its owner, and will thus be privileged to use the software in his or her computer without violating Autodesk's right to control reproduction of the software.

Autodesk believes that it still owns the AutoCAD packages in Mr. Vernor's possession.  It contends that it never transferred ownership of the AutoCAD packages to CTA.  Indeed, in Autodesk's view, it never transfers ownership of AutoCAD packages to anyone.  Instead, it licenses AutoCAD packages without transferring ownership of them, and thus remains the "owner" of the copies of copyrighted material contained therein.  Autodesk claims that Mr. Vernor's sales of AutoCAD packages violate its distribution monopoly and contribute to violations of its reproduction monopoly by the persons to whom he sells.  It thus claims that Mr. Vernor's sales constitute both direct and contributory copyright infringement.  *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261 (9th Cir. 1996) (contrasting direct and contributory infringement).

**B.    Autodesk's Transfer of AutoCAD Packages to CTA**

The key to resolving this dispute is determining whether Autodesk transferred ownership of the AutoCAD packages to CTA.  Assuming that it did, no one disputes that CTA transferred whatever ownership it had to Mr. Vernor.  Autodesk unquestionably transferred *possession* of ten AutoCAD packages to CTA in a 1999 settlement of a dispute.  Harris Decl., Ex. A.  In the 1999 settlement agreement, CTA promised to "adhere to all terms of the Autodesk Software License Agreement."  *Id.*, Ex. A at ¶ 4.  No

ORDER – 6

one disputes that the license agreement to which the settlement agreement refers is

materially identical to the License contained in each AutoCAD package.

The License governs both the use and disposition of the AutoCAD packages.  It

limits installation of AutoCAD software to two computers, with a ban on simultaneous

use of the software on those computers.  License: GRANT OF LICENSE.[3]  It prohibits

modification or reverse engineering of the software.  License: RESTRICTIONS.  It bars any

use or transfer of the software outside of the western hemisphere.  *Id.*  It bars any transfer

of the software without Autodesk's written permission.  *Id.*  It also declares that "[t]itle

and copyrights to the Software and accompanying materials and any copies made by you

remain with Autodesk."  License: COPYRIGHT.  Finally, the License dictates that a user

who obtains the software via an upgrade from Autodesk must destroy any copies of older

AutoCAD software in his possession.  License: UPGRADES AND UPDATES.

The court also assumes for purposes of this order that in 2002 CTA upgraded the

software contained in the AutoCAD packages that Autodesk transferred to it in the 1999

settlement agreement, and violated its agreement to destroy the copies of the software in

those packages.  This assumption requires some explanation.  The sole "evidence" of

CTA's agreement to destroy the software in its 1999 packages is the recitals included in

Autodesk's 2009 consent judgment against CTA.  Harris Decl., Ex. B.  Those recitals

include the inaccurate statement that CTA's 1999 settlement agreement and the License

included with the AutoCAD packages received in that settlement agreement required

CTA to destroy the software in those packages upon upgrade.  *Id.* ¶ 7.  This court

repeated a variation of that inaccurate statement in its prior order.  *Vernor*, 555 F. Supp.

2d at 1170 n.5.  The 1999 settlement agreement does not mention any upgrade-and-

destroy policy.  The License to the version of AutoCAD (AutoCAD 14) that CTA

received in that settlement does not require destruction of the AutoCAD 14 copies that

---

[3] Because the License contains no numbered paragraphs, the court cites it by reference to its
boldface headings.  The License is in the record at Exhibit A to Exhibit A of the LaHaie
Declaration, and at Exhibit A to Exhibit 2 of Exhibit B of the Harris Declaration.

ORDER – 7

1    CTA received.  Instead, the License requires destruction of *older* versions of the software

2    in the event that the AutoCAD 14 software was itself obtained as an upgrade.  License:

3    UPGRADES AND UPDATES ("If this Software is being licensed to you as an upgrade or

4    update to software previously licensed to you, you must destroy the software previously

5    licensed to you . . . .").  It would not be surprising if the license agreement Autodesk

6    included with the upgraded software (AutoCAD 2000) it transferred to CTA in 2002

7    included a similar requirement to destroy older copies, but there is no evidence of that

8    license agreement before the court.  Autodesk purported to submit a copy of the

9    AutoCAD 2000 license in its 2009 consent judgment (Harris Decl, Ex. B at ¶ 8 (citing

10    Ex. 6)), but the submitted exhibit is merely the first page of the "click-through" license

11    for AutoCAD 14.  The court assumes that CTA agreed to destroy the AutoCAD 14

12    software in 2002 only because the assumption ultimately does not prejudice Mr. Vernor.

13        Importantly, however, CTA made no agreement to destroy the AutoCAD 14

14    software when it acquired it in 1999.  It made that agreement in 2002 because CTA

15    offered an enormous discount as an incentive to agree to destroy the software when it

16    upgraded to AutoCAD 2000.  Harris Decl., Ex. B at ¶ 7 (noting that AutoCAD 2000

17    software retailed for $3750, but sold for $495 as an upgrade).

