HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TIMOTHY S. VERNOR,

        Plaintiff,

   v.

AUTODESK, INC.,

        Defendant.

CASE NO. C07-1189RAJ

ORDER

The court enters this order to amend its September 30, 2009 order. Dkt. # 71. After that order, the parties stipulated to correct Defendant's omission of a version of its software license. This order modifies the portions of the prior order that addressed that license and its omission. Sept. 30 Ord. at 7-8, 14. In addition, this order amends Part II to address the continued validity of the court's May 30, 2008 order. It adds footnote 4 to address whether Plaintiff was bound by any software license. It also expands the last paragraph of Part III.D. All other changes correct typographical or stylistic mistakes.

## I.  INTRODUCTION

This matter comes before the court on cross-motions for summary judgment. Dkt. ## 49, 54. The court has reviewed the parties' briefs and documentary evidence, and has heard from the parties at oral argument. For the reasons stated below, the court DENIES Defendant's summary judgment motion (Dkt. # 49) and GRANTS in part and DENIES in part Plaintiff's summary judgment motion (Dkt. # 54). The clerk shall enter judgment for Plaintiff.

ORDER – 1

1

## II.  BACKGROUND

2      The court first addressed this dispute in a May 20, 2008 order denying the motion

3  of Defendant Autodesk, Inc. ("Autodesk") to dismiss Plaintiff Timothy Vernor's

4  complaint.  *Vernor v. Autodesk*, 555 F. Supp. 2d 1164 (W.D. Wash. 2008).  This order

5  explicitly corrects or clarifies a few statements from *Vernor*, and examines some issues in

6  greater depth, but it does not otherwise supplant that order.  Mr. Vernor makes a living

7  selling merchandise on eBay, the well-known internet marketplace.  In 2005 and 2007, he

8  attempted to sell what the court will refer to as "AutoCAD packages."  Each AutoCAD

9  package is an Autodesk-commissioned box, inside which is a "jewel case" containing a

10  compact disk encoded with Autodesk's copyrighted AutoCAD software.  LaHaie Decl.

11  (Dkt. # 21) ¶¶ 10-11.  The jewel case is sealed with a sticker advising that, among other

12  things, "[t]his software is subject to the license agreement that appears during the

13  installation process or is included in the package."  *Id.* ¶ 11 & Ex. B.  The box also

14  contains a copy of the Autodesk Software License Agreement (the "License"), and

15  possibly other documentation as well.  *Id.* ¶ 14.

16      Upon discovering Mr. Vernor's attempted eBay sale of AutoCAD packages,

17  Autodesk invoked the "takedown" provisions of the Digital Millennium Copyright Act.

18  17 U.S.C. § 512; *see also Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d

19  1146, 1179 (C.D. Cal. 2001) (describing takedown procedure).  Autodesk's 2005

20  takedown efforts delayed Mr. Vernor's sales.  Its 2007 takedown efforts not only delayed

21  one or more sales, they caused eBay to bar Mr. Vernor from selling anything for a month.

22      Autodesk directed its 2007 takedown notices at Mr. Vernor's attempted sales of

23  AutoCAD packages that he acquired from a Seattle architecture firm, Cardwell/Thomas

24  Associates ("CTA"), in a 2007 sale of office equipment.  Although CTA had broken the

25  sticker sealing the jewel case in each AutoCAD package, there is no dispute that the

26  packages and their contents were authentic and otherwise identical to AutoCAD packages

27

28  ORDER – 2

1    as Autodesk distributes them.  There is no evidence or assertion that Mr. Vernor used

2    AutoCAD software himself, or even installed it on his computer.

3            Mr. Vernor succeeded in selling two of the AutoCAD packages he acquired from

4    CTA, and brought this action seeking a declaratory judgment that his sales of the other

5    two AutoCAD packages, and any other AutoCAD packages that he might acquire in the

6    future, would not violate the Copyright Act.[1]  He also claimed that Autodesk's campaign

7    to stop his sales was an unfair trade practice under Washington law.

8            In *Vernor*, the court denied Autodesk's motion to dismiss Mr. Vernor's claims.  It

9    held that the first sale doctrine codified at 17 U.S.C. § 109(a) permitted Mr. Vernor to sell

10   the AutoCAD packages without copyright liability.  *Vernor*, 555 F. Supp. 2d at 1174.   It

11   also held that because persons to whom Mr. Vernor would sell the packages would use

12   the software in accordance with 17 U.S.C. § 117, Mr. Vernor would not be liable for

13   contributory copyright infringement.  *Id.* at 1175.  Factual disputes prevented the court

14   from resolving Mr. Vernor's state law claims.  *Id.* at 1176-77.

15           Little has changed in this matter in the seventeen months since the court decided

16   *Vernor*.  The parties have taken discovery, but it has revealed no facts materially different

17   than those before the court in May 2008.  The new developments are as follows:

18           1)  The parties settled Mr. Vernor's state law claim, and the court dismissed it at

19               the parties' request.  Dkt. # 47.

20           2)  Autodesk obtained a consent judgment against CTA in the United States

21               District Court for the Northern District of California.  Harris Decl. (Dkt. # 51),

22               Ex. B (Feb. 6, 2009 judgment in Case 09-397-WHA).  According to the

23               recitals in the consent judgment, CTA agreed in 2002 to destroy all copies of

24               AutoCAD software in the AutoCAD packages that it transferred to Mr. Vernor

---

[1] The court previously rejected Autodesk's contention that Mr. Vernor lacked Article III standing
to seek declaratory judgment. *Vernor*, 555 F. Supp. 2d at 1167.  Autodesk has not challenged
that ruling in its current motion, and the court is aware of no changed circumstances undermining
Mr. Vernor's standing.

ORDER – 3

in 2007.  *Id.*, Ex. B at ¶ 7.  CTA entered the 2002 agreement when upgrading its AutoCAD software.  In the consent judgment, CTA agreed that it had breached its promise to destroy the AutoCAD packages, and that it had transferred those packages to Mr. Vernor in violation of Autodesk's copyright.  *Id.*, Ex. B at ¶ 11

3) Autodesk retained professor Raymond Nimmer as an expert witness.  Mr. Nimmer provided two declarations in support of Autodesk's summary judgment motion.  Dkt. ## 52, 60.  Mr. Vernor did not depose him, and he did not appear at oral argument.

4) Autodesk submitted a declaration from an employee regarding its licensing practices.  Suppes Decl. (Dkt. # 50).

5) Two district courts wrote decisions bearing on the issues that this court addressed in *Vernor.  MDY Indus., LLC v. Blizzard Entm't, Inc.*, No. CV-06-2555-PHX-DGC, 2008 U.S. Dist. LEXIS 53988 (D. Ariz. Jul. 14, 2008); *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055 (C.D. Cal. 2008).

Despite these new developments, the motions before the court present the same issues that the court resolved in May 2008.  The parties disagree over whether Mr. Vernor has a first sale right to resell the AutoCAD packages, and they disagree over whether Mr. Vernor's sales are contributory copyright infringement.  The court answered both questions in Mr. Vernor's favor in May 2008, and for the reasons stated below, it does so again today.