18        There is no dispute that Autodesk licensed its software to CTA.  The court makes

19    this observation because the parties and their witnesses too often suggest that their

20    dispute is about whether Autodesk "sold" rather than "licensed" its software.  That

21    dispute is not determinative, because the use of software copies can be licensed while the

22    copies themselves are sold.  Autodesk unquestionably licensed the software in that it

23    limits the right to use it.  For example, the License takes away fair use right to reverse

24    engineer the software.  License: RESTRICTIONS.  The License also expands the right to

25    use software.  For example, it permits the licensee to install the software on two

26    computers, whereas § 117(a) would permit only a single installation.  License: GRANT OF

27    LICENSE.  There is also no question that most software is transferred to consumers via

28    ORDER – 8

licenses that restrict and expand their right to use it, although no party has presented competent evidence of the terms of any other software maker's license. The question before the court is whether the Autodesk License is a license that transfers ownership of the software copies included in AutoCAD packages. To capture that distinction, the court will use the terms "mere license" and "mere licensee" in reference to licenses that do not transfer ownership of any copies. The question before the court is whether Mr. Vernor is the "owner" of the copies of copyrighted material in the AutoCAD packages he acquired from CTA, or whether CTA was a mere licensee who had no ownership to transfer to Mr. Vernor.

## C. Who is the "Owner" of the AutoCAD Packages? The Ninth Circuit Gives Two Different Answers.

In *Vernor*, this court concluded that Ninth Circuit precedent gives two different answers to the question of what distinguishes an "owner" from a mere licensee. In *United States v. Wise*, 550 F.2d 1180, 1190-93 (9th Cir. 1977), a panel examined numerous agreements governing the transfer of film prints to determine which transferred ownership and which did not. Although no line of demarcation between transfers of ownership and mere licenses emerges from *Wise*, the opinion establishes that even a transfer that places severe restrictions on the use and disposition of a copy of copyrighted material can transfer ownership of that copy. Three later panels, considering software licenses, were more deferential to the characterization of a transaction as a mere license. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993); *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330 (9th Cir. 1995); *Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769 (9th Cir. 2006). In each of these cases the panel deemed the transfer of possession pursuant to a license to be a mere license, rather than a transfer of ownership. The court examined the conflict between *Wise* and the "*MAI* Trio" in its prior decision, and does so again today.

ORDER – 9

1

2    **1.    The *Wise* View:  The Distinction Between a Transfer of Ownership and a Mere License Turns on the Terms of the Transfer Agreement.**

3    *Wise* called upon the panel to examine several transfer agreements for movie

4    prints.  Many were generic distribution agreements transferring possession of prints to

5    theaters and other outlets for display.  Virtually all of the distribution agreements "were

6    designated as 'licenses'," and they transferred only "limited rights for the exhibition or

7    distribution of the films for a limited purpose and for a limited period of time."  *Wise*,

8    550 F.2d at 1190.  The "[t]ypical" distribution agreement "reserved title to the film

9    prints" in the studio and "required their return to [the studio] following expiration of the

10   contract term."  *Id.*  Two different agreements governed the transfer of film prints to

11   ABC and NBC for televised display.  *Id.* at 1191.  Several other agreements were "V.I.P.

12   licenses" that "reserved all rights and title in the studios, restricting the licensee to

13   possession of the print for his own personal use."  *Id.* at 1184.  Others were agreements

14   transferring possession of film prints to salvage companies so that they could be

15   destroyed or obscured and recycled.  *Id.*

16        The *Wise* panel noted that the "complicated" nature of agreements transferring

17   rights in copyrighted works required an analysis of each transfer agreement before it.

18   *Wise*, 550 F.2d at 1189.  Designating an agreement as a "license" does not determine

19   whether it transfers ownership.  *Id.* at 1192 (finding that some contracts "consistent with

20   their designation as loans or licenses" did not transfer ownership).  The panel noted

21   several relevant characteristics of transfer agreements, but they were ambiguous in the

22   sense that those characteristics were present in both transfers of ownership and mere

23   licenses.  For example, although an agreement that fails to include a clause reserving title

24   in the transferred copy to the copyright holder is suggestive of an ownership transfer, that

25   failure is not dispositive.  *Id.* at 1191 ("The mere failure to expressly reserve title to the

26   films does not require a finding that the films were sold, where the general tenor of the

27   entire agreement is inconsistent with such a conclusion.").  Similarly, a single, up-front

28   ORDER – 10

1   payment by the transferee for a particular copy is suggestive of a transfer of ownership,

2   but not dispositive.  *Compare id.* at 1191 (finding no transfer of ownership despite

3   provision permitting licensee to order film prints "at its expense") *with id.* at 1191

4   (finding transfer of ownership where agreement permitted licensee to retain a film print at

5   its "election and cost").  An agreement requiring the transferee to destroy transferred

6   copies is not dispositive of whether ownership transfers.  *Compare id.* at 1191 (finding no

7   transfer of ownership despite clause requiring transferee to either sell prints to copyright

8   holder or destroy them at copyright holder's election) *with id.* at 1193 (finding transfer of

9   ownership in agreements requiring transferee to destroy film prints for salvage).