### III.  ANALYSIS

The court begins by observing that nothing prevents it from revisiting the issues it resolved in *Vernor*.  That order did not result in the entry of judgment for any party, and Federal Rule of Civil Procedure 54(b) confirms that the court can revise such orders at any time before the entry of final judgment.  Of course, a prudent court will not change one of its orders absent new evidence or a demonstration that it committed legal error.

ORDER – 4

1  Typically, a request to revise an order comes in the form of a motion for reconsideration,

2  and there is no dispute that the time for such a motion has long passed. Local Rules

3  W.D. Wash. CR 7(h)(2). In this case, however, Autodesk has asked the court to revisit its

4  prior ruling not merely in light of new legal arguments that target that ruling, but in light

5  of the new developments listed above. This distinguishes Autodesk's motion from an

6  untimely motion for reconsideration.

7       The court considers the parties' new and old evidence and argument under the

8  familiar summary judgment standard. The court must resolve all disputes of fact in favor

9  of the non-moving party, and grant summary judgment only if disputes resolved in this

10  manner, coupled with undisputed facts, establish that the moving party is entitled to

11  judgment as a matter of law. Fed. R. Civ. P. 56(c); *Addisu v. Fred Meyer, Inc.*, 198 F.3d

12  1130, 1134 (9th Cir. 2000). The court applied this standard in *Vernor*, because Autodesk

13  relied on evidence beyond the scope of Mr. Vernor's complaint in its motion to dismiss.

14  555 F. Supp. 2d at 1167 (citing Fed. R. Civ. P. 12(d)). As was the case in May 2008, and

15  as the parties confirmed at oral argument, there are no disputes of material fact.

16  Although the parties have some factual disagreements, they agree upon every fact that is

17  material to the court's decision. The parties' material disputes are purely legal.

18  **A.   Rights Belonging to an "Owner" of a Copy of Copyrighted Material:  The**
       **First Sale Doctrine of § 109 and the Reproduction Exception of § 117**

19
20       Some of the copyright principles bearing on this dispute are not controversial, and

21  the court summarizes them here. No one disputes that Autodesk holds the copyright in

22  the AutoCAD software and the printed materials in the AutoCAD packages. The

23  Copyright Act grants several exclusive rights to copyright holders. 17 U.S.C. § 106.

24  Most relevant to this dispute are the exclusive rights to control distribution (§ 106(3)) and

25  reproduction (§ 106(1)) of copyrighted material. Exceptions to these rights inure to an

26
27
28  ORDER – 5

"owner" of a copy of copyrighted material.[2]  The first, commonly known as the "first sale" right, entitles the "owner of a particular copy" of copyrighted material to "sell or otherwise dispose of" that copy despite the copyright holder's distribution monopoly.  17 U.S.C. § 109(a).  The second is the privilege of the "owner of a copy of a computer program" to reproduce the program if doing so is an "essential step in the utilization of the computer program."  17 U.S.C. § 117(a)(1).  Because the ordinary use of a computer program inevitably entails copying all or part of the program in the computer's memory, § 117 ensures that people who own computer software copies can use them without fear of copyright liability.  *See Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 537-38 (M.D.N.C. 2005).

   Mr. Vernor claims to be the "owner" of the copies of software in the AutoCAD packages in his possession, and seeks refuge in both § 109 and § 117.  He contends that Autodesk transferred ownership of the AutoCAD packages to CTA, that CTA transferred ownership to him, and that he has a first sale right to sell those packages.  For the same reason, he contends that anyone to whom he sells an AutoCAD package will become its owner, and will thus be privileged to use the software in his or her computer without violating Autodesk's right to control reproduction of the software.

   Autodesk believes that it still owns the AutoCAD packages in Mr. Vernor's possession.  It contends that it never transferred ownership of the AutoCAD packages to CTA.  Indeed, in Autodesk's view, it never transfers ownership of AutoCAD packages to anyone.  Instead, it licenses AutoCAD packages without transferring ownership of them, and thus remains the "owner" of the copies of copyrighted material contained therein.  Autodesk claims that Mr. Vernor's sales of AutoCAD packages violate its distribution

---

[2] Although the phrase "copy of copyrighted material" is awkward, the court uses it to emphasize the distinction between the copy and the copyrighted material.  *See* 17 U.S.C. § 202.  Autodesk's copyrighted AutoCAD software is its intellectual property, and Mr. Vernor makes no claim to it.  Copies of AutoCAD software are personal property embodied in compact disks and other media scattered across the world.  Mr. Vernor claims to be the owner of two such copies, contained in the two AutoCAD packages still in his possession.

ORDER – 6

monopoly and contribute to violations of its reproduction monopoly by the persons to whom he sells. It thus claims that Mr. Vernor's sales constitute both direct and contributory copyright infringement. *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261 (9th Cir. 1996) (contrasting direct and contributory infringement).

**B.    Autodesk's Transfer of AutoCAD Packages to CTA**

The key to resolving this dispute is determining whether Autodesk transferred ownership of the AutoCAD packages to CTA. Assuming that it did, no one disputes that CTA transferred whatever ownership it had to Mr. Vernor. Autodesk unquestionably transferred *possession* of ten AutoCAD packages to CTA in a 1999 settlement of a dispute. Harris Decl., Ex. A. In the 1999 settlement agreement, CTA promised to "adhere to all terms of the Autodesk Software License Agreement." *Id.*, Ex. A at ¶ 4. No one disputes that the license agreement to which the settlement agreement refers is materially identical to the License contained in each AutoCAD package.

The License governs both the use and disposition of the AutoCAD packages. It limits installation of AutoCAD software to two computers, with a ban on simultaneous use of the software on those computers. License: GRANT OF LICENSE.[3] It prohibits modification or reverse engineering of the software. License: RESTRICTIONS. It bars any use or transfer of the software outside of the western hemisphere. *Id.* It bars any transfer of the software without Autodesk's written permission. *Id.* It also declares that "[t]itle and copyrights to the Software and accompanying materials and any copies made by you remain with Autodesk." License: COPYRIGHT. Finally, the License dictates that a user who obtains the software via an upgrade from Autodesk must destroy any copies of older AutoCAD software in his possession. License: UPGRADES AND UPDATES.

The court also assumes for purposes of this order that in 2002 CTA upgraded the software contained in the AutoCAD packages that Autodesk transferred to it in the 1999

---

[3] Because the License contains no numbered paragraphs, the court cites it by reference to its boldface headings. The License is in the record at Exhibit A to Exhibit A of the LaHaie Declaration, and at Exhibit A to Exhibit 2 of Exhibit B of the Harris Declaration.