10          A clause in an agreement reserving title to the transferred copy in the copyright

11  holder is also an ambiguous characteristic in *Wise*.  With only one likely exception, in

12  every agreement containing an express reservation of title in the copyright holder, the

13  panel found a mere license.  *Id.* at 1191 (discussing generic film print distribution

14  agreements and agreement for transfer of "Camelot" prints to NBC), 1192 (discussing

15  V.I.P. loans to "actors of major stature" of "The Sting," and "Paper Moon").  The likely

16  exception was an agreement to transfer a print of "Camelot" to actress Vanessa Redgrave

17  (the "Redgrave Contract.").  Like all of the V.I.P. agreements, that agreement "reserved

18  all rights and title in the studios, restricting the licensee to possession of the print for his

19  own personal use."  *Id.* at 1184.  Nonetheless, when coupled with an upfront payment for

20  the cost of the print and "the rest of the language of the agreement," the panel found the

21  Redgrave Contract transferred ownership.  *Id.* at 1192.  It reached that conclusion despite

22  restrictions that prevented the sale, lease, license, or loan of the print "to any other

23  person," and eliminated all uses of the film except for Ms. Redgrave's in-home display.

24  *Id.*  The court acknowledges, however, that the panel's discussion of other V.I.P.

25  agreements twice noted that the agreements contained a reservation of title, despite

26  having already made that observation earlier in the opinion.  *Compare id.* at 1184

27  (describing V.I.P. agreements collectively) *with id.* at 1192 (describing V.I.P. agreements

28  ORDER – 11

individually). It is possible that the panel's collective description was not meant to apply to every V.I.P. agreement, and that the Redgrave Contract lacked an express reservation of title. The court finds this interpretation unlikely after a careful reading of the opinion, but notes it as a possibility, as Autodesk's counsel did at oral argument.

Only one characteristic was unambiguous in that it appeared only in agreements that the *Wise* panel deemed to be transfers of ownership. In each instance in which the transferee could, at his election, retain possession of the transferred copy indefinitely, and the copyright holder had no right to regain possession, the court found an ownership transfer. *Id.* at 1191-92 (discussing transfers of prints of "Funny Girl" to ABC and the Redgrave Contract). By contrast, the copyright holder's right to regain possession of the transferred copy was characteristic of a mere license. *Id.* at 1191 (discussing agreements requiring the return of the prints to the studio at the expiration of the contract term), 1192 (discussing V.I.P. transfer of a print of "Paper Moon" subject to studio's right to demand its return and a "revocable" consent to Robert Redford to use a print of "The Sting").

The Autodesk License is a hodgepodge of terms that, standing alone, support both a transfer of ownership and a mere license. Autodesk expressly retains title to the "Software and accompanying materials," but it has no right to regain possession of the software or the "accompanying materials." Licensees pay a single up-front price for the software. Autodesk can require the destruction of the software, but only as consideration in the later purchase of an upgrade. The decision to upgrade, and thus the decision to accept Autodesk's destruction requirement, is entirely in the control of the licensee.[4] Autodesk severely restricts the use and further transfer of the software.

---

[4] Autodesk provides evidence that its policies at one time required the return of older software to Autodesk as a condition of upgrading, rather than the destruction of the older software as in the License. Suppes Decl. ¶¶ 18-19. Autodesk is free to demand any consideration it wishes for software upgrades. Unless its customers *choose* to upgrade, however, Autodesk has no right to demand either the return of older copies of the software or their destruction. Thus, neither the upgrade policy reflected in the License nor previous versions of that policy alter the court's conclusion that Autodesk had no right to regain possession of the software copies it transfers.

ORDER – 12

Despite these competing considerations, the court concludes that *Wise* leads to the conclusion that the transfer of AutoCAD copies via the License is a transfer of ownership. Of all the agreements that the *Wise* panel analyzed, the License is most analogous to the Redgrave Contract. Like the License, the Redgrave Contract purported to reserve title in the copy to the copyright holder, but made no provision for the copyright holder to regain possession of the copy. Like Ms. Redgrave, Autodesk licensees pay a single price to the copyright holder at the outset of the transaction. Like the License, the Redgrave Contract severely restricts the use and transfer of the copy.[5] But, like the panel in *Wise*, this court concludes that the License transferred ownership of the software copy despite those restrictions.

The court's conclusion, moreover, would be the same even if the Redgrave Contract did not contain an express reservation of title to the film print to the studio. If the Redgrave Contract had no such clause, then the *Wise* panel had no occasion to consider an agreement that both retained the copyright holder's title in transferred copies *and* permitted the transferee to retain the copies indefinitely. In this court's view, retaining title in a copy is meaningless unless the copyright holder has some means to regain possession of the copy. *Wise* requires the court to look at a transaction holistically, and the court finds no basis for the conclusion that an agreement to permit perpetual possession of property can be construed as reserving ownership. Autodesk's attempt to establish the common understanding of "ownership" by citing a legal

---

[5] Seeking more analysis of the importance of the copyright holder's express retention of title in a license, the court directed the parties to prepare supplemental briefing. Dkt. # 66. Among other things, the court asked Autodesk to address any of its business practices other than the license that are consistent with retention of title. In response, Autodesk pointed out that it takes measures to enforce the prohibition on transfer of software by assigning a unique authorization code to each licensed copy of the software, and revealing that code only to registered licensees. Autodesk insists that this measure strengthens its argument that it has retained ownership of those copies, but the court disagrees. Although Autodesk may be serious about enforcing its transfer ban, there is no indication that the film studios in *Wise* were any less serious. As both Autodesk and the studios know, measures to enforce transfer bans are not likely to succeed against a determined licensee. CTA circumvented Autodesk's measures by simply writing authorization codes on the software copies it sold to Mr. Vernor.