ORDER – 7

settlement agreement, and violated its agreement to destroy the copies of the software in those packages. This assumption requires some explanation. The sole "evidence" of CTA's agreement to destroy the software in its 1999 packages is the recitals included in Autodesk's 2009 consent judgment against CTA. Harris Decl., Ex. B. Those recitals include the inaccurate statement that CTA's 1999 settlement agreement and the License included with the AutoCAD packages received in that settlement agreement required CTA to destroy the software in those packages upon upgrade. *Id.* ¶ 7. This court repeated a variation of that inaccurate statement in its prior order. *Vernor*, 555 F. Supp. 2d at 1170 n.5. The 1999 settlement agreement does not mention any upgrade-and-destroy policy. The License to the version of AutoCAD (AutoCAD 14) that CTA received in that settlement does not require destruction of the AutoCAD 14 copies that CTA received. Instead, the License requires destruction of *older* versions of the software in the event that the AutoCAD 14 software was itself obtained as an upgrade. License: UPGRADES AND UPDATES ("If this Software is being licensed to you as an upgrade or update to software previously licensed to you, you must destroy the software previously licensed to you . . . .").

CTA apparently accepted a new AutoCAD license in 2002 when it upgraded from AutoCAD 14 to AutoCAD 2000. That license also contains an "Upgrades" clause. Supp. LaHaie Decl. (Dkt. # 75), Ex. A. It provided that "[i]f this Software [(AutoCAD 2000)] is labeled as an upgrade to software previously licensed to you, you must destroy all copies of the software previously licensed to you replaced by this Software, including any copies resident on your hard disk drive . . . ." *Id.* CTA's agreement to destroy the AutoCAD 14 copies it acquired in 1999 came in 2002, not in 1999 as Autodesk has asserted. CTA presumably made that agreement in 2002 because Autodesk offered an enormous discount as an incentive to agree to destroy the software when it upgraded to AutoCAD 2000. Harris Decl., Ex. B at ¶ 7 (noting that AutoCAD 2000 software retailed for $3750, but sold for $495 as an upgrade).

ORDER – 8

1    There is no dispute that Autodesk licensed its software to CTA. The court makes

2 this observation because the parties and their witnesses too often suggest that their

3 dispute is about whether Autodesk "sold" rather than "licensed" its software. That

4 dispute is not determinative, because the use of software copies can be licensed while the

5 copies themselves are sold. Autodesk unquestionably licensed the software in that it

6 limits the right to use it. For example, the License takes away the fair use right to reverse

7 engineer the software. License: RESTRICTIONS. The License also expands the right to

8 use software. For example, it permits the licensee to install the software on two

9 computers, whereas § 117(a) would permit only a single installation. License: GRANT OF

10 LICENSE. There is also no question that most software is transferred to consumers via

11 licenses that restrict and expand their right to use it, although no party has presented

12 competent evidence of the terms of any other software maker's license. The question

13 before the court is whether the Autodesk License is a license that transfers ownership of

14 the software copies included in AutoCAD packages. To capture that distinction, the

15 court will use the terms "mere license" and "mere licensee" in reference to licenses that

16 do not transfer ownership of any copies. The question before the court is whether Mr.

17 Vernor is the "owner" of the copies of copyrighted material in the AutoCAD packages he

18 acquired from CTA, or whether CTA was a mere licensee who had no ownership to

19 transfer to Mr. Vernor.[4]

20 **C.    Who is the "Owner" of the AutoCAD Packages? The Ninth Circuit Gives Two Different Answers.**

21    In *Vernor*, this court concluded that Ninth Circuit precedent gives two different

22 answers to the question of what distinguishes an "owner" from a mere licensee. In

23 *United States v. Wise*, 550 F.2d 1180, 1190-93 (9th Cir. 1977), a panel examined

24

---

25 [4] In its prior motion, Autodesk contended that the License somehow bound Mr. Vernor, even
   though the License is expressly nontransferable. The court rejected that contention. *Vernor*, 555
26 F. Supp. 2d at 1175-76. In the instant motions, no one contends that the License binds Mr.
   Vernor. The License is important solely because it determines whether Autodesk transferred
27 ownership of AutoCAD copies to CTA.

28 ORDER – 9

numerous agreements governing the transfer of film prints to determine which transferred ownership and which did not. Although no line of demarcation between transfers of ownership and mere licenses emerges from *Wise*, the opinion establishes that even a transfer that places severe restrictions on the use and disposition of a copy of copyrighted material can transfer ownership of that copy. Three later panels, considering software licenses, were more deferential to the characterization of a transaction as a mere license. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993); *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330 (9th Cir. 1995); *Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769 (9th Cir. 2006). In each of these cases the panel deemed the transfer of possession pursuant to a license to be a mere license, rather than a transfer of ownership. The court examined the conflict between *Wise* and the "*MAI* Trio" in its prior decision, and does so again today.

### 1.    The *Wise* View:  The Distinction Between a Transfer of Ownership and a Mere License Turns on the Terms of the Transfer Agreement

*Wise* called upon the panel to examine several transfer agreements for movie prints. Many were generic distribution agreements transferring possession of prints to theaters and other outlets for display. Virtually all of the distribution agreements "were designated as 'licenses'," and they transferred only "limited rights for the exhibition or distribution of the films for a limited purpose and for a limited period of time." *Wise*, 550 F.2d at 1190. The "[t]ypical" distribution agreement "reserved title to the film prints" in the studio and "required their return to [the studio] following expiration of the contract term." *Id.* Two different agreements governed the transfer of film prints to ABC and NBC for televised display. *Id.* at 1191. Several other agreements were "V.I.P. licenses" that "reserved all rights and title in the studios, restricting the licensee to possession of the print for his own personal use." *Id.* at 1184. Others were agreements transferring possession of film prints to salvage companies so that they could be destroyed or obscured and recycled. *Id.*

ORDER – 10

The *Wise* panel noted that the "complicated" nature of agreements transferring rights in copyrighted works required an analysis of each transfer agreement before it. *Wise*, 550 F.2d at 1189. Designating an agreement as a "license" does not determine whether it transfers ownership. *Id.* at 1192 (finding that some contracts "consistent with their designation as loans or licenses" did not transfer ownership). The panel noted several relevant characteristics of transfer agreements, but they were ambiguous in the sense that those characteristics were present in both transfers of ownership and mere licenses. For example, although an agreement that fails to include a clause reserving title in the transferred copy to the copyright holder is suggestive of an ownership transfer, that failure is not dispositive. *Id.* at 1191 ("The mere failure to expressly reserve title to the films does not require a finding that the films were sold, where the general tenor of the entire agreement is inconsistent with such a conclusion."). Similarly, a single, up-front payment by the transferee for a particular copy is suggestive of a transfer of ownership, but not dispositive. *Compare id.* at 1191 (finding no transfer of ownership despite provision permitting licensee to order film prints "at its expense") *with id.* at 1191 (finding transfer of ownership where agreement permitted licensee to retain a film print at its "election and cost"). An agreement requiring the transferee to destroy transferred copies is not dispositive of whether ownership transfers. *Compare id.* at 1191 (finding no transfer of ownership despite clause requiring transferee to either sell prints to copyright holder or destroy them at copyright holder's election) *with id.* at 1193 (finding transfer of ownership in agreements requiring transferee to destroy film prints for salvage).