ORDER – 13

1    dictionary equating ownership with *unrestricted* ownership is consistent neither with

2    *Wise* nor with common understanding.  Autodesk Mot. (Dkt. # 49) at 10.  For example, a

3    person who buys a home is nonetheless restricted in his use and subsequent transfer of

4    the home by property laws, zoning ordinances, and fair housing statutes.  No one would

5    characterize the person's possession, however, as something other than ownership.

6    Similarly, the court cannot characterize Autodesk's decision to let its licensees retain

7    possession of the software forever as something other than a transfer of ownership,

8    despite numerous restrictions on that ownership.

9         Autodesk did not regain ownership of the software copies it transferred to CTA

10    when it upgraded CTA's software.  Instead, years after Autodesk transferred ownership

11    of the software copies to CTA, CTA agreed to destroy the copies as consideration for a

12    discounted upgrade to new software.  *See supra* Part III.B & n.4.  As the court concluded

13    in its prior order, "[t]here is no basis to distinguish this transaction from the salvage

14    transactions that were found to be sales in *Wise*."  *Vernor*, 555 F. Supp. 2d at 1170 n.5.

15         Autodesk also suggests that it can distinguish its License from the agreements in

16    *Wise* because it is a computer software agreement, and should be judged in the context of

17    the software industry.  In *Wise*, industry practices have at least some relevance.  550 F.2d

18    at 1190 (noting "testimony of studio representatives knowledgeable about the film

19    distribution system").  Yet despite a film industry that "generally [did] not sell films, but

20    rather license[d] their use for limited purposes and for limited periods of time," *id.* at

21    1184, the *Wise* panel found transfers of ownership when the terms of a transfer agreement

22    warranted that conclusion.  Put differently, no amount of evidence of industry practice

23    can overcome the plain terms of an agreement.  Moreover, the court has little competent

24    evidence of software industry practice.  Autodesk presents evidence that "licensing" is

25    the predominant method of software transfer, but it largely ignores the important

26    question, which is whether those licenses transfer ownership.  Autodesk presents no

27    evidence of the terms of other company's licenses.  It does not take the position that no

28    ORDER – 14

other company transfers ownership of its software, nor would it have any evidentiary foundation for doing so.  Its expert witness, Mr. Nimmer, argues that software companies take a restrictive view of whether they transfer ownership of software companies.  The court has no doubt that software companies prefer to reserve as much control over copies as the law and the market will permit, but that preference bears little on the issue before the court.  Although Autodesk correctly observes that film print is a much more expensive medium than a compact disk, it does not explain how this distinction favors its position.  Mr. Vernor was able to sell the "cheap" Autodesk compact disk for hundreds of dollars, just like the resale of the films in *Wise*.  The value of the copy is determined not primarily by the medium, but rather by the content the medium carries.

Ultimately, although there are many distinctions between the film prints in *Wise*, Autodesk's AutoCAD disks, and the industries in which they are transferred, those distinctions do not make a difference for purposes of answering the copyright question before the court.  The court will address the possibility that there is a statutory difference between ownership of software copies and ownership of other copyrighted copies in *infra* Part III.D.2.  The court turns now to the *MAI* Trio.

### 2.    The *MAI* Trio: More Deference to a Copyright Holder's Characterization of a Transfer Agreement as a Mere License

More than 25 years after *Wise*, the *MAI* panel took a more deferential view of the characterization of a transfer of copyrighted material as a mere license.  The transfer agreement in *MAI* was a license that restricted the use of software.[6]  *MAI*, 991 F.2d at 517 n.3.  The defendant in *MAI* was not a licensee, but rather a repair service that serviced computer systems on which licensed software had been installed.  *Id.* at 513.  The *MAI* panel was mainly concerned with whether the repair technicians' use of the computers

---

[6] In *Vernor*, this court stated that the software license in *MAI* had "no restrictions on resale" of the software.  555 F. Supp. 2d at 1172 (citing *MAI*, 991 F.2d at 517 n.3).  Although no one has challenged that statement, the court notes that the license contained a clause requiring the licensee to "keep the Software . . . confidential and not make [it] available to others . . . .".  *MAI*, 991 F.2d at 517 n.3 (ellipses and bracketed material in original).  This may be a restriction on resale, although the *MAI* court had no occasion to elaborate on that issue.

ORDER – 15

1    entailed making an unauthorized copy of the software. *Id.* at 517-19. In a one-sentence

2    footnote, the panel stated that because "MAI licensed its software, the [customers to

3    whom it licensed the software] do not qualify as 'owners' of the software and are not

4    eligible for protection under § 117." *Id.* at 518 n.5.[7] The panel did not cite *Wise*.

5         In *Triad*, a panel again confronted a copyright infringement claim against a repair

6    service, this time considering three versions of a software transfer agreement. In the first,

7    the copyright holder "sold its software outright." 64 F.3d at 1333. In the second version,

8    it "began licensing" the software and prohibited duplication of the software or use of the

9    software by third parties. *Id.* In the third, it added a requirement that licensees pay a

10   "transfer fee" to sell computer systems on which the software had been installed. *Id.* The

11   court concluded that customers who acquired software under the first agreement

12   "own[ed] their software," and thus had the right under § 117 to authorize repairs. *Id.* at

13   1333 & n.3. Transferees under the second and third agreements could not use § 117 to

14   authorize repairs, and thus the panel implicitly held that they were mere licensees. *Id.*

15        Most recently, in *Wall Data*, another panel considered the § 117 defense of a

16   computer software user. The transfer agreement in question prohibited the installation of