A clause in an agreement reserving title to the transferred copy in the copyright holder is also an ambiguous characteristic in *Wise*. With only one likely exception, in every agreement containing an express reservation of title in the copyright holder, the panel found a mere license. *Id.* at 1191 (discussing generic film print distribution agreements and agreement for transfer of "Camelot" prints to NBC), 1192 (discussing V.I.P. loans to "actors of major stature" of "The Sting," and "Paper Moon"). The likely

ORDER – 11

exception was an agreement to transfer a print of "Camelot" to actress Vanessa Redgrave (the "Redgrave Contract."). Like all of the V.I.P. agreements, that agreement "reserved all rights and title in the studios, restricting the licensee to possession of the print for his own personal use." *Id.* at 1184. Nonetheless, when coupled with an upfront payment for the cost of the print and "the rest of the language of the agreement," the panel found the Redgrave Contract transferred ownership. *Id.* at 1192. It reached that conclusion despite restrictions that prevented the sale, lease, license, or loan of the print "to any other person," and eliminated all uses of the film except for Ms. Redgrave's in-home display. *Id.* This court acknowledges, however, that the panel's discussion of other V.I.P. agreements twice noted that the agreements contained a reservation of title, despite having already made that observation earlier in the opinion. *Compare id.* at 1184 (describing V.I.P. agreements collectively) *with id.* at 1192 (describing V.I.P. agreements individually). It is possible that the panel's collective description was not meant to apply to every V.I.P. agreement, and that the Redgrave Contract lacked an express reservation of title. The court finds this interpretation unlikely after a careful reading of the opinion, but notes it as a possibility, as Autodesk's counsel did at oral argument.

Only one characteristic was unambiguous in that it appeared only in agreements that the *Wise* panel deemed to be transfers of ownership. In each instance in which the transferee could, at his election, retain possession of the transferred copy indefinitely, and the copyright holder had no right to regain possession, the court found an ownership transfer. *Id.* at 1191-92 (discussing transfers of prints of "Funny Girl" to ABC and the Redgrave Contract). By contrast, the copyright holder's right to regain possession of the transferred copy was characteristic of a mere license. *Id.* at 1191 (discussing agreements requiring the return of the prints to the studio at the expiration of the contract term), 1192 (discussing V.I.P. transfer of a print of "Paper Moon" subject to studio's right to demand its return and a "revocable" consent to Robert Redford to use a print of "The Sting").

ORDER – 12

1    The Autodesk License is a hodgepodge of terms that, standing alone, support both

2    a transfer of ownership and a mere license.  Autodesk expressly retains title to the

3    "Software and accompanying materials," but it has no right to regain possession of the

4    software or the "accompanying materials."  Licensees pay a single up-front price for the

5    software.  Autodesk can require the destruction of the software, but only as consideration

6    in the later purchase of an upgrade.  The decision to upgrade, and thus the decision to

7    accept Autodesk's destruction requirement, is entirely in the control of the licensee. [5]

8    Autodesk severely restricts the use and further transfer of the software.

9    Despite these competing considerations, the court concludes that *Wise* leads to the

10    conclusion that the transfer of AutoCAD copies via the License is a transfer of

11    ownership.  Of all the agreements that the *Wise* panel analyzed, the License is most

12    analogous to the Redgrave Contract.  Like the License, the Redgrave Contract purported

13    to reserve title in the copy to the copyright holder, but made no provision for the

14    copyright holder to regain possession of the copy.  Like Ms. Redgrave, Autodesk

15    licensees pay a single price to the copyright holder at the outset of the transaction.  Like

16    the License, the Redgrave Contract severely restricts the use and transfer of the copy.[6]

---

[5] Autodesk provides evidence that its policies at one time required the return of older software to
Autodesk as a condition of upgrading, rather than the destruction of the older software as in the
License.  Suppes Decl. ¶¶ 18-19.  Autodesk is free to demand any consideration it wishes for
software upgrades.  Unless its customers *choose* to upgrade, however, Autodesk has no right to
demand either the return of older copies of the software or their destruction.  Thus, neither the
upgrade policy reflected in the License nor previous versions of that policy alter the court's
conclusion that Autodesk had no right to regain possession of the software copies it transfers.

[6] Seeking more analysis of the importance of the copyright holder's express retention of title in a
license, the court directed the parties to prepare supplemental briefing.  Dkt. # 66.  Among other
things, the court asked Autodesk to address any of its business practices other than the license
consistent with retention of title.  In response, Autodesk pointed out that it takes measures to
enforce the prohibition on transfer of software by assigning a unique authorization code to each
licensed copy of the software, and revealing that code only to registered licensees.  Autodesk
insists that this measure strengthens its argument that it has retained ownership of those copies,
but the court disagrees.  Although Autodesk may be serious about enforcing its transfer ban,
there is no indication that the film studios in *Wise* were any less serious.  As both Autodesk and
the studios know, measures to enforce transfer bans are not likely to succeed against a
determined licensee.  CTA circumvented Autodesk's measures by simply writing authorization
codes on the software copies it sold to Mr. Vernor.

28    ORDER – 13

1    But, like the panel in *Wise*, this court concludes that the License transferred ownership of

2    the software copy despite those restrictions.

3            The court's conclusion, moreover, would be the same even if the Redgrave

4    Contract did not contain an express reservation of title to the film print to the studio.  If

5    the Redgrave Contract had no such clause, then the *Wise* panel had no occasion to

6    consider an agreement that both retained the copyright holder's title in transferred copies

7    *and* permitted the transferee to retain the copies indefinitely.  In this court's view,

8    retaining title in a copy is meaningless unless the copyright holder has some means to

9    regain possession of the copy.  *Wise* requires the court to look at a transaction

10   holistically, and the court finds no basis for the conclusion that an agreement to permit

11   perpetual possession of property can be construed as reserving ownership.  Autodesk's

12   attempt to establish the common understanding of "ownership" by citing a legal

13   dictionary equating ownership with *unrestricted* ownership is consistent neither with

14   *Wise* nor with common understanding.  Autodesk Mot. (Dkt. # 49) at 10.  For example, a

15   person who buys a home is nonetheless restricted in his use and subsequent transfer of

16   the home by property laws, zoning ordinances, and fair housing statutes.  No one would

17   characterize the person's possession, however, as something other than ownership.

18   Similarly, the court cannot characterize Autodesk's decision to let its licensees retain

19   possession of the software forever as something other than a transfer of ownership,

20   despite numerous restrictions on that ownership.

21           Autodesk did not regain ownership of the software copies it transferred to CTA

22   when it upgraded CTA's software.  Instead, years after Autodesk transferred ownership

23   of the software copies to CTA, CTA agreed to destroy the copies as consideration for a

24   discounted upgrade to new software.  *See supra* Part III.B & n.5.  As the court concluded

25   in its prior order, "[t]here is no basis to distinguish this transaction from the salvage

26   transactions that were found to be sales in *Wise*."  *Vernor*, 555 F. Supp. 2d at 1170 n.5.