17   the software in "multiple computer" or networked "multiple user arrangement[s]," and

18   permitted transfers of the software between computers under the transferee's control only

19   once every 30 days. *Wall Data*, 447 F.3d at 775 n.5. The agreement did not otherwise

20   restrict resale or disposition of the software. *Id.* at 775 n.5. The transferee, a large

21   sheriff's department, purchased licenses permitting it to install approximately 3600

22   copies of the software. *Id.* at 774. It instead installed copies of the software on more

23   than 6000 computers, but used a password system to ensure that no more than 3600 users

24   could access the software at one time. *Id.* at 774-75. The *Wall Data* panel rejected the

25   _____

26   [7] Mr. Vernor dismisses the *MAI* footnote as dicta, but the court disagrees. Had the *MAI* panel not
     rejected the licensees' claim to ownership, the licensees could have relied on § 117 to authorize

27   the repair technicians to copy the software in the ordinary use of their computers. *See Triad*, 64
     F.3d at 1333 & n.3.

28   ORDER – 16

licensee's attempt to invoke § 117 for two independent reasons. First, it followed *MAI* in concluding that a licensee who obtains a software copy with a license that "makes it clear that she or he is granting only a license to the copy of the software" and "imposes significant restrictions on the purchaser's ability to redistribute or transfer that copy" is "not an owner" of the copy. *Id.* at 785. It also cited *MAI* for the proposition that "if a software developer retains ownership of every copy of software, and merely licenses the use of those copies, § 117 does not apply." *Id.* Second, the panel held that even if the licensee could rely on § 117, it could not establish that its installation of more than 2000 unauthorized copies of the software was an "essential step" in the use of the software, as § 117(a)(1) requires. As the court noted in *Vernor*, the court cannot characterize either of *Wall Data*'s twin holdings as dicta. 555 F. Supp. 2d at 1172 n.7 (citing *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949)). The *Wall Data* panel explained, however, that it had declined to revisit *MAI* despite substantial criticism from commentators and lower courts because the second of its two holdings made "any error [in the first holding] harmless." *Wall Data*, 447 F.3d at 786 n.9.

If the court were to follow the *MAI* Trio, Autodesk would prevail. Mr. Vernor appears to concede as much, as he scarcely addresses the three cases in his briefs. Although the distinction between a transfer of ownership of a software copy and a mere license is barely discussed in *MAI* and *Triad*, those panels suggest that the mere labeling of a transfer agreement as a license is sufficient to ensure that the licensee does not have ownership of any copy of the software. The *Wall Data* holding is more flexible:

> Generally, if the copyright owner makes it clear that she or he is granting only a license to the copy of software and imposes significant restrictions on the purchaser's ability to redistribute or transfer that copy, the purchaser is considered a licensee, not an owner, of the software.

447 F.3d at 785. Coupling that holding to the panel's deference to *MAI*, however, the court would have to conclude that the Autodesk License did not transfer ownership of any software copy to CTA.

ORDER – 17

Having examined the conflict between *Wise* and the *MAI* Trio, the court notes that Autodesk's expert witness, Mr. Nimmer, disagrees with the court's interpretation of those cases. His declarations highlight those disagreements. *See*, *e.g.*, Nimmer Decl. (Dkt. # 60) ¶ 11 ("These restrictions [in the License] are more than sufficient to clarify that CTA did not become an owner of the copy."), ¶ 13 ("CTA was never an owner of the software it received pursuant to the [License]."). Autodesk acknowledged at oral argument that Mr. Nimmer's legal conclusions do not bind the court. Stripped of legal conclusions and conclusory statements that support those conclusions, the court queries what remains of Mr. Nimmer's declarations. As the court has already noted in Part III.C.1, Mr. Nimmer's general description of software licensing practices does not overcome the language of the Autodesk License.

While Autodesk asks the court to defer to Mr. Nimmer's views, it does not acknowledge that those views have proven malleable. In *SoftMan Prods. Co. v. Adobe Sys. Inc.*, 171 F. Supp. 2d 1075, 1089 (C.D. Cal. 2001), the court concluded that a software manufacturer transferred ownership of copies of its software despite its claim that it had merely licensed their use. The *SoftMan* court noted that numerous commentators had taken the same position, including Mr. Nimmer:

> Merely labeling a transaction as a lease or license does not control. If a transaction involves a single payment giving the buyer an unlimited period in which it has the right to possession, the transaction is a sale. In this situation, the buyer owns the copy regardless of the label the parties use for the contract. . . . The pertinent issue is whether, as in a lease, the user may be required to return the copy to the vendor after the expiration of a particular period. If not, the transaction conveyed not only possession, but also transferred ownership of the copy.

*Id.* at 1086 (citing Raymond T. Nimmer, *The Law of Computer Technology* § 1.18[1] p. 1-103 (2d ed. 1992)). In *DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354 (Fed. Cir. 1999), Mr. Nimmer was of counsel to the party in Mr. Vernor's position, claiming to have acquired ownership of a copy of copyrighted software. The *DSC* court, citing a later edition of the treatise cited above, dismissed Mr. Nimmer's view of

ORDER – 18

1  licensing as "overly simplistic." *Id.* at 1362. (citing R. Nimmer, *The Law of Computer*

2  *Technology* § 1.24[1] at 1-143 to 1-144 (3d ed. 1997)).  In subsequent updates of Mr.