27   Indeed, although the AutoCAD 2000 license that CTA accepted in 2002 gave Autodesk

28   ORDER – 14

1    many options to ensure that CTA had complied with its destruction requirement, none of

2    those options permitted Autodesk to regain possession of any AutoCAD 14 copy.  Supp.

3    LaHaie Decl., Ex. A.

4         Autodesk also suggests that it can distinguish its License from the agreements in

5    *Wise* because it is a computer software agreement, and should be judged in the context of

6    the software industry.  In *Wise*, industry practices have at least some relevance.  550 F.2d

7    at 1190 (noting "testimony of studio representatives knowledgeable about the film

8    distribution system").  Yet despite a film industry that "generally [did] not sell films, but

9    rather license[d] their use for limited purposes and for limited periods of time," *id.* at

10   1184, the *Wise* panel found transfers of ownership when the terms of a transfer agreement

11   warranted that conclusion.  Put differently, no amount of evidence of industry practice

12   can overcome the plain terms of an agreement.  Moreover, the court has little competent

13   evidence of software industry practice.  Autodesk presents evidence that "licensing" is

14   the predominant method of software transfer, but it largely ignores the important

15   question, which is whether those licenses transfer ownership.  Autodesk presents no

16   evidence of the terms of other company's licenses.  It does not take the position that no

17   other company transfers ownership of its software, nor would it have any evidentiary

18   foundation for doing so.  Its expert witness, Mr. Nimmer, argues that software companies

19   take a restrictive view of whether they transfer ownership of software companies.  The

20   court has no doubt that software companies prefer to reserve as much control over copies

21   as the law and the market will permit, but that preference bears little on the issue before

22   the court.  Although Autodesk correctly observes that film print is a much more

23   expensive medium than a compact disk, it does not explain how this distinction favors its

24   position.  Mr. Vernor was able to sell the "cheap" Autodesk compact disk for hundreds of

25   dollars, just like the resale of the films in Wise.  The value of the copy is determined not

26   primarily by the medium, but rather by the content the medium carries.

27

28   ORDER – 15

1    Ultimately, although there are many distinctions between the film prints in *Wise*,

2    Autodesk's AutoCAD disks, and the industries in which they are transferred, those

3    distinctions do not make a difference for purposes of answering the copyright question

4    before the court.  The court will address the possibility that there is a statutory difference

5    between ownership of software copies and ownership of other copyrighted copies in *infra*

6    Part III.D.2.  The court turns now to the *MAI* Trio.

### 2.    The *MAI* Trio: More Deference to a Copyright Holder's Characterization of a Transfer Agreement as a Mere License

8    More than 25 years after *Wise*, the *MAI* panel took a more deferential view of the

9    characterization of a transfer of copyrighted material as a mere license.  The transfer

10   agreement in *MAI* was a license that restricted the use of software.[7]  *MAI*, 991 F.2d at 517

11   n.3.  The defendant in *MAI* was not a licensee, but rather a repair service that serviced

12   computer systems on which licensed software had been installed.  *Id.* at 513.  The *MAI*

13   panel was mainly concerned with whether the repair technicians' use of the computers

14   entailed making an unauthorized copy of the software.  *Id.* at 517-19.  In a one-sentence

15   footnote, the panel stated that because "MAI licensed its software, the [customers to

16   whom it licensed the software] do not qualify as 'owners' of the software and are not

17   eligible for protection under § 117."  *Id.* at 518 n.5.[8]  The panel did not cite *Wise*.

18   In *Triad*, a panel again confronted a copyright infringement claim against a repair

19   service, this time considering three versions of a software transfer agreement.  In the first,

20   the copyright holder "sold its software outright."  64 F.3d at 1333.  In the second version,

---

[7] In *Vernor*, this court stated that the software license in *MAI* had "no restrictions on resale" of the software.  555 F. Supp. 2d at 1172 (citing *MAI*, 991 F.2d at 517 n.3).  Although no one has challenged that statement, the court notes that the license contained a clause requiring the licensee to "keep the Software . . . confidential and not make [it] available to others . . . .".  *MAI*, 991 F.2d at 517 n.3 (ellipses and bracketed material in original).  This may be a restriction on resale, although the *MAI* court had no occasion to elaborate on that issue.

[8] Mr. Vernor dismisses the *MAI* footnote as dicta, but the court disagrees.  Had the *MAI* panel not rejected the licensees' claim to ownership, the licensees could have relied on § 117 to authorize the repair technicians to copy the software in the ordinary use of their computers.  *See Triad*, 64 F.3d at 1333 & n.3.

28   ORDER – 16

it "began licensing" the software and prohibited duplication of the software or use of the software by third parties. *Id.* In the third, it added a requirement that licensees pay a "transfer fee" to sell computer systems on which the software had been installed. *Id.* The court concluded that customers who acquired software under the first agreement "own[ed] their software," and thus had the right under § 117 to authorize repairs. *Id.* at 1333 & n.3. Transferees under the second and third agreements could not use § 117 to authorize repairs, and thus the panel implicitly held that they were mere licensees. *Id.*

Most recently, in *Wall Data*, another panel considered the § 117 defense of a computer software user. The transfer agreement in question prohibited the installation of the software in "multiple computer" or networked "multiple user arrangement[s]," and permitted transfers of the software between computers under the transferee's control only once every 30 days. *Wall Data*, 447 F.3d at 775 n.5. The agreement did not otherwise restrict resale or disposition of the software. *Id.* at 775 n.5. The transferee, a large sheriff's department, purchased licenses permitting it to install approximately 3600 copies of the software. *Id.* at 774. It instead installed copies of the software on more than 6000 computers, but used a password system to ensure that no more than 3600 users could access the software at one time. *Id.* at 774-75. The *Wall Data* panel rejected the licensee's attempt to invoke § 117 for two independent reasons. First, it followed *MAI* in concluding that a licensee who obtains a software copy with a license that "makes it clear that she or he is granting only a license to the copy of the software" and "imposes significant restrictions on the purchaser's ability to redistribute or transfer that copy" is "not an owner" of the copy. *Id.* at 785. It also cited *MAI* for the proposition that "if a software developer retains ownership of every copy of software, and merely licenses the use of those copies, § 117 does not apply." *Id.* Second, the panel held that even if the licensee could rely on § 117, it could not establish that its installation of more than 2000 unauthorized copies of the software was an "essential step" in the use of the software, as § 117(a)(1) requires. As the court noted in *Vernor*, the court cannot characterize either of

ORDER – 17

1   *Wall Data*'s twin holdings as dicta.  555 F. Supp. 2d at 1172 n.7 (citing *Woods v.*

2   *Interstate Realty Co.*, 337 U.S. 535, 537 (1949)).  The *Wall Data* panel explained,

3   however, that it had declined to revisit *MAI* despite substantial criticism from

4   commentators and lower courts because the second of its two holdings made "any error

5   [in the first holding] harmless."  *Wall Data*, 447 F.3d at 786 n.9.

6           If the court were to follow the *MAI* Trio, Autodesk would prevail.  Mr. Vernor

7   appears to concede as much, as he scarcely addresses the three cases in his briefs.