3  Nimmer's book, his position has changed to one consistent with his opinions in this

4  litigation.  *E.g.*, R. Nimmer, *The Law of Computer Technology* § 1.115 p. 1-300 to 1-306

5  (3d ed., Jun. 2006 update), § 1.110 p. 1-268 to 1-269 (4th ed. 2009) (praising *DSC*

6  opinion).  The court has no explanation for Mr. Nimmer's change in viewpoint, other

7  than Autodesk's presumably lighthearted speculation at oral argument that Mr. Nimmer

8  "got smart."

9          The views of commentators like Mr. Nimmer are helpful in illuminating different

10  perspectives on legal issues, and no doubt come from people who have devoted more

11  study to those issues than the court.  Nonetheless, the court is neither permitted nor

12  inclined to defer to Mr. Nimmer's view of licensing law and practices, any more than it

13  could defer to the supportive views of other commentators.  *See*, *e.g.*, William F. Patry,

14  *Patry on Copyright* § 13:25 at 13-56 to 13-57 (2009) (praising *Vernor* decision); Melville

15  B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.12[B][1][d][i] p 8-160.4 to 8-

16  164 (rev. ed. 2008) (criticizing court decisions holding that licenses did not transfer

17  ownership of software copies).

18  **D.    *Wise* and the *MAI* Trio Conflict Irreconcilably; this Court Must Follow *Wise*.**

19          With two sets of conflicting precedent before the court, the question becomes

20  which to follow.  That question, at least, has a simple answer.  The court must follow the

21  oldest precedent among conflicting opinions from three-judge Ninth Circuit panels.

22  *United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005).  This court is loath,

23  however, to apply this rule unless there is no way to avoid the conflict between the

24  opinions.  As was the case in the prior order, the court finds the conflict unavoidable.

25

26

27

28  ORDER – 19

1.    **Despite Autodesk's Suggestion, the Court Cannot Reconcile *Wise* with the *MAI* Trio.**

Autodesk argues that the *Wall Data* court's first holding can be reconciled with *Wise*. This contention does not address *MAI* or *Triad*. It also does not address the Redgrave Contract. In this court's view, the *Wall Data* panel would have found the Redgrave Contract to be a mere license, contrary to the result in *Wise*. More to the point, a faithful application of *Wall Data* leads to the conclusion that the Autodesk License is a mere license, whereas *Wise* leads to the opposite conclusion.

2.    **The Text of § 109 and § 117 And Their Legislative Histories Suggest that "Owner" Has The Same Meaning in Both Statutes.**

*Wise* construed the statutory predecessor to § 109, whereas each opinion in the *MAI* Trio construes § 117. It is possible, then, that "owner" has a different meaning in each statute. Even on a casual analysis, this is unlikely. The court has already noted the presumption that identical terms within the same statute have the same meaning. *Vernor*, 555 F. Supp. 2d at 1173 & n.8. At least in their briefs, Mr. Vernor and Autodesk agree that the phrases "owner of a copy" in § 117 and "owner of a particular copy" in § 109 have the same meaning. Autodesk Mot. (Dkt. # 49) at 2-3, 13-14. At oral argument, Autodesk retreated from this position, suggesting that the court could reach the anomalous result that *Wise* and § 109 permit Mr. Vernor to sell the AutoCAD packages whereas the *MAI* Trio and § 117 deny him and the persons to whom he sells the right to use the software.[8] This result is far from satisfactory.

A more detailed review of the legislative history, moreover, strongly suggests that "owner" has the same meaning in § 117 and § 109. *Cf. Baker v. Delta Air Lines, Inc.*, 6

---

[8] In support of this suggestion, Autodesk pointed to *MDY*, where an Arizona court considered a dispute that required it only to resolve the application of § 117, not § 109. Although the defendant urged that court to follow this court's decision in *Vernor*, the court declined, ruling that *Wise* did not address § 117, and thus it was bound to follow the *MAI* Trio. *MDY Indus.*, 2008 U.S. Dist. LEXIS 53988 at *30-31 & n.7. The court also noted that it was "not at all clear that the result in this case would be different even if the court were to follow *Wise*," because the *Wise* court found no transfer of ownership in each case in which the licensor retained title in any copies transferred. *Id.* at *30-31 n.7. This court interprets *Wise* differently, for the reasons stated in *supra* Part III.C.1

ORDER – 20

1   F.3d 632, 637 (9th Cir. 1993) (noting that precedent loses binding force when

2   "subsequent legislation" undermines it). *Wise* relied on § 27 of a prior incarnation of the

3   Copyright Act, the statutory predecessor to § 109. When Congress comprehensively

4   revised copyright law's statutory framework in the Copyright Act of 1976, it added

5   § 109. S. 22, 94th Cong., 90 Stat. 2541, 2548-49 (1976). Both the House and Senate

6   Reports on the 1976 Act confirm that Section 109 merely preserved the first sale doctrine

7   as it had "been established by the court decisions of section 27 of the present law." H.R.

8   Rep. No. 94-1476 at 79 (1976); S.R. Rep. No. 94-474 at 71 (1975). What was then

9   subsection (c) of § 109, and is now subsection (d), furthered the preservation of existing

10  law by emphasizing that the first sale doctrine did not "extend to any person who has

11  acquired possession of the copy or phonorecord from the copyright owner by rental,

12  lease, loan, or otherwise without acquiring ownership of it." S. 22, 94th Cong., 90 Stat.