8   Although the distinction between a transfer of ownership of a software copy and a mere

9   license is barely discussed in *MAI* and *Triad*, those panels suggest that the mere labeling

10  of a transfer agreement as a license is sufficient to ensure that the licensee does not have

11  ownership of any copy of the software.  The *Wall Data* holding is more flexible:

12          Generally, if the copyright owner makes it clear that she or he is granting
            only a license to the copy of software and imposes significant restrictions
13          on the purchaser's ability to redistribute or transfer that copy, the purchaser
            is considered a licensee, not an owner, of the software.

14  447 F.3d at 785.  Coupling that holding to the panel's deference to *MAI*, however, the

15  court would have to conclude that the Autodesk License did not transfer ownership of

16  any software copy to CTA.

17          Having examined the conflict between *Wise* and the *MAI* Trio, the court notes that

18  Autodesk's expert witness, Mr. Nimmer, disagrees with the court's interpretation of those

19  cases.  His declarations highlight those disagreements.  *See*, *e.g.*, Nimmer Decl. (Dkt.

20  # 60) ¶ 11 ("These restrictions [in the License] are more than sufficient to clarify that

21  CTA did not become an owner of the copy."), ¶ 13 ("CTA was never an owner of the

22  software it received pursuant to the [License].").  Autodesk acknowledged at oral

23  argument that Mr. Nimmer's legal conclusions do not bind the court.  Stripped of legal

24  conclusions and conclusory statements that support those conclusions, the court queries

25  what remains of Mr. Nimmer's declarations.  As the court has already noted in Part

26

27

28  ORDER – 18

1  III.C.1, Mr. Nimmer's general description of software licensing practices does not

2  overcome the language of the Autodesk License.

3    While Autodesk asks the court to defer to Mr. Nimmer's views, it does not

4  acknowledge that those views have proven malleable.  In *SoftMan Prods. Co. v. Adobe*

5  *Sys. Inc.*, 171 F. Supp. 2d 1075, 1089 (C.D. Cal. 2001), the court concluded that a

6  software manufacturer transferred ownership of copies of its software despite its claim

7  that it had merely licensed their use.  The *SoftMan* court noted that numerous

8  commentators had taken the same position, including Mr. Nimmer:

9     Merely labeling a transaction as a lease or license does not control.  If a
   transaction involves a single payment giving the buyer an unlimited period
10     in which it has the right to possession, the transaction is a sale.  In this
   situation, the buyer owns the copy regardless of the label the parties use for
11     the contract. . . . The pertinent issue is whether, as in a lease, the user may
   be required to return the copy to the vendor after the expiration of a
12     particular period.  If not, the transaction conveyed not only possession, but
   also transferred ownership of the copy.

13  *Id.* at 1086 (citing Raymond T. Nimmer, *The Law of Computer Technology* § 1.18[1] p.

14  1-103 (2d ed. 1992)).  In *DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354

15  (Fed. Cir. 1999), Mr. Nimmer was of counsel to the party in Mr. Vernor's position,

16  claiming to have acquired ownership of a copy of copyrighted software.  The *DSC* court,

17  citing a later edition of the treatise cited above, dismissed Mr. Nimmer's view of

18  licensing as "overly simplistic."  *Id.* at 1362. (citing R. Nimmer, *The Law of Computer*

19  *Technology* § 1.24[1] at 1-143 to 1-144 (3d ed. 1997)).  In subsequent updates of Mr.

20  Nimmer's book, his position has changed to one consistent with his opinions in this

21  litigation.  *E.g.*, R. Nimmer, *The Law of Computer Technology* § 1.115 p. 1-300 to 1-306

22  (3d ed., Jun. 2006 update), § 1.110 p. 1-268 to 1-269 (4th ed. 2009) (praising *DSC*

23  opinion).  The court has no explanation for Mr. Nimmer's change in viewpoint, other

24  than Autodesk's presumably lighthearted speculation at oral argument that Mr. Nimmer

25  "got smart."

26

27

28  ORDER – 19

1    The views of commentators like Mr. Nimmer are helpful in illuminating different

2    perspectives on legal issues, and no doubt come from people who have devoted more

3    study to those issues than the court.  Nonetheless, the court is neither permitted nor

4    inclined to defer to Mr. Nimmer's view of licensing law and practices, any more than it

5    could defer to the supportive views of other commentators.  *See*, *e.g.*, William F. Patry,

6    *Patry on Copyright* § 13:25 at 13-56 to 13-57 (2009) (praising *Vernor* decision); Melville

7    B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.12[B][1][d][i] p 8-160.4 to 8-

8    164 (rev. ed. 2008) (criticizing court decisions holding that licenses did not transfer

9    ownership of software copies).

10    **D.    *Wise* and the *MAI* Trio Conflict Irreconcilably; This Court Must Follow *Wise*.**

11    With two sets of conflicting precedent before the court, the question becomes

12    which to follow.  That question, at least, has a simple answer.  The court must follow the

13    oldest precedent among conflicting opinions from three-judge Ninth Circuit panels.

14    *United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005).  This court is loath,

15    however, to apply this rule unless there is no way to avoid the conflict between the

16    opinions.  As was the case in the prior order, the court finds the conflict unavoidable.

17    **1.    Despite Autodesk's Suggestion, the Court Cannot Reconcile *Wise* with
          the *MAI* Trio.**

18

19    Autodesk argues that the *Wall Data* court's first holding can be reconciled with

20    *Wise*.  This contention does not address *MAI* or *Triad*.  It also does not address the

21    Redgrave Contract.  In this court's view, the *Wall Data* panel would have found the

22    Redgrave Contract to be a mere license, contrary to the result in *Wise*.  More to the point,

23    a faithful application of *Wall Data* leads to the conclusion that the Autodesk License is a

24    mere license, whereas *Wise* leads to the opposite conclusion.

25    **2.    The Text of § 109 and § 117 And Their Legislative Histories Suggest
          that "Owner" Has The Same Meaning in Both Statutes.**

26    *Wise* construed the statutory predecessor to § 109, whereas each opinion in the

27    *MAI* Trio construes § 117.  It is possible, then, that "owner" has a different meaning in

28    ORDER – 20

1    each statute.  Even on a casual analysis, this is unlikely.  The court has already noted the

2    presumption that identical terms within the same statute have the same meaning.  *Vernor*,

3    555 F. Supp. 2d at 1173 & n.8.  At least in their briefs, Mr. Vernor and Autodesk agree

4    that the phrases "owner of a copy" in § 117 and "owner of a particular copy" in § 109

5    have the same meaning.  Autodesk Mot. (Dkt. # 49) at 2-3, 13-14.  At oral argument,

6    Autodesk retreated from this position, suggesting that the court could reach the

7    anomalous result that *Wise* and § 109 permit Mr. Vernor to sell the AutoCAD packages

8    whereas the *MAI* Trio and § 117 deny him and the persons to whom he sells the right to

9    use the software.[9]  This result is far from satisfactory.