13  2541, 2549 (1976).

14          In the Copyright Act of 1976, § 117 bore little resemblance to its current form. S.

15  22, 94th Cong., 90 Stat. 2541, 2565 (1976). Instead, § 117 acted as a placeholder,

16  preserving then-existing law regarding the copyrightability of computer software until the

17  Commission on New Technological Uses ("CONTU") finished a "thorough study of the

18  emerging patterns in this field and . . . recommend[ed] definite copyright provisions to

19  deal with the situation." H.R. Rep. No. 94-1476 at 116 (1976); S.R. Rep. No. 94-473 at

20  99-100 (1975). CONTU's recommendations came a few years later, leading to the

21  enactment of the first modern version § 117 in 1980. H.R. 6933, 96th Cong., 94 Stat.

22  3015, 3028-29 (1980). Congress made only one change to CONTU's statutory language.

23  CONTU had recommended that § 117's privilege to make copies of computer software

24  belong to any "rightful possessor" of the software. *Krause v. Titleserv, Inc.*, 402 F.3d

25  119, 122 (2d Cir. 2005) (citing CONTU Report). Congress "changed the term 'rightful

26  possessor' to 'owner' but did not explain its reason." *Id.*   The amended version of the

27  statute was discussed at legislative hearings. No member of Congress commented on the

28  ORDER – 21

reasons for the change.  One person testifying at the hearings argued that the "rightful possessor" language was preferable, because a "lessee" of a computer program has the same need to copy a computer program during use as an owner.  Industrial Innovation and Patent and Patent and Copyright Law Amendments, Hearing on H.R. 6933, 6934, 3806, & 2414 Before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the H. Comm. on the Judiciary, 96th Cong., 2d Sess., at 635-36 (1980) (testimony of H. Manbeck).  Others either had no comment on the change or remarked on it favorably without discussing the distinction between a "rightful possessor" and an "owner."  *E.g., id.* at 42-44, 700, 903.  Congress ultimately enacted § 117 with the "owner of a copy" language, and there is no suggestion that its adoption of the language in existing § 109 was accidental.  Like the enactment of § 109, the enactment of § 117 preserved prior judicial interpretations of the "owner" of a copyrighted copy.  *See Krause*, 402 F.3d at 123 (concluding that Congress did not intend a "narrow, formalistic definition of ownership dependent on title").

Moreover, Congress declined to amend the "owner" language even as it amended § 117 and § 109 to keep pace with new technology.  Confronted with a rise in commercial software rental, software producers successfully lobbied Congress to amend § 109 to bar software rental.  *See* The Computer Software Rental Amendments Act of 1988, Hearing on S. 2727 Before the Subcomm. on Patents, Copyrights and Trademarks of the H. Comm. on the Judiciary, 100th Cong., 2d sess., at 2-3 (1988) (introductory statement of Sen. Hatch).  Software "rental" companies would purchase software for hundreds of dollars and then rent it for a few days for a much lower price.  *Id.* ("The most obvious rationale for such a practice is to facilitate the unauthorized copying of this program.").  The amendments to § 109 declared that no "person in possession of a particular copy of a computer program" could dispose of the copy "by rental, lease, or lending or by any other act or practice in the nature of rental, lease, or lending" for "direct or indirect commercial advantage."  H.R. 5316, 104 Stat. 5089, 5134-35 (1990)

ORDER – 22

(enacting 17 U.S.C. § 109(b)(1)(A)).  Congress left the "owner" language undisturbed in §109(a).[9]

Almost a decade after Congress amended § 109 to address new developments in the software industry, it amended § 117 as well.  This time, the amendment favored users of computer software rather than copyright holders.  As part of the Digital Millennium Copyright Act, Congress amended the law to undo the result of cases like *MAI* and *Triad*.  It added subsections (c) and (d) to § 117 to permit owners of machines containing "an authorized copy of a computer program" to duplicate that copy in the process of repairing or maintaining the machine.  H.R. 2281, 105th Cong., 2d Sess., 112 Stat 2860, 2886-87 (1998).  Again, Congress did not disturb the "owner of a copy" language in § 117(a).

The legislative history of § 109 and § 117 informs the court's decision in several respects.  First, as the court noted, it suggests that "owner" not only had the same meaning when both sections were enacted, but that the meaning was that ascribed to the term in decisions like *Wise*.  Congress did not amend the term "owner" when amending the statutes.  Second, the legislative history reveals not only that Congress has modified § 117 and § 109 to specifically address computer software, but that when it does so, its modifications are not subtle.  This makes it even more improbable that Congress ascribes two different meanings to "owner."  Third, the legislative history shows that despite incentive and opportunity to modify the term "owner," Congress has not done so.  For example, rather than amend § 109 to add a new section barring software rental, Congress could simply have changed the "owner" language to indicate that software licensees were not owners, thereby placing the right to control rental in the hands of licensors.  Instead,

---

[9] One court explains that software licensing originated as a means to circumvent the first sale doctrine to prevent rental of computer software.  *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 96 n.7 (3d Cir. 1991).  Much like Autodesk, those early licensors "characterized the original transaction between the software producer and the software rental company as a license, rather than a sale, and by making the license personal and non-transferable, software producers hoped to avoid the reach of the first sale doctrine . . . ."  *Id.*  Congress amended § 109 to specifically address software rental, but has never, so far as the court is aware, addressed licensing in reference to either § 109 or § 117.