10    A more detailed review of the legislative history, moreover, strongly suggests that

11    "owner" has the same meaning in § 117 and § 109.  *Cf. Baker v. Delta Air Lines, Inc.*, 6

12    F.3d 632, 637 (9th Cir. 1993) (noting that precedent loses binding force when

13    "subsequent legislation" undermines it).  *Wise* relied on § 27 of a prior incarnation of the

14    Copyright Act, the statutory predecessor to § 109.  When Congress comprehensively

15    revised copyright law's statutory framework in the Copyright Act of 1976, it added

16    § 109.  S. 22, 94th Cong., 90 Stat. 2541, 2548-49 (1976).  Both the House and Senate

17    Reports on the 1976 Act confirm that Section 109 merely preserved the first sale doctrine

18    as it had "been established by the court decisions of section 27 of the present law."  H.R.

19    Rep. No. 94-1476 at 79 (1976); S.R. Rep. No. 94-474 at 71 (1975).  What was then

20    subsection (c) of § 109, and is now subsection (d), furthered the preservation of existing

21    law by emphasizing that the first sale doctrine did not "extend to any person who has

22    acquired possession of the copy or phonorecord from the copyright owner by rental,

23    ---

[9] In support of this suggestion, Autodesk pointed to *MDY*, where an Arizona court considered a dispute that required it only to resolve the application of § 117, not § 109.  Although the defendant urged that court to follow this court's decision in *Vernor*, the court declined, ruling that *Wise* did not address § 117, and thus it was bound to follow the *MAI* Trio.  *MDY Indus.*, 2008 U.S. Dist. LEXIS 53988 at *30-31 & n.7.  The court also noted that it was "not at all clear that the result in this case would be different even if the court were to follow *Wise*," because the *Wise* court found no transfer of ownership in each case in which the licensor retained title in any copies transferred.  *Id.* at *30-31 n.7.  This court interprets *Wise* differently, for the reasons stated in *supra* Part III.C.1

28    ORDER – 21

1   lease, loan, or otherwise without acquiring ownership of it." S. 22, 94th Cong., 90 Stat.

2   2541, 2549 (1976).

3           In the Copyright Act of 1976, § 117 bore little resemblance to its current form. S.

4   22, 94th Cong., 90 Stat. 2541, 2565 (1976). Instead, § 117 acted as a placeholder,

5   preserving then-existing law regarding the copyrightability of computer software until the

6   Commission on New Technological Uses ("CONTU") finished a "thorough study of the

7   emerging patterns in this field and . . . recommend[ed] definite copyright provisions to

8   deal with the situation." H.R. Rep. No. 94-1476 at 116 (1976); S.R. Rep. No. 94-473 at

9   99-100 (1975). CONTU's recommendations came a few years later, leading to the

10  enactment of the first modern version § 117 in 1980. H.R. 6933, 96th Cong., 94 Stat.

11  3015, 3028-29 (1980). Congress made only one change to CONTU's statutory language.

12  CONTU had recommended that § 117's privilege to make copies of computer software

13  be extended to any "rightful possessor" of the software. *Krause v. Titleserv, Inc.*, 402

14  F.3d 119, 122 (2d Cir. 2005) (citing CONTU Report). Congress "changed the term

15  'rightful possessor' to 'owner' but did not explain its reason." *Id.*   The amended version

16  of the statute was discussed at legislative hearings. No member of Congress commented

17  on the reasons for the change. One person testifying at the hearings argued that the

18  "rightful possessor" language was preferable, because a "lessee" of a computer program

19  has the same need to copy a computer program during use as an owner. Industrial

20  Innovation and Patent and Copyright Law Amendments, Hearing on H.R. 6933, 6934,

21  3806, & 2414 Before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice

22  of the H. Comm. on the Judiciary, 96th Cong., 2d Sess., at 635-36 (1980) (testimony of

23  H. Manbeck). Others either had no comment on the change or remarked on it favorably

24  without discussing the distinction between a "rightful possessor" and an "owner." *E.g.,*

25  *id.* at 42-44, 700, 903. Congress ultimately enacted § 117 with the "owner of a copy"

26  language, and there is no suggestion that its adoption of the language in existing § 109

27  was accidental. Like the enactment of § 109, the enactment of § 117 preserved prior

28  ORDER – 22

1    judicial interpretations of the "owner" of a copyrighted copy.  *See Krause*, 402 F.3d at

2    123 (concluding that Congress did not intend a "narrow, formalistic definition of

3    ownership dependent on title").

4        Moreover, Congress declined to amend the "owner" language even as it amended

5    § 117 and § 109 to keep pace with new technology.  Confronted with a rise in

6    commercial software rental, software producers successfully lobbied Congress to amend

7    § 109 to bar software rental.  *See* The Computer Software Rental Amendments Act of

8    1988, Hearing on S. 2727 Before the Subcomm. on Patents, Copyrights and Trademarks

9    of the H. Comm. on the Judiciary, 100th Cong., 2d sess., at 2-3 (1988) (introductory

10   statement of Sen. Hatch).  Software "rental" companies would purchase software for

11   hundreds of dollars and then rent it for a few days for a much lower price.  *Id.* ("The most

12   obvious rationale for such a practice is to facilitate the unauthorized copying of this

13   program.").  The amendments to § 109 declared that no "person in possession of a

14   particular copy of a computer program" could dispose of the copy "by rental, lease, or

15   lending or by any other act or practice in the nature of rental, lease, or lending" for

16   "direct or indirect commercial advantage."  H.R. 5316, 104 Stat. 5089, 5134-35 (1990)

17   (enacting 17 U.S.C. § 109(b)(1)(A)).  Congress left the "owner" language undisturbed in

18   §109(a).[10]

19       Almost a decade after Congress amended § 109 to address new developments in

20   the software industry, it amended § 117 as well.  This time, the amendment favored users

21   of computer software rather than copyright holders.  As part of the Digital Millennium

22   Copyright Act, Congress amended the law to undo the result of cases like *MAI* and *Triad*.

---

[10] One court explains that software licensing originated as a means to circumvent the first sale
doctrine to prevent rental of computer software.  *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939
F.2d 91, 96 n.7 (3d Cir. 1991).  Much like Autodesk, those early licensors "characterized the
original transaction between the software producer and the software rental company as a license,
rather than a sale, and by making the license personal and non-transferable, software producers
hoped to avoid the reach of the first sale doctrine . . . ."  *Id.*  Congress amended § 109 to
specifically address software rental, but has never, so far as the court is aware, addressed
licensing in reference to either § 109 or § 117.

28   ORDER – 23

1   It added subsections (c) and (d) to § 117 to permit owners of machines containing "an

2   authorized copy of a computer program" to duplicate that copy in the process of repairing

3   or maintaining the machine.  H.R. 2281, 105th Cong., 2d Sess., 112 Stat 2860, 2886-87

4   (1998).  Again, Congress did not disturb the "owner of a copy" language in § 117(a).