ORDER – 23

it enacted a specific prohibition on software rental.  Similarly, rather than expand the meaning of "owner" when enacting the repair amendments to § 117, Congress enacted a specific expansion of the right to authorize software copies for the purpose of repair.

### 3.    The Court Cannot Choose Between *Wise* and the *MAI* Trio Based on which Result is the Best Policy.

The lack of legislation addressing computer licensing leads the court to conclude with a discussion of the policy concerns that the parties have raised.  Autodesk argues that this court's interpretation of "owner" will harm consumers and software producers alike.  It suggests, for example, that software prices would rise if producers had to confront the possibility of resale, and that resale promotes piracy.  Mr. Vernor contends that Autodesk's preferred interpretation of "owner" would give copyright holders of all stripes the ability to destroy secondary markets for their works by the simple expedient of declaring transfers of copies of their works to be "licenses" rather than sales.  For example, a book publisher could transfer its wares pursuant to licenses retaining title and barring resale or use by other parties, effectively eliminating not only the secondhand market, but preventing a library from lending the book as well.

These contentions make for interesting debate.  Autodesk's suggestion that consumers will be harmed by rising retail prices if software producers compensate for the resale market does not address the concomitant price benefit in the form of reduced resale prices.  Although Autodesk would no doubt prefer that consumers' money reaches its pockets, that preference is not a basis for policy.

Autodesk's claim that Mr. Vernor promotes piracy is unconvincing.  Mr. Vernor's sales of AutoCAD packages promote piracy no more so than Autodesk's sales of the same packages.  Piracy depends on the number of people willing to engage in piracy, and a pirate is presumably just as happy to unlawfully duplicate software purchased directly from Autodesk as he is to copy software purchased from a reseller like Mr. Vernor.  The court notes, moreover, that even if CTA had never opened its AutoCAD packages, never

ORDER – 24

1    installed the software on its computer, and thus never raised the possibility of piracy,

2    Autodesk would still take the position that CTA's resale of those packages was a

3    copyright violation.

4        Mr. Vernor's fear of the destruction of established resale markets also seems

5    misplaced. The court notes, for example, that widespread piracy of musical recordings

6    from compact disks has not led the music industry to adopt a restrictive licensing regime

7    like the one Autodesk advocates.

8        There is much more to say about such policy debates, but the court's decision

9    today is not based on any policy judgment. Congress is both constitutionally and

10   institutionally suited to render judgments on policy; courts generally are not. The parties'

11   policy concerns might be of heightened importance had the Ninth Circuit not already

12   addressed the dispositive legal questions in *Wise* and the *MAI* Trio. Precedent binds the

13   court regardless of whether it would be good policy to ignore it. The court has followed

14   *Wise* solely for the reasons stated in this order, not because of any policy judgment.

15       Although the interpretation of "owner" in the Copyright Act no doubt has

16   important consequences for software producers and consumers, the court is skeptical that

17   its ruling today will have far-reaching consequences. As the court observed in its earlier

18   opinion, courts across the nation have issued rulings that adopt and reject the equivalent

19   of the parties' positions here. *Vernor*, 555 F. Supp. 2d at 1174 (citing rulings from courts

20   in California, New York, and Utah). Since that opinion, at least two more courts have

21   joined the cacophony. The *MDY* court favored the copyright holder, whereas the court in

22   *UMG Recordings* favored the consumer. Software producers and consumers alike find

23   ways to meet their needs despite these contrary rulings.

24   **E.    Mr. Vernor Has Not Proven Copyright Misuse.**

25       Mr. Vernor also raises the possibility that Autodesk's attempts to prevent his sales

26   constitute copyright misuse. As Mr. Vernor conceded at oral argument, copyright misuse

27   is an equitable defense to copyright infringement that has received little judicial attention.

28   ORDER – 25

The Ninth Circuit has confirmed that copyright misuse is a viable defense, *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997), but has not elaborated on the contours of the defense.  At least one district court has held that a copyright holder's attempt to claim infringement in disregard of the Copyright Act's limited exceptions to infringement can be copyright misuse.  *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1081 (N.D. Cal. 2007) (denying motion to dismiss claim of misuse based, *inter alia*, on copyright holder's assertion that author could not invoke fair use defense). Mr. Vernor, however, has offered little argument or authority to support his misuse allegations.

In light of the court's ruling today, Mr. Vernor cannot currently benefit from demonstrating copyright misuse.  The remedy for copyright misuse is to deny the copyright holder the right to enforce his copyright during the period of the misuse. *Practice Mgmt.*, 121 F.3d at 520 n.9.  Because Mr. Vernor has prevailed in his claim that Autodesk's copyright does not prevent him from reselling his AutoCAD packages, a misuse remedy is of no value to him.  The court thus declines to resolve his copyright misuse allegations.

## IV.   CONCLUSION

For the reasons stated above, the court DENIES Autodesk's motion for summary judgment (Dkt. # 49) and GRANTS Mr. Vernor's motion except to the extent it seeks a judgment that Autodesk engaged in copyright misuse.  The court directs the clerk to enter judgment for Mr. Vernor.

DATED this 30th day of September, 2009.

_____
The Honorable Richard A. Jones
United States District Judge

ORDER – 26