5         The legislative history of § 109 and § 117 informs the court's decision in several

6   respects.  First, as the court noted, it suggests that "owner" not only had the same

7   meaning when both sections were enacted, but that the meaning was that ascribed to the

8   term in decisions like *Wise*.  Congress did not amend the term "owner" when amending

9   the statutes.  Second, the legislative history reveals not only that Congress has modified

10   § 117 and § 109 to specifically address computer software, but that when it does so, its

11   modifications are not subtle.  This makes it even more improbable that Congress ascribes

12   two different meanings to "owner."  Third, the legislative history shows that despite

13   incentive and opportunity to modify the term "owner," Congress has not done so.  For

14   example, rather than amend § 109 to add a new section barring software rental, Congress

15   could simply have changed the "owner" language to indicate that software licensees were

16   not owners, thereby placing the right to control rental in the hands of licensors.  Instead,

17   it enacted a specific prohibition on software rental.  Similarly, rather than expand the

18   meaning of "owner" when enacting the repair amendments to § 117, Congress enacted a

19   specific expansion of the right to authorize software copies for the purpose of repair.

20        **3.**     **The Court Cannot Choose Between *Wise* and the *MAI* Trio Based on which Result is the Best Policy.**

21

22         The lack of legislation addressing computer licensing leads the court to conclude

23   with a discussion of the policy concerns that the parties have raised.  Autodesk argues

24   that this court's interpretation of "owner" will harm consumers and software producers

25   alike.  It suggests, for example, that software prices would rise if producers had to

26   confront the possibility of resale, and that resale promotes piracy.  Mr. Vernor contends

27

28   that Autodesk's preferred interpretation of "owner" would give copyright holders of all

ORDER – 24

1    stripes the ability to destroy secondary markets for their works by the simple expedient of

2    declaring transfers of copies of their works to be "licenses" rather than sales.  For

3    example, a book publisher could transfer its wares pursuant to licenses retaining title and

4    barring resale or use by other parties, effectively eliminating not only the secondhand

5    market, but preventing a library from lending the book as well.

6         These contentions make for interesting debate.  Autodesk's suggestion that

7    consumers will be harmed by rising retail prices if software producers compensate for the

8    resale market does not address the concomitant price benefit in the form of reduced resale

9    prices.  Although Autodesk would no doubt prefer that consumers' money reaches its

10   pockets, that preference is not a basis for policy.

11        Autodesk's claim that Mr. Vernor promotes piracy is unconvincing.  Mr. Vernor's

12   sales of AutoCAD packages promote piracy no more so than Autodesk's sales of the

13   same packages.  Piracy depends on the number of people willing to engage in piracy, and

14   a pirate is presumably just as happy to unlawfully duplicate software purchased directly

15   from Autodesk as he is to copy software purchased from a reseller like Mr. Vernor.  The

16   court notes, moreover, that even if CTA had never opened its AutoCAD packages, never

17   installed the software on its computer, and thus never raised the possibility of piracy,

18   Autodesk would still take the position that CTA's resale of those packages was a

19   copyright violation.

20        Mr. Vernor's fear of the destruction of established resale markets also seems

21   misplaced.  The court notes, for example, that widespread piracy of musical recordings

22   from compact disks has not led the music industry to adopt a restrictive licensing regime

23   like the one Autodesk advocates.

24        There is much more to say about such policy debates, but the court's decision

25   today is not based on any policy judgment.  Congress is both constitutionally and

26   institutionally suited to render judgments on policy; courts generally are not.  The parties'

27   policy concerns might be of heightened importance had the Ninth Circuit not already

28   ORDER – 25

1  addressed the dispositive legal questions in *Wise* and the *MAI* Trio.  Precedent binds the

2  court regardless of whether it would be good policy to ignore it.  The court has followed

3  *Wise* solely for the reasons stated in this order, not because of any policy judgment.

4         Although the interpretation of "owner" in the Copyright Act no doubt has

5  important consequences for software producers and consumers, the court is skeptical that

6  its ruling today will have far-reaching consequences.  As the court observed in its earlier

7  opinion, courts across the nation have issued rulings that adopt and reject the equivalent

8  of the parties' positions here.  *Vernor*, 555 F. Supp. 2d at 1174 (citing rulings from courts

9  in California, New York, and Utah).  Since that opinion, at least two more courts have

10  joined the cacophony.  The *MDY* court favored the copyright holder, whereas the court in

11  *UMG Recordings* favored the consumer.  Software producers and consumers alike find

12  ways to meet their needs despite these contrary rulings.  Additionally, the court notes that

13  this case is not about whether licensors like Autodesk can use licenses to control the use

14  and transfer of software copies.  Nothing in this order prohibits any licensing practice.

15  Instead, it places Autodesk's licensing efforts in the realm of contract law, rather than

16  copyright law.  Although Autodesk and other licensors might prefer the statutory

17  remedies and federal forum that a copyright claim provides, there is no suggestion that

18  state law remedies are inadequate.  Indeed, in this case, Autodesk has demonstrated

19  convincingly its ability to obtain a remedy against licensees like CTA who violate its

20  license.  Autodesk's has merely been deprived of additional copyright remedies against

21  Mr. Vernor.

22  **E.    Mr. Vernor Has Not Proven Copyright Misuse.**

23         Mr. Vernor also raises the possibility that Autodesk's attempts to prevent his sales

24  constitute copyright misuse.  As Mr. Vernor conceded at oral argument, copyright misuse

25  is an equitable defense to copyright infringement that has received little judicial attention.

26  The Ninth Circuit has confirmed that copyright misuse is a viable defense, *Practice*

27  *Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997), but has not

28  ORDER – 26

1   elaborated on the contours of the defense.  At least one district court has held that a

2   copyright holder's attempt to claim infringement in disregard of the Copyright Act's

3   limited exceptions to infringement can be copyright misuse.  *Shloss v. Sweeney*, 515 F.

4   Supp. 2d 1068, 1081 (N.D. Cal. 2007) (denying motion to dismiss claim of misuse based,

5   *inter alia*, on copyright holder's assertion that author could not invoke fair use defense).

6   Mr. Vernor, however, has offered little argument or authority to support his misuse

7   allegations.

8           In light of the court's ruling today, Mr. Vernor cannot currently benefit from

9   demonstrating copyright misuse.  The remedy for copyright misuse is to deny the

10  copyright holder the right to enforce his copyright during the period of the misuse.

11  *Practice Mgmt.*, 121 F.3d at 520 n.9.  Because Mr. Vernor has prevailed in his claim that

12  Autodesk's copyright does not prevent him from reselling his AutoCAD packages, a

13  misuse remedy is of no value to him.  The court thus declines to resolve his copyright

14  misuse allegations.

15                                    **IV.  CONCLUSION**

16          For the reasons stated above, the court DENIES Autodesk's motion for summary

17  judgment (Dkt. # 49) and GRANTS Mr. Vernor's motion (Dkt. # 54) except to the extent

18  it seeks a judgment that Autodesk engaged in copyright misuse.  The court directs the

19  clerk to enter judgment for Mr. Vernor.

20          DATED this 23rd day of October, 2009.

21

22

23

24  The Honorable Richard A. Jones
    United States District Judge

25

26

27

28  ORDER – 